## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CALVERT M. WILSON, an individual, 1905 2nd Street, NE, Washington, DC 20002, (202) 386-4971 | * * * * | Case No.: _____ |
| Plaintiff, | * * | VERIFIED COMPLAINT FOR:  (A) |
| v. | * * * | DECLARATORY AND INJUNCTIVE RELIEF; (B) BREACH OF CONTRACT; (C) FRAUD; (D) CONSUMER PROTECTION |
| HOME-SAVERS, LLC, a foreign limited liability company; 1905 2nd STREET, NE, LLC, a limited liability company;  LUTHER HECTOR, an individual; and BARRETT WARE, an individual, | * * * * * | VIOLATIONS; (E) UNJUST ENRICHMENT; AND (F) OTHER RELATED RELIEF |
| | * | JURY TRIAL DEMANDED |
| Defendants. | * * * | |
| *********************************** | * | |

Plaintiff Calvert M. Wilson ("Wilson" or "Plaintiff") for his Verified Complaint against

Defendants Home Savers, LLC, 1905 2nd Street, NE, LLC, Luther Hector, and Barrett Ware

(collectively, the "Home Savers Group"), hereby avers:

### PRELIMINARY STATEMENT

1.    This action also seeks to remedy an unconscionable predatory lending and equity

stripping scheme by the Home Savers Group under which Defendants advanced $30,525.14 on

Wilson's behalf during November 2004, without first seeking Bankruptcy Court approval, to

stop what Plaintiff believes was a wrongfully noticed foreclosure sale of the 2nd Street Property

by ABN AMRO Mortgage Group, Inc. ("ABN AMRO" or the "Mortgage Company"), the law

firm of Friedman & MacFayden, PA and certain of its attorney (collectively, the "Friedman Law Firm").[1]

2.    The Home Savers Group has now recorded or otherwise filed certain documents, <u>without prior notice to Plaintiff and against Plaintiff's will</u>, with the D.C. Recorder of Deeds indicating that Wilson allegedly sold the 2nd Street Property to Defendants on November 9, 2005 for $166,000.  *See generally* Declaration of Calvert M. Wilson, a true and correct copy of which is attached hereto as Exhibit "1".

3.    There was no real estate sale by and between Wilson and Defendants involving the 2nd Street on November 9, 2005 or any other date.  Rather, the Home Savers Group recorded alleged sale and related documents with the D.C. Recorder of Deeds because Wilson has resisted demands that he repay the high costs associated with the unlawful HOEPA loan including the $30,525.14 principal, 20% interest and 50% of the equity in Plaintiff's house, i.e., an amount equal to or exceeding $125,000.

4.    The loan terms and conditions extended by Home Savers to Wilson for the express purpose of averting foreclosure by ABN AMRO and the Friedman Law Firm are harsh, oppressive, inequitable unfair and unconscionable.

5.    In sum, defendant Home Savers (via its 1905 2nd Street, NE, LLC affiliate) apparently can acquire fee simple ownership and title to the 2nd Street Property (a property then worth $379,000 circa November 2004, and now worth over $425,000) for a mere $30,525.14 absent rescission of the transaction or other appropriate relief by this Court.

---

[1] Plaintiff presently is prosecuting claims against ABN AMRO and the Friedman Law Firm in a related action before this Court under Civil Action No. 05-CV-0108 JDB (D.D.C.).  Among others claims, Plaintiff contends that he was forced to accept HOEPA loan to stop the improperly noticed foreclosure sale of the 2nd Street Property by ABN AMRO and the Friedman Law Firm.

6.    Defendants' on-going misconduct against Plaintiff constitutes predatory lending in violation of federal and District of Columbia law.

7.    Defendants' misconduct, selectively or cumulatively, also was so outrageous that it rises to the level of fraud, ill will, recklessness or willful disregard of Plaintiff's rights.

8.    Absent immediate judicial intervention, Wilson will lose ownership, possession and control of the 2nd Street Property.

## THE PARTIES

9.    Plaintiff Calvert M. Wilson is a resident of the District of Columbia, and fee simple owner of the 2nd Street Property.

10.    On information and belief, defendant Home Savers is a privately-held, foreign limited liability company that holds itself out as a foreclosure expert or specialist firm that "helps" Maryland, Virginia and the District of Columbia homeowners avoid losing their homes through bank or mortgage company foreclosures by providing short-term, distressed, consumer loans to cure or reinstate the original mortgage loans.

11.    On further information and belief, Home Savers derives its customer and prospect lists by combing the public records and media-driven foreclosure notices to identify property owners, and then making direct contact with those homeowners concerning Defendants' "special loan program".

12.    On information and belief, 1905 2nd Street, NE, LLC is a special purpose entity (or "SPE") that was formed by or at the direction of co-defendants Home Savers, Luther Hector and/or Barrett Ware to facilitate the HOEPA loan to Wilson. On further information and belief, 1905 2nd Street, NE, LLC is owned, controlled or the alter ego of co-defendants Home Savers, LLC and its members, Luther Hector and/or Barrett Ware.

3

13.   On information and belief, defendant Luther Hector is an adult resident of the metropolitan District of Columbia area.  Defendant Luther Hector is a member, officer, director, employee or principal agent of defendants Home Savers, LLC and 1905 2nd Street, NE, LLC, who holds himself out as a "foreclosure specialist".

14.   On further information and belief, defendant Luther Hector is not a *licensed* mortgage broker, loan officer or financial advisor in the District of Columbia.

15.   On information and belief, defendant Barrett Ware is an adult resident of the metropolitan District of Columbia area.   Defendant Ware is a member, officer, director, employee or principal agent of defendants Home Savers, LLC and 1905 2nd Street, NE, LLC, who holds himself out as a "foreclosure specialist".

16.   On further information and belief, defendant Barrett Ware is not a *licensed* mortgage broker, loan officer or financial advisor in the District of Columbia.

17.   On further information and belief, defendants Luther Hector and Barrett Ware have had direct contact with Wilson, representatives of ABN AMRO, representatives of the Friedman Law Firm, and representatives of non-parties brokers and financiers (e.g., Allstate Lending, Finance America and/or New Century Mortgage), with whom Wilson sought to refinance the HOEPA loan at various intervals during calendar year 2005.

18.   Although not named individually as defendants in this action, Wilson is informed and believes that above-named Defendants were aided, abetted and/or counseled in their misconduct, which caused significant harm to Plaintiff, by as yet unidentified persons or entities during the relevant time frame. Wilson hereby reserves the right to amend, revise or otherwise supplement this Verified Complaint to the extent third parties or non-parties are identified during the course of this action that contributed, in whole or part, to Plaintiff's losses.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this matter under the laws of the United States pursuant to 28 U.S.C. §§ 1331 and 2201, and 15 U.S.C. §§ 1601 *et seq.*, and 15 U.S.C. §§ 1602(aa) *et seq.*

20.    Plaintiff notes further that before filing this action, he sought the entry of an Order granting leave to Amend the First Amended Complaint in Related Case No. 05-CV-0108 (JDB) involving ABN AMRO and the Friedman Law Firm to add the Home Savers Group as co-defendants in that action. By Memorandum Opinion and Order dated December 21, 2005 in Case No. 05-CV-0108 (JDB), this Court determined that although federal jurisdiction existed over the claims asserted against Defendants herein, misjoinder principles precluded the addition of these Defendants in Case No. 05-CV-0108 (JDB).

## GENERAL ALLEGATIONS

### A.    Plaintiff Acquires the 2nd Street Property

21.    At all relevant times, Wilson was the fee simple owner of the 2nd Street Property.

22.    The 2nd Street Property is a residential dwelling located in Northeast, Washington, DC.

23.    Notwithstanding Defendants' misconduct (including the improper recordation of sham land sale documents) Plaintiff remains in exclusive possession of the 2nd Street Property as of this date.

24.    Plaintiff's ownership difficulties began when Standard Federal Bank, an affiliate of ABN AMRO, refused to provide loss mitigation options to Plaintiff during a serious period of physical pain and rehabilitation.  As a result, Wilson was forced to file a voluntary Petition for Relief under Chapter 13 of the Bankruptcy Code on January 16, 2001 (the "Petition Date").

25.    Defendants were on notice that Plaintiff was a Chapter 13 Debtor at the time of the HOEPA loan transaction.

**B.    ABN AMRO's arbitrarily alters Plaintiff's P&I Amount, without notice, and issues numerous Foreclosure Notices**

26.    During the pendency of the Chapter 13 Proceeding, Plaintiff made payments directly to the ABN AMRO or its predecessor in interest, at first by check, and then later via Western Union wire transfer until March 2004.

27.    For some unknown reason, ABN AMRO stopped accepting payments from Wilson during April 2004.

28.    Thereafter, Plaintiff made a series of attempts to work with the ABN AMRO to reconcile his account, including his compilation and delivery of cancelled checks and Western Union receipts to ABN AMRO and the Friedman Law Firm to no avail.

29.    After returning from a trip to Florida during the summer 2004, Plaintiff received correspondence from the Friedman Law Firm indicating that Wilson was in default, and further, that the ABN AMRO was planning to foreclose of the 2nd Street Property.

30.    All or substantially all of the ABN AMRO notices contains a "Mini-Miranda" warning as required by the federal Fair Debt Collection Practices Act.

31.    Among other things, ABN AMRO also claimed in the Bankruptcy Court that it has not received any payments from Plaintiff since March 12, 2002.

32.    The ABN AMRO foreclosure notice that was sent by the Friedman Law Firm to Wilson expressly provides that unless Plaintiff tendered immediately available funds totaling $21,740.72, by September 22, 2004, foreclosure proceedings would occur on the 2nd Street Property.

33.    In an effort to rectify the discrepancy, Plaintiff immediately began making a series of inquiries and attempted inquiries with the Friedman Law Firm as Plaintiff was permitted to do under federal and District of Columbia law.

34.    Plaintiff made it clear to the Friedman Law Firm that time was of the essence in obtaining feedback from ABN AMRO on the discrepancies with his mortgage account.

35.    Thereafter, Plaintiff and his agents made a series of follow-up communications, including letters and telephone calls to the Friedman Law Firm attempting to obtain information on the status of the debt validation activities.

36.    Neither ABN AMRO nor the Friedman Law Firm ever provided the required debt validation information to Plaintiff before he sought emergency injunctive relief from the Bankruptcy Court.

**C.    Wilson was victimized by Defendants' Predatory Behavior**

37.    On September 17, 2004, Plaintiff filed an emergency motion for a Section 105 injunction to prevent ABN AMRO from attempting to improperly foreclose against the 2nd Street Property.

38.    On October 7, 2004, the U.S. Bankruptcy Court for the District of Columbia heard oral arguments on Plaintiff's emergency motion (the "Injunction Hearing").  At the conclusion of the stay hearing, the Bankruptcy Court denied Plaintiff's motion for emergency stay.

39.    On October 8, 2004, one day after learning that the Bankruptcy Court denied Wilson's emergency motion, Defendants persuaded Wilson to grant them permission to make inquiries about his mortgage with ABN AMRO and the Friedman Law Firm.  A true and correct copy of the Authorization Form is attached hereto as Exhibit "2".

40.    On October 18, 2004, ABN AMRO (via the Friedman Law Firm) improperly and inexplicably issued two (2) different cure amounts for the same foreclosure notice:  the first to the Home Savers Group indicating that Wilson's reinstatement amount was $21,128.29; and the second to Plaintiff indicating that the cure amount was $27,535.14.  True and correct copies of the conflicting Cure Amounts are attached hereto as composite Exhibit "3" hereto.

41.    The sum and substance of ABN AMRO's and the Friedman Law Firm's misconduct as described in Paragraph 39 above was to make it virtually impossible for Wilson to vindicate his rights, all of which left him further imperiled at Defendants' whim.

42.    Between November 5th and November 17, 2004, Plaintiff worked diligently to obtain accurate account balance and cure amount information from ABN AMRO and the Friedman Law Firm to no avail.

43.    During this critical time frame, ABN AMRO and the Friedman Law Firm either refused or were unable to provide Plaintiff with an actual cure amount for the 2nd Street Property.

44.    During or about the same time, the Home Savers Group was lying in wait for Plaintiff and making contemporaneous inquiries with ABN AMRO and/or the Friedman Law Firm presumably in an attempt to obtain reinstatement figures for the Wilson's mortgage on the 2nd Street Property.

45.    Although Wilson believed that the Home Savers Group was "working with him" to reinstate his mortgage account with ABN AMRO, on information and belief, Defendants actually were seeking the information with the hidden motive of finding out precisely how *little* money Defendants would have to pay to acquire "ownership" of the 2nd Street Property.

46.    Specifically, the only reinstatement amount(s) that Defendants agreed to provide were estimates for periods that may or may not have included the day of the scheduled foreclosure sale.  For example, as of November 5, 2004, the cure amount allegedly was $26,262.88.

47.    By the end of Plaintiff's November 2004 inquiry, Defendants advised that the cure amount was back up to $27,535.14.  The foregoing amount was supposed to be accurate until the date of the scheduled foreclosure on the 2nd Street Property, i.e., November 17, 2004.

48.    Nonetheless, Defendants once again refused to be bound the account information in its own foreclosure notice and raised the number by an extra $3,000 the day before the scheduled foreclosure sale, or $30,525.14.

49.    As such, in a final attempt to avert foreclosure, Plaintiff was forced to obtain a HOEPA loan from the Home Savers Group.

50.    The HOEPA loan that Plaintiff was forced to obtain to save his 2nd Street Property would have been totally unnecessary but for the unlawful acts and omissions of ABN AMRO and the Friedman Law Firm Defendants.

51.    On November 16, 2004, the day before the scheduled Foreclosure of the 2nd Street Property, defendant Barrett Ware attempted to deliver a Cashier's Check to counsel for ABN AMRO to satisfy the alleged cure amount of $27,535.14.

52.    Much to Plaintiff's dismay, ABN AMRO and the Friedman Law Firm refused to accept the Cashier's Check allegedly on the grounds that the cure amount some how had increased "at the eleventh hour" by $3,000.

53.    Defendants' artificially increased the cure amount by $3,000 under false pretenses or with a reckless indifference for whether the inflated cure amount was true or false, with the intent that Plaintiff would rely to his detriment on that misinformation.

54.    To date, Plaintiff has never received any written verification from ABN AMRO or the Friedman Law Firm of a new cure amount, or for that matter, how the new $3,000 figure was derived.

55.    On information and belief, the "new" $3,000 increase, <u>announced on the day before the scheduled foreclosure</u>, was in furtherance of Defendants' illicit scheme to foreclose on the 2nd Street Property by any means necessary.

56.    Plaintiff also is informed and believes that the cure amount was increased artificially in retaliation for appealing the Bankruptcy Court's Order and otherwise preventing ABN AMRO from obtaining the 2nd Street Property.

57.    Nonetheless, Plaintiff relied to his detriment on ABN AMRO's and the Friedman Law Firm's false and materially misleading statements regarding his mortgage account by, among other things, taking out the HOEPA loan and further encumbering his 2nd Street Property.

58.    As part of the "special loan program" Home Savers required Wilson execute numerous "loan documents", one of which happens to be an actual deed to the house.

59.    The execution of this combination of land records and loan documents was orchestrated by Home Savers and its agents to increase their leverage over Wilson, and bolster Home Savers prospects for "taking over" the 2nd Street Property if Wilson did not cooperate with their demands.

60.    Notwithstanding its promises of the refinancing assistance, the Home Savers Group has not provided any material assistance to Wilson in his efforts to refinance the mortgage debt on the 2nd Street Property.

61.    In sum, defendant Home Savers (via its 1905 2nd Street, NE, LLC affiliate) apparently can acquire fee simple ownership and title to the 2nd Street Property (a property then worth

$379,000 circa November 2004, and now worth nearly $425,000) for a mere $30,525.14 absent rescission of the transaction or other appropriate relief by this Court.

62.    On November 17th, defendant Barrett Ware of the Home Savers Group appeared at the location of the scheduled Foreclosure Sale, and delivered two Cashier's Checks in the amount of $27,535.14, and $3,000.00, respectively, to Kenneth J. MacFayden, Esq. of the Friedman Law Firm to reinstate Wilson's mortgage loan with ABN AMRO.

### D.    Home Savers Group uses the HOEPA Loan to strip  Wilson's Equity in the 2nd Street Property and frustrate Plaintiffs refinancing efforts

63.    At all relevant times, the Home Savers Group knew Wilson was a Debtor under Chapter 13 bankruptcy proceedings when it approached Plaintiff concerning the feasibility of making a HOEPA loan to avert the noticed foreclosure on the 2nd Street Property.

64.    On or about November 17, 2004, defendant Home Savers (acting through its principal agents, Barrett Ware and Luther Hector) advanced $30,525.14 on Wilson's behalf to stop the wrongful foreclosure of the 2nd Street Property by ABN AMRO and the Friedman Law Firm.

65.    The $30,525.14 advance made by the Home Savers Group on Wilson's behalf was a consumer loan transaction related to a real estate mortgage finance transaction.

66.    To induce Wilson to enter into its "special loan program", beginning in September 2004, Home Savers' representatives, co-defendants Luther Hector and Barrett Ware promised, verbally over the telephone and face-to-face to "work with Wilson" to help him save the 2nd Street Property from wrongful foreclosure and "guaranteed" Wilson that he would be able to refinance the Note on the 2nd Street Property if he accepted the HOEPA loan.

67.    Defendant Home Savers and its affiliates knew at the time they approached Wilson concerning its "special loan program" that the 2nd Street Property was under a cloud of foreclosure.

68.    Defendants also knew when they approached Wilson concerning an emergency loan that Wilson was desperate to save his house from involuntary loss.

69.    Finally, and perhaps most significantly, Defendants knew when they pursued Wilson concerning the "special loan program" that the value of 2nd Street Property vastly exceeded the outstanding balance of ABN AMRO's Note, i.e., there was substantial equity in Wilson's property at the time of the HOEPA loan transaction.  A true and correct copy of the most recent Appraisal of the 2nd Street Property is attached hereto as Exhibit "4".

70.    The emergency loan made by Home Savers to Wilson is a high interest; high finance charge loan that is based on the value of Wilson's equity in the 2nd Street Property.

71.    The Home Savers Group made the HOEPA loan and insisted that Wilson execute numerous documents in connection therewith, including a deed to his house, without first seeking Bankruptcy Court approval of this atypical, emergency loan transaction.

72.    The loan documents utilized by Home Savers in connection with the HOEPA loan are attached hereto as composite Exhibit "5".

73.    At the time of Home Savers initial contacts with Wilson, the 2nd Street Property was worth $379,000, and the Note on the property was approximately $82,000.

74.    To increase its leverage over Wilson as part of the "special loan program", Home Savers required Wilson execute numerous "loan documents", one of which just happens to be an actual deed to the house.

75.    Before signing the "loan documents", as an additional inducement to commit to the transaction, Wilson was assured by co-defendant Barrett Ware that the documents were a formality because Home Savers would not even make a short-term loan to distressed homeowner, like Wilson, unless it first confirmed that its own established network of mortgage lenders would be ready, able and willing to refinance the Note on the property.

76.    On information and belief, the Home Savers Group did not have an established network of mortgage lenders that were ready, able and willing to refinance loans to customers in the Home Savers portfolio at the direction or on the instruction of Home Savers.

77.    These and related representations by the Home Savers Group were false or materially misleading when made to Wilson, with the design and intent that Wilson rely on of such misinformation to execute all the documents for the short-term loan arrangement.

78.    During July and August 2005, Home Savers and its affiliates began to exercise some of its leverage against Wilson by improperly interfering with Wilson's attempt to refinance the entire debt on the 2nd Street Property.

79.    Specifically (and at all relevant times), Wilson advised Home Savers that he would be attempting to refinance the mortgage on the 2nd Street Property as soon as he received a Discharge in his Chapter 13 Bankruptcy Case.  The D.C. Bankruptcy Court entered an Order of Discharge in Wilson's Chapter 13 case on July 1, 2005.

80.    Shortly thereafter, Wilson began working with Allstate Lending to make arrangements to refinance the 2nd Street Property.  Wilson gave notice of these good faith efforts to refinance the mortgage debt to Home Savers.

81.    As a lender, Home Savers only obligation was to provide a good pay-off figure to Allstate Lending or its representatives so that the underwriting and documenting functions of the refinancing could be completed by the end of August 2005.

82.    Home Savers was on notice that a prompt summer 2005 refinancing was critical because ABN AMRO had mysteriously continued to withhold excess sums in Wilson's escrow account and given notice that it intended to increase his monthly mortgage payment beginning in September 2005.

83.    Although Home Savers knew that Wilson was working with Allstate Lending on a refinancing package, Home Savers, led by co-defendant Luther Hector, made numerous, albeit unauthorized, contacts with Allstate Lending or its affiliates and proceeded to provide false or materially misleading information to Allstate Lending or its affiliate Finance America concerning Wilson's relationship with ABN AMRO, as well as to demand that Allstate Lending cease certain parts of its work on Wilson's refinancing package so that its own professionals and affiliates could further increase their nearly 400% yield on the short-term transaction by assuming control of the title work and settlement of the refinancing for Wilson's house.

84.    On August 5, 2005, Wilson's attorney sent a cease & desist letter to co-defendants Home Savers and Hector requesting that they stop interfering with the known business relationship between Wilson and Allstate Lending. A true and correct copy of the first C&D Letter is attached hereto as Exhibit "6".

85.    All these unauthorized contacts interrupted the normal business relationship between Wilson and Allstate Lending and ultimately led to a decision that Finance America would terminate or suspend further dealings with Wilson, i.e., Home Savers destroyed a planned refinancing that was well on its way toward consummation by the end of August 2005, thus

further jeopardizing Wilson's fee ownership in the 2nd Street Property. See September 12, 2005 letter from Allstate Lending to Wilson, a true and correct copy of which is attached hereto as Exhibit "7".

86.    Thereafter, Plaintiff pursued other refinancing alternatives. Once again Wilson's *bona fide* efforts to refinance his mortgage obligations on the 2nd Street Property were unlawfully disturbed by Defendants, including the repeated demands that Wilson's prospective lenders at New Century Mortgage violate Plaintiff's rights under the Privacy Act under the threat that Defendants would seize the 2nd Street Property if these demands were not honored.

87.    As a result, on November 8, 2005, Wilson's attorney issued a second C&D Letter to Defendants. A true and correct copy of the second C&D Letter is attached hereto as Exhibit "8".

**E.    Defendants records sham land records and interferes with Wilson's Ownership Rights**

88.    Without prior notice or written demand to Plaintiff, on or after November 9, 2005, Defendants apparently recorded certain land sale documents with the D.C. Recorder of Deeds purporting to show that Wilson had sold all his right, title and interest in the 2nd Street Property to the Home Savers Group.

89.    There was no such land sale agreement or closing by and between Plaintiff and Defendants on November 9, 2005 or any other time.

90.    Thereafter, by letter dated January 7, 2006, Defendants gave written notice to the other residents of the 2nd Street Property to the other residents of the 2nd Street Property that they bought the 2nd Street Property from Wilson, and would be attempting to make future arrangements to re-work existing landlord-tenant relationships. A true and correct copy of Defendants' January 7, 2006 letter is attached hereto as Exhibit "9".

91. Plaintiff was made aware of this development because on or about January 7, 2006, he began receiving telephone calls from these residents expressing concern and confusion as to this alleged development.

92. Although Wilson has attempted to allay the residents' concerns about the nature and viability of their tenancies, there are no guarantees that further disruptions will not occur absent immediate judicial relief, particularly since these Defendants have shown in their past dealings with Plaintiff and other interested parties that they will do whatever they want; whenever they want, regardless of who may be adversely impacted by their misconduct. *See generally* January 12, 2006 Order, a true and correct copy of which is attached hereto as Exhibit "10".

## COUNT I

### (Declaratory Judgment versus All Defendants)

93. Plaintiff hereby incorporates all the allegations set forth in this Verified Complaint as if fully set forth herein.

94. Section 2201(a) of the Declaratory Judgment Act provides, in pertinent part: "[A]ny court of the United States, upon filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such a declaration. 28 U.S.C. § 2201(a).

95. Section 2202 of the Declaratory Judgment Act similarly provides: "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against *any* adverse party whose rights have been determined by such judgment. 28 U.S.C. § 2202.

96. The parties have a justiciable dispute concerning their respective rights, interests and obligations under written agreements.

97.   For example, the Home Savers Group induced Wilson to execute numerous loan documents, including the deed to the 2nd Street Property, as part of an emergency $30,525.14 consumer loan transaction to cure a wrongful foreclosure notice by ABN AMRO. To satisfy the emergency loan obligation, the Home Savers Group insisted that Wilson repay at least $125,000, or forfeit his fee simple ownership of the property.

98.   The loan terms and conditions extended by Home Savers to Wilson are harsh, oppressive, inequitable unfair and unconscionable.

99.   Before signing the "loan documents", as an additional inducement to commit to the transaction, Wilson was assured by co-defendant Barrett Ware that the documents were a formality because Home Savers would not even make a short-term loan to distressed homeowner, like Wilson, unless it first confirmed that its own established network of lenders would be ready, able and willing to refinance the Note on the property.

100.  On information and belief, the Home Savers Group did not have an established network of lenders that were ready, able and willing to refinance loans to customers in the Home Savers portfolio at the direction or on the instruction of Home Savers.

101.  The Home Savers Group knew its representations concerning Wilson's payback obligation under the short-term loan and the "guarantee" of refinancing by the Home Savers Group's "established network of mortgage lenders" were false or materially misleading when made to Plaintiff, or submitted such misinformation to Plaintiff with a reckless indifference as to whether the substance of these communications was true or false.

102.  The Home Savers Group also took advantage in the preparation and submission of the loan documents for the short-term loan knowing that Plaintiff would have no choice but to rely on them to his detriment because these records were prepared and transmitted for purposes of

being able to immediately seize the 2nd Street Property if Wilson refused or otherwise failed to comply with their demands.

103.  The Home Savers Group, principally, on information and belief, through co-defendants Luther Hector and Barrett Ware, also improperly erected or attempted to erect roadblocks to prevent Wilson from refinancing his mortgage obligations on the 2nd Street Property.

104.  During July and August 2005, the Home Savers Group began to exercise some of its leverage against Wilson by improperly interfering with Wilson's attempt to refinance the entire debt on the 2nd Street Property.

105.  Specifically (and at all relevant times), Wilson advised Home Savers that he would be attempting to refinance the mortgage on the 2nd Street Property as soon as he received a Discharge in his Chapter 13 Bankruptcy Case.  The D.C. Bankruptcy Court entered an Order of Discharge in Wilson's Chapter 13 case on July 1, 2005.

106.  Shortly thereafter, Wilson began working with Allstate Lending to make arrangements to refinance the 2nd Street Property.  Wilson gave notice of these good faith efforts to Home Savers.

107.  As a lender, Home Savers only obligation was to provide a good pay-off figure to Allstate Lending or its representatives so that the underwriting and documenting functions of the refinancing could be completed by the end of August 2005.

108.  The Home Savers Group undertook actions that far exceeded the scope of its authority or obligations to Wilson's detriment.

109.  The Home Savers Group was on notice that a prompt summer 2005 refinancing was critical because ABN AMRO had mysteriously continued to withhold excess sums in Wilson's

escrow account and given notice that it intended to increase his monthly mortgage payment beginning in September 2005.

110.  Although the Home Savers Group knew that Wilson was working with Allstate Lending on a refinancing package, defendant Home Savers, led by co-defendant Luther Hector, made numerous, albeit unauthorized, contacts with Allstate Lending or its affiliates and proceeded to provide false or materially misleading information to Allstate Lending or its affiliate Finance America concerning Wilson's relationship with ABN AMRO, as well as to demand that Allstate Lending cease certain parts of its work on Wilson's refinancing package so that its own professionals and affiliates could further increase their nearly 400% yield on the transaction by assuming control of any title work and/or settlement of the refinancing for the debt on the 2nd Street Property.

111.  During early August 2005, Wilson's attorney sent a cease & desist letter to co-defendants Home Savers and Hector requesting that they stop interfering with the known business relationship between Wilson and Allstate Lending.  It is now clear that the Home Savers Group refused to heed this warning, and that they did so with actual notice of the business relationship and at their own peril.

112.  All these unauthorized contacts interrupted the existing business relationship between Wilson and Allstate Lending and ultimately led to a decision that Finance America would terminate or suspend further dealings with Wilson, i.e., Home Savers destroyed a planned refinancing that was well on its way toward consummation by the end of August 2005, thus further jeopardizing Wilson's fee ownership in the 2nd Street Property.

113.  In sum, defendant Home Savers (via its 1905 2nd Street, NE, LLC affiliate) apparently can acquire fee simple ownership and title to the 2nd Street Property (a property then worth

$379,000 circa November 2004, and now worth nearly $425,000) for a mere $30,525 absent rescission of the transaction or other appropriate relief by this Court.

114.  The alleged consideration for exchange of the deed and related loan documents was grossly inadequate and unconscionable.

115.  All of the foregoing has and continues to prevent Wilson from refinancing his mortgage on the 2nd Street Property with another financial institution, or make it more difficult for Wilson to accomplish this task.

116.  The Home Savers Group is not authorized to wrongfully administer Plaintiff's emergency HOEPA loan for personal gain, or to knowingly and willfully take action that deprives Plaintiff's ability to exercise his legal rights under applicable law.

117.  The Home Savers Group on-going misconduct against Wilson constitutes predatory lending and abusive loan administration practices.

118.  If left unchecked, the Home Savers Group's misconduct will trigger a set of circumstances that will lead to the immediate loss of the 2nd Street Property.

119.  On further information and belief, defendant Luther Hector is not a *licensed* mortgage broker, loan officer or financial advisor in the District of Columbia.

120.  There is a legal dispute concerning whether the Home Savers Group's special financing program and related loan administration activities are permissible under applicable federal and District of Columbia law, including whether the Home Savers Group's misconduct constitutes unlawful trade practices and infringed on Plaintiff's ownership interests and equity in the 2nd Street Property in the District of Columbia.

121. Plaintiff also seeks a determination from this Court that the Home Savers Group's misconduct, selectively or cumulatively, was so outrageous that it rises to the level of fraud, ill will, recklessness or willful disregard of Plaintiff's rights.

122. The Declaratory Judgment Act authorizes this Court to make findings of fact and conclusions of law when litigants have a dispute concerning the nature of written agreements, including real estate loans, and the legal interpretation of the terms therein as it affects the rights, interests and obligations of the parties thereto.

WHEREFORE, on Count I of his Verified Complaint, plaintiff Calvert M. Wilson respectfully prays for this Court to declare that: (a) the short-term loan that the Home Savers Group made to Wilson is a HOEPA loan that was based on the equity in Plaintiff's house; (b) it is improper for the Home Savers Group to mislead Wilson concerning the terms and conditions of the HOEPA loan, including representations concerning the guarantee that Wilson would be able to refinance his debt obligations on the 2nd Street Property if he consummated the emergency loan; (c) it is unlawful for the Home Savers Group to pursue finance charges and interest that equal or exceed four times the original principle amount of the emergency real estate loan; (d) the Home Savers Group will be unjustly enriched by receipt of repayment on the express terms of the HOEPA loan or title to the 2nd Street Property, either of which far exceed any amounts expended to finance the emergency loan to Wilson; (e) the HOEPA loan (including the requirement that Plaintiff sign a deed or comparable document for a $30,535.14 loan) is unconscionable, and thus, can be voided by Plaintiff; (f) the Home Savers Group did not provide any material assistance to Wilson in his efforts to refinance the mortgage on the 2nd Street Property; (g) injunctive relief to prevent Defendant from exercising or attempting to exercise ownership or control over the 2nd Street Property; and (h) Wilson is entitled to reasonable

attorney's fees and costs given the extreme nature of the circumstances here, together with such further relief favoring Wilson as this Court deems just and proper under the circumstances.

## COUNT II

**(Violations of TILA and HOEPA versus Home Savers, LLC and 1905 2nd Street, NE, LLC)**

123.  Wilson hereby incorporates the all the allegations set forth in this Verified Complaint as if fully set forth herein.

124.  During mid-November 2004, the Home Savers Group advanced $30,525.14 on Wilson's behalf to stop the foreclosure sale of the 2nd Street Property by ABN AMRO and the Friedman Law Firm.

125.  The Home Savers loan to Wilson is a high interest; high finance charge HOEPA loan that calls for Wilson to repay the principal amount, plus at least four times the amount of the original principal balance of the loan, i.e., $125,000.

126.  The Home Savers Group's advance on Wilson's behalf was a consumer loan transaction related to a real estate mortgage transaction.

127.  The HOEPA loan that was used to reinstate ABN AMRO's Note for the 2nd Street Property and related emergency loan documents are written instruments that involve interests that touch or concern the real property.

128.  For example, the Home Savers Group induced Wilson to execute numerous loan documents, including the deed to the 2nd Street Property, as part of the emergency, $30,525.14 consumer loan transaction to cure a wrongful foreclosure notice by ABN AMRO. To satisfy the HOEPA loan, the Home Savers Group insists that Wilson repay $125,000, or forfeit his fee simple ownership of the property.

129.  The loan terms and conditions extended by Home Savers to Wilson are harsh, oppressive, inequitable unfair and unconscionable.

130.  The Home Savers Group also took advantage in the preparation and submission of the loan documents for the HOEPA loan because Defendants are a lender of last resort that knows Plaintiff (and consumers under the same or similar circumstances) had no choice but to rely on them to his detriment because these loan documents were prepared and transmitted to Wilson for purposes of being able to immediately seize the 2nd Street Property if Plaintiff refused or otherwise failed to comply with their demands.

131.  Notwithstanding its promises of the refinancing assistance, the Home Savers Group has not provided any material assistance to Wilson in his efforts to refinance the mortgage debt on the 2nd Street Property.

132.  In sum, defendant Home Savers (via its 1905 2nd Street, NE, LLC affiliate) apparently has now recorded documents with the D.C. Recorder of Deeds that purports to grant Defendants title to the 2nd Street Property (a property then worth $379,000 circa November 2004, and now worth over $425,000) for a mere $30,525.14 absent rescission of the transaction or other appropriate relief by this Court.

133.  Defendants conduct in connection with the emergency real estate loan violates the HOEPA amendments to the federal Truth in Lending Act, and is otherwise illegal and/or unconscionable under applicable District of Columbia law.

134.  The Home Savers Group on-going misconduct against Wilson constitutes predatory lending and abusive collection practices.

135.  There is a legal dispute concerning whether the Home Savers Group's special financing program and related loan administration activities are permissible under applicable federal and

District of Columbia law, including whether the Home Savers Group's misconduct constitutes unlawful trade practices and infringed on Plaintiff's ownership interests and equity in the 2nd Street Property in the District of Columbia.

136. The Home Savers Group also has failed to deal fairly and act in good faith with respect to its post-bankruptcy dealings with Wilson.

137. As a direct and proximate result of the Home Savers Group's misconduct, Wilson has and will continue to suffer damages, including the imposition of exorbitant finance charges to prevent Wilson's immediate forfeiture of the 2nd Street Property to the Home Savers Group or its affiliates.

WHEREFORE, on Count II of his Verified Complaint, plaintiff Calvert M. Wilson respectfully prays for a judgment in his favor and against Home Savers, LLC and 1905 2nd Street, LLC under TILA and HOEPA to rescind the parties' agreement or reform the parties' agreement consistent with actual performance and the circumstances surrounding the transaction, together with reasonable attorney's fees and costs, and such further relief favoring Wilson as this Court deems just and proper.

## COUNT III

### (Breach of Contract versus Home Savers, LLC and 1905 2nd Street, NE, LLC)

138. Wilson hereby incorporates the all the allegations set forth in this Verified Complaint as if fully set forth herein.

139. During mid-November 2004, the Home Savers Group advanced $30,525.14 on Wilson's behalf to stop the foreclosure sale of the 2nd Street Property by ABN AMRO and the Friedman Law Firm.

140. The terms and conditions of Defendants' advance to Wilson was memorialized in writing and augmented by verbal promises and assurances as to the manner in which the loan would administered.

141. The Home Savers loan to Wilson is a high interest; high finance charge HOEPA loan that calls for Wilson to repay the principal amount, plus at least four times the amount of the original principal balance of the loan, i.e., $125,000.

142. The HOEPA loan that was used to reinstate ABN AMRO's Note for the 2nd Street Property and related short-term loan documents are written instruments that involve interests that touch or concern the real property.

143. The Home Saver Group did not seek Bankruptcy Court approval before the HOEPA loan documents were signed by Wilson or the HOEPA loans funds were advanced on Wilson's behalf.

144. Plaintiff is informed and believes that this covert lending practice by Defendants was knowing and intentional, and in direct conflict with Bankruptcy Code.

145. Nonetheless, as with any contractual agreement, co-defendants Home Savers, LLC and 1905 2nd Street, NE, LLC owe duties good faith and fair dealing to Wilson in terms, conditions and loan administration activities, including a duty to deal honestly and legally with Plaintiff concerning the nature and extent of his obligations under the short-term loan mortgage.

146. For example, the Home Savers Group induced Wilson to execute numerous loan documents, including the deed to the 2nd Street Property, as part of the emergency, $30,525.14 consumer loan transaction to cure a wrongful foreclosure notice by ABN AMRO. To satisfy the HOEPA loan, the Home Savers Group insists that Wilson repay $125,000, or forfeit his fee simple ownership of the property.

147. The loan terms and conditions extended by Home Savers to Wilson are harsh, oppressive, inequitable unfair and unconscionable.

148. As an additional inducement to commit to the transaction, Before signing the "loan documents", Wilson was assured by co-defendant Barrett Ware that the documents were a mere formality because Home Savers would not even make an emergency loan to a distressed homeowner, like Wilson, unless Defendants first confirmed that their own established network of lenders would be ready, able and willing to refinance the Wilson's obligation on the 2nd Street Property.

149. On information and belief, the Home Savers Group did not have an established network of lenders that were ready, able and willing to refinance loans to customers in the Home Savers portfolio at the direction or on the instruction of Home Savers.

150. The Home Savers Group knew its representations concerning Wilson's repayment obligations under the short-term loan and the "guarantee" of refinancing by the Home Savers Group's "established network of mortgage lenders" were false or materially misleading when made to Plaintiff, or submitted such misinformation to Plaintiff with a reckless indifference as to whether the substance of these communications was true or false.

151. The Home Savers Group also took advantage in the preparation and submission of the loan documents for the HOEPA loan because Defendants are a lender of last resort that knows Plaintiff (and consumers under the same or similar circumstances) had no choice but to rely on them to his detriment because these loan documents were prepared and transmitted to Wilson for purposes of being able to immediately seize the 2nd Street Property if Plaintiff refused or otherwise failed to comply with their demands.

152.  Notwithstanding its promises of the refinancing assistance, the Home Savers Group has not provided any material assistance to Wilson in his efforts to refinance the mortgage debt on the 2nd Street Property in material breach of their promises to Plaintiff.

153.  In sum, defendant Home Savers (via its 1905 2nd Street, NE, LLC affiliate) apparently has now recorded documents with the D.C. Recorder of Deeds that purports to grant Defendants title to the 2nd Street Property (a property then worth $379,000 circa November 2004, and now worth over $425,000) for a mere $30,525.14.

154.  The terms and conditions of Defendants' emergency loan to Wilson are unconscionable or inequitable.

155.  Wilson is informed and believes that Defendants will take affirmative steps to sell or pull money out of the house via refinancing absent rescission of the transaction or other appropriate injunctive relief by this Court.

156.  As a direct and proximate result of the Home Savers Group's misconduct, Wilson has and will continue to suffer damages, including the imposition of exorbitant finance charges to prevent Wilson's immediate forfeiture of the 2nd Street Property to the Home Savers Group or its affiliates.

WHEREFORE, on Count III of his Verified Complaint, plaintiff Calvert M. Wilson respectfully prays for a judgment in his favor and against Home Savers, LLC and 1905 2nd Street, LLC, jointly and severally, for breach of contract, and an order rescinding the parties' agreement or reforming the parties' agreement consistent with actual performance and the circumstances surrounding the transaction, together with reasonable attorney's fees and costs, and such further relief favoring Wilson as this Court deems just and proper.

## COUNT IV

### (Fraud versus All Defendants)

157.  Wilson hereby incorporates all the allegations set forth in this Verified Complaint as if fully set forth herein.

158.  Defendants perpetrated a fraud on Wilson for purposes of carrying out a scheme to either extort exorbitant sums of money in exchange for its modest $30,525.14 emergency loan, or to assume ownership and control over the 2nd Street Property, which was worth $379,000 at the time of the HOEPA loan transaction, and is now worth over $425,000.

159.  Among other reasons, Defendants were motivated by greed, and engaged in misconduct because the value of the 2nd Street Property is worth nearly four times the value of the Note on defendant ABAN AMRO's books (i.e., there was substantial equity in the house at the time of the transaction), and Defendants knew Wilson was desperate to save the property.

160.  To carry out this illicit scheme, Defendants used false, abusive, ruse, sham or oppressive tactics to pursue the collection of excess monies allegedly due and owing under a HOEPA loan or to accomplish Wilson's forfeiture of the extremely valuable Second Street Property.

161.  For example, the Home Savers Group induced Wilson to execute numerous loan documents, including the deed to the 2nd Street Property, as part of an emergency, $30,525.14 consumer loan to cure a wrongful foreclosure notice by ABN AMRO and the Friedman Law Firm.

162.  To satisfy the emergency loan obligation, the Home Savers Group demanded that Wilson repay at least $125,000 for the modest HOEPA loan, or forfeit his fee simple ownership of the 2nd Street Property.

163. The loan terms and conditions extended by the Home Savers Group to Wilson are harsh, oppressive, inequitable unfair and unconscionable.

164. As an additional inducement to commit to the transaction, Before signing the "loan documents", Wilson was assured by co-defendant Barrett Ware that the documents were a formality because Home Savers would not even make a short-term loan to distressed homeowner, like Wilson, unless it first confirmed that its own established network of lenders would be ready, able and willing to refinance the Note on the property.

165. On information and belief, the Home Savers Group did not have an established network of lenders that were ready, able and willing to refinance loans to customers in the Home Savers portfolio at the direction or on the instruction of Home Savers.

166. The Home Savers Group knew its representations concerning Wilson's payback obligation under the short-term loan and the "guarantee" of refinancing by the Home Savers Group's "established network of mortgage lenders" were false or materially misleading when made to Plaintiff, or submitted such misinformation to Plaintiff with a reckless indifference as to whether the substance of these communications was true or false.

167. The Home Savers Group also took advantage in the preparation and submission of the loan documents for the emergency consumer loan knowing that Plaintiff would have no choice but to rely on them to his detriment because these records were prepared and transmitted for purposes of being able to immediately seize the 2nd Street Property if Wilson refused or otherwise failed to comply with their demands.

168. Defendants representations to Wilson concerning the terms and conditions of the "special loan program" were false or materially misleading.

169. Defendants made the foregoing misrepresentations to Wilson concerning emergency HOEPA loan with scienter to wit: Defendants knew their representations to Wilson and any related material omissions of fact were false; or Defendants representations concerning the "special loan program" were made with a reckless disregard for the truth of the statements and Plaintiff's interests.

170. Defendants knowingly and willfully made the foregoing false and materially misleading representations to Wilson concerning the HOEPA loan with the purpose and intent that Plaintiff would rely on these misrepresentations and accept the one-sided HOEPA loan under distress circumstances.

171. Wilson reasonably and justifiably relied to his detriment on Defendants' representations concerning the terms, conditions and administration of the HOEPA loan.

172. Plaintiff actually relied on the Home Savers Group's false and materially misleading statements in entering into the emergency loan to save the 2nd Street Property from foreclosure.

173. In sum, defendant Home Savers (via its 1905 2nd Street, NE, LLC affiliate) apparently can acquire fee simple ownership and title to the 2nd Street Property (a property then worth $379,000 circa November 2004, and now worth nearly $425,000) for a mere $30,525.14 absent rescission of the transaction or other appropriate relief by this Court.

174. The alleged consideration for exchange of the deed and related loan documents was grossly inadequate and unconscionable.

175. Defendants' misconduct, selectively or cumulatively, was so outrageous that it rises to the level of fraud, ill will, recklessness or willful disregard of Plaintiff's rights.

176. As a direct and proximate result of ABN AMRO's actions, Wilson has been traumatized, humiliated, embarrassed, suffered loss of sleep, intense stress, and emotional distress and deprived of the quiet ownership, use and enjoyment of his 2nd Street Property.

WHEREFORE, on Count IV of his Verified Complaint against Defendants for fraud, plaintiff Calvert M. Wilson respectfully prays for a determination that Defendants are liable, jointly and severally, for fraud and deceit in the origination, administration and collection activities related to the 2nd Street Property that caused him record ownership of the 2nd Street Property, significant compensatory and punitive damages in an amount to be proven at trial, together with interest, reasonable attorney's fees and costs, and such further relief favoring Wilson as this Court deems just and proper.

## COUNT V

### (Unjust Enrichment versus all Defendants)

177. Wilson hereby incorporates all the allegations set forth in this Verified Complaint as if fully set forth herein.

178. Defendants made a HOEPA loan to Wilson that calls for the repayment of, among other things, high interest and costs, or the forfeiture of the 2nd Street Property.

179. In the course of administering this emergency loan, the Home Savers Group took advantage of Wilson by: (a) preying on him when his house was under a cloud of foreclosure, making frequent and unjustified demands for Plaintiff's personal information and money after the HOEPA loan was made; (b) thwarting Plaintiff's attempts to refinance the mortgage loan obligations on 2nd Street Property, including the harassment of prospective lenders and brokers that Defendant knew were doing business or attempting to do business with Plaintiff; (c) improperly recording sham land sale and related documents with the D.C. Recorder of Deeds

claiming ownership of the 2nd Street Property; and (d) making contact with other residents at the 2nd Street Property to advise them, among other things, that any payments due and owing to Plaintiff should be re-directed to the Home Savers Group as a result of the alleged land sale.

180.  By virtue of the foregoing, Defendants have unjustly enriched themselves by asserting acts of ownership against the 2nd Street Property, including the recordation of sham land sale records with the D.C. Recorder of Deeds, and making claims to monies from other residents of the 2nd Street Property to which Defendants are not entitled at law or in equity.

181.  Defendants have accomplished the unjust enrichment by engaging or instructing their agents to engage in false, abusive, ruse, sham or oppressive tactics to pursue title to the 2nd Street Property or the collection of extraordinary sums of money allegedly due and owing to Defendants under the HOEPA loan.

182.  As a direct and proximate result of Defendants' misconduct, Wilson is being deprived of the quiet ownership, use and enjoyment of his 2nd Street Property and all the related incidents of ownership thereto.

WHEREFORE, on Count V of his Verified Complaint for Unjust Enrichment, plaintiff Calvert M. Wilson respectfully prays for a judgment in his favor and against the Defendants by declaring that the Home Savers Group has been unjustly enriched in its dealings with Plaintiff in connection with the 2nd Street Property, including the loan fees and costs allegedly due under the HOEPA loan, attorney's fees and costs given the unique circumstances here to clear title to the 2nd Street Property, together with such further relief favoring Wilson as this Court deems just and proper under the circumstances.

## COUNT VI

### (DCCPPA Violations versus All Defendants)

183. Wilson hereby incorporates all the allegations set forth in this Verified Complaint as if fully set forth herein.

184. The District of Columbia Consumer Protection Procedures Act, as codified at D.C. Code Ann. §§ 28-3901 *et seq.* ("DCCPA"), declares it an "***unlawful trade practice***" for a person to "make or enforce unconscionable terms or provisions of ***sales or leases***."

185. Section 28-3904 of the DCCPA provides, in relevant part:

It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to:

(e) misrepresent as to a material fact which has a tendency to mislead;

(f) fail to state a material fact if such failure tends to mislead; and

(r) to make or enforce unconscionable terms or provisions of sales or leases.

186. The DCCPA applies to all real estate finance transactions.

187. A violation of the federal TILA and the HOEPA Amendments thereto constitutes a *per se* violation of the DCCPA.

188. Defendants knowingly and intentionally provided false or materially misleading information to Plaintiff regarding his mortgage account for purposes of carrying out a scheme to wrongfully foreclose on the 2nd Street Property.

189. Among other reasons, Defendants engaged in misconduct because the value of the 2nd Street Property is worth nearly four times the value of the Note on defendant ABN AMRO's books, i.e., Wilson had substantial equity in his house.

190. To carry out this illicit scheme, Defendants used false, abusive, ruse, sham or oppressive tactics to pursue the collection of monies allegedly due and owing under the HOEPA

loan, or to seize the 2nd Street Property in the event Wilson did not accede to all Defendants demands.

191. Defendants unlawful acts and omissions include, but are not limited to: (a) issuing false or materially misleading information concerning the terms and conditions of the HOEPA loan; (b) engaging in abusive collection practices against Wilson, including repeated telephone calls for personal information or exorbitant repayment demands during all hours of the day; (c) interfering with Wilson's efforts to refinance his mortgage obligations on the 2nd Street Property, including intentionally making false or material misleading statements to prospective refinanciers and mortgage brokers; (d) recording sham land sale records with the D.C. Recorder of Deeds; and (e) interfering with or harassing other residents of the 2nd Street Property under the guise that Defendants bought the 2nd Street Property from Plaintiff.

192. Defendants' misconduct is so outrageous that it rises to the level of fraud, ill will, recklessness or willful disregard of Plaintiff's rights.

193. As a direct and proximate result of ABN AMRO's actions, Wilson has been traumatized, humiliated, embarrassed, suffered loss of sleep, intense stress, and emotional distress and deprived of the quiet ownership, use and enjoyment of his 2nd Street Property.

WHEREFORE, on Count VI of his Verified Complaint for violations of the District of Columbia Consumer Protection Procedures Act, plaintiff Calvert M. Wilson respectfully prays for a determination that Defendants are liable, jointly and severally, for engaging unfair lending and abusive debt collection practices in connection with a consumer real estate loan, and to award Plaintiff a judgment for compensatory damages, treble damages and punitive damages, together with reasonable attorney's fees, costs, interest and such further relief favoring Wilson as this Court deems just and proper under the circumstances.

## COUNT VII

### (Tortious Interference versus All Defendants)

194.  Wilson hereby incorporates the all the allegations set forth in this Verified Complaint as if fully set forth herein.

195.  The Home Savers Group loan $30,525.14 to Wilson for the express purpose of averting foreclosure of the 2nd Street Property by ABN AMRO and the Friedman Law Firm.

196.  The Home Savers loan is a high interest; high finance charge loan that calls for Wilson to repay the principal amount, plus nearly four times the amount of the original principal balance of the loan, i.e., $125,000.

197.  The HOEPA loan that was used to reinstate ABN AMRO's Note for the 2nd Street Property and related short-term loan documents are written instruments that involve interests that touch or concern the real property.

198.  For example, the Home Savers Group induced Wilson to execute numerous loan documents, including the deed to the 2nd Street Property, as part of a short-term, $30,525 loan transaction to cure a wrongfully foreclosure notice by ABN AMRO. To satisfy the emergency loan obligation, the Home Savers Group insists that Wilson repay $125,000, or forfeit his fee simple ownership of the property.

199.  The loan terms and conditions extended by Home Savers to Wilson are harsh, oppressive, inequitable unfair and unconscionable.

200.  Before signing the "loan documents", as an additional inducement to commit to the transaction, Wilson was assured by defendants Luther Hector and Barrett Ware on October 8, 2005 and again on November 14, 2005 that the documents were a formality because Home Savers would not even make a short-term loan to distressed homeowner, like Wilson, unless it

first confirmed that its own established network of lenders would be ready, able and willing to refinance the Note on the property.

201. On information and belief, the Home Savers Group did not have an established network of lenders that were ready, able and willing to refinance loans to customers in the Home Savers portfolio at the direction or on the instruction of Home Savers.

202. The Home Savers Group knew its representations concerning Wilson's repayment obligations under the short-term loan and the "guarantee" of refinancing by the Home Savers Group's "established network of mortgage lenders" were false or materially misleading when made to Plaintiff, or submitted such misinformation to Plaintiff with a reckless indifference as to whether the substance of these communications was true or false.

203. The Home Savers Group also took advantage in the preparation and submission of the loan documents for the short-term loan knowing that Plaintiff would have no choice but to rely on them to his detriment because these loan documents were prepared and transmitted to Wilson for purposes of being able to immediately seize the 2nd Street Property if Plaintiff refused or otherwise failed to comply with their demands.

204. The Home Savers Group, principally, on information and belief, through co-defendant Luther Hector, also improperly erected or attempted to erect roadblocks to prevent Wilson from refinancing his mortgage obligations on the 2nd Street Property.

205. During July and August 2005, the Home Savers Group began to exercise some of its leverage against Wilson by improperly interfering with Wilson's attempt to refinance the entire debt on the 2nd Street Property.

206. Specifically (and at all relevant times), Wilson advised Home Savers that he would be attempting to refinance the mortgage on the 2nd Street Property as soon as he received a

Discharge in his Chapter 13 Bankruptcy Case.  The D.C. Bankruptcy Court entered an Order of Discharge in Wilson's Chapter 13 case on July 1, 2005.

207.  Shortly thereafter, Wilson began working with Allstate Lending to make arrangements to refinance the 2nd Street Property.  Wilson gave notice of these good faith efforts to Home Savers.

208.  As a lender, Home Savers only obligation was to provide a good pay-off figure to Allstate Lending or its representatives so that the underwriting and documenting functions of the refinancing could be completed by the end of August 2005.

209.  The Home Savers Group undertook actions that far exceeded the scope of its authority or obligations under applicable law all to Wilson's detriment.

210.  The Home Savers Group was on notice that a prompt summer 2005 refinancing was critical because ABN AMRO had mysteriously continued to withhold excess sums in Wilson's escrow account and given notice that it intended to increase his monthly mortgage payment beginning in September 2005.

211.  Although the Home Savers Group knew that Wilson was working with Allstate Lending, Finance America and New Century Mortgage on a refinancing package(s), Defendants made numerous, albeit unauthorized, contacts with these prospective lenders and mortgage brokers or their affiliates and proceeded to provide false or materially misleading information to these organizations concerning Wilson's relationship with ABN AMRO, as well as to demand, on at least one occasion that a prospective lender cease certain parts of its work on Wilson's refinancing package so that Defendants' own professionals and affiliates could further increase their nearly 400% yield on the transaction by assuming control of any title work and/or settlement of the refinancing for the debt on the 2nd Street Property.

212. All these unauthorized contacts interrupted the existing business relationship between Wilson and Allstate Lending and ultimately led to a decision that Finance America would terminate or suspend further dealings with Wilson, i.e., Home Savers destroyed a planned refinancing that was well on its way toward consummation by the end of August 2005, thus further jeopardizing Wilson's fee ownership in the 2nd Street Property.

213. Since the termination of proposed refinance transaction with Finance America, Allstate Lending has advised Wilson that future attempts at refinancing likely will only come with an increased cost of funds.  Thus, the Home Savers Group's intentional acts and omissions have actually made it more expensive for Wilson to refinance than would have occurred but for the unlawful interference.

214. In sum, defendant Home Savers (via its 1905 2nd Street, NE, LLC affiliate) apparently can acquire fee simple ownership and title to the 2nd Street Property (a property then worth $379,000 circa November 2004, and now worth nearly $425,000) for a mere $30,525 absent rescission of the transaction or other appropriate relief by this Court.

215. The Home Savers Group's misconduct, including its on-going possession of a voidable deed to the 2nd Street Property, has triggered a set of circumstances that will lead to Wilson's immediate loss of the 2nd Street Property.

216. As a direct and proximate result of the Home Savers Group's misconduct, Wilson has and will continue to suffer compensatory damages and punitive damages, including the imposition of exorbitant finance charges to prevent Wilson's immediate forfeiture of the 2nd Street Property to the Home Savers Group or its affiliates.

WHEREFORE, on Count VII of his Verified Complaint, plaintiff Calvert M. Wilson respectfully prays for a judgment in his favor and against Defendants for knowingly and

unlawfully interfering with Wilson's business relationships for financial gain with, among

others, Allstate Lending Finance America, New Century Mortgage and the other residents of the

2nd Street Property all at Plaintiff's expense, and to award Plaintiff compensatory and punitive

damages, jointly and severally, against all Defendants in an amount to be proven at trial, together

reasonable attorney's fees, costs, interest and such further relief favoring Wilson as this Court

deems just and proper under the circumstances.

Respectfully submitted,

By: **/s/Rawle Andrews J**

Rawle Andrews Jr. (DC #436283)
ANDREWS & BOWE, PLLP
1717 K Street N.W., Suite 600
Washington, DC 20036
Office: (202) 349-3975
Fax: (410) 510-1034
Attorney for Plaintiff

Dated:  January 13, 2006

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff, by counsel, hereby demands a jury trial of all issues so triable.

**/s/Rawle Andrews J**

Rawle Andrews Jr. (DC #436283)
Counsel for Plaintiff

**VERIFICATION**

I, Calvert M. Wilson, hereby verify, under penalty of perjury that the forgoing is true and correct to the best of my knowledge, information and belief.

**/s/Calvert M. Wilson**
_____
Calvert M. Wilson, an Individual
Plaintiff

# EXHIBIT "1"

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CALVERT M. WILSON, an individual, 1905 2nd Street, NE, Washington, DC 20002, (202) 386-4971 | * * * * | Case No.: _____ |
| Plaintiff, | * * | |
| v. | * * | |
| | * | **DECLARATION OF CALVERT M.** |
| HOME-SAVERS, LLC, a foreign limited liability company; 1905 2nd STREET, NE, LLC, a limited liability company; LUTHER HECTOR, an individual; and BARRETT WARE, an individual, | * * * * * | **WILSON** |
| Defendants. | * * | |
| | * * | |
| ********************************** | * | |

I, Calvert M. Wilson, hereby declare and state under penalty of perjury as follows:

1. I am over the age of 18 years, have personal knowledge of the facts and circumstances set forth in this Declaration, and I am competent to testify on these facts and circumstances if called upon to do so.

2. I am the Plaintiff in the above captioned case, and the owner of residential real property at 1905 2nd Street, NE, Washington, DC (the "2nd Street Property").

3. The circumstances involved in this lawsuit originally arose out of difficulties my family and I have experienced in dealing with ABN AMRO Mortgage Group, Inc. ("ABN AMRO") and its outside attorneys at Friedman MacFayden, PA (the "Friedman Law Firm"), including a scheme to wrongfully foreclose on the "2nd Street Property" beginning in mid-September 2004.

4.  After receiving notice of the wrongful foreclosure sale, I was approached by Luther Hector ("Hector") and Barrett Ware (Ware) of a company called Home Savers Plus, LLC (collectively, the "Home Savers") during late September 2004.

5.  Among other things, Hector and Ware informed me that they were foreclosure specialists who could stop the foreclosure of the 2nd Street Property based on the equity in my house.

6.  I was also informed by Hector and Ware that under the Home Savers emergency loan program I had nothing to worry about if I had substantial equity in my house because the Home Savers Group had a policy of not making loans to home owners unless it was clear from their network of lenders that the borrower could refinance the mortgage obligations on the house.

7.  During the pendency of the Chapter 13 Proceeding, I made payments directly to the ABN AMRO or its predecessor in interest, at first by check, and then later via Western Union wire transfer until March 2004.  For some unknown reason, ABN AMRO stopped accepting payments from Wilson during April 2004.

8.  Thereafter, I made a series of attempts to work with the ABN AMRO to reconcile his account, including his compilation and delivery of cancelled checks and Western Union receipts to ABN AMRO and the Friedman Law Firm to no avail.

9.  After returning from a trip to Florida during the summer 2004, I received correspondence from the Friedman Law Firm indicating that Wilson was in default, and a foreclosure notice on the 2nd Street Property.

10. Among other things, ABN AMRO also claimed in the Bankruptcy Court that it has not received any payments from Plaintiff since March 12, 2002.  I know this is untrue

not only because I made the payments, but also because I know a mortgage company would not have waited 18 months to give me notice of default if I had not been making monthly mortgage payments.

11. As such, I immediately contacted representatives of the Friedman Law Firm in an attempt to resolve the situation.

12. Neither ABN AMRO nor the Friedman Law Firm ever provided the required debt validation information to Plaintiff before he sought emergency injunctive relief from the Bankruptcy Court.

13. As such, I hired an attorney and on September 17, 2004, Plaintiff filed an emergency motion for a Section 105 injunction to prevent ABN AMRO from attempting to improperly foreclose against the 2nd Street Property.  On October 7, 2004, the U.S. Bankruptcy Court for the District of Columbia held a hearing on my emergency motion. At the conclusion of the stay hearing, the Bankruptcy Court denied the motion to stay the foreclosure sale.

14. On October 8, 2004, one day after learning that the Bankruptcy Court denied Wilson's emergency motion, Defendants persuaded me to give them permission to make inquiries about his mortgage with ABN AMRO and the Friedman Law Firm.  A true and correct copy of the Authorization Form is attached as Exhibit "2" to the Verified Complaint.

15. When I inquired whether my Bankruptcy status would affect my ability to obtain the emergency loan, Hector and Ware said no because Home Savers make loans based on the home owners' equity in the house.

16. On October 18, 2004, ABN AMRO (via the Friedman Law Firm) improperly and

inexplicably issued two (2) different cure amounts for the same foreclosure notice. This issue has never been corrected or explained, which left me in an almost impossible situation while I was trying to save my house from foreclosure.

17. Between November 5th and November 17, 2004, Plaintiff worked diligently to obtain accurate account balance and cure amount information from ABN AMRO and the Friedman Law Firm to no avail.

18. During this critical time frame, ABN AMRO and the Friedman Law Firm either refused or were unable to provide Plaintiff with an actual cure amount for the 2nd Street Property.

19. During or about the same time, the Home Savers Group was lying in wait for me and making contemporaneous inquiries with ABN AMRO and/or the Friedman Law Firm presumably in an attempt to obtain reinstatement figures for the Wilson's mortgage on the 2nd Street Property.

20. Although I believed that Home Savers was working with me to reinstate his mortgage account with ABN AMRO, I now understand that Defendants actually were seeking the information with the hidden motive of finding out precisely how little money Defendants would have to pay to acquire ownership of the 2nd Street Property.

21. When ABN AMRO and the Friedman Law Firm did finally provided cure information, the reinstatement amount(s) were estimates for periods that may or may not have included the day of the scheduled foreclosure sale. For example, as of November 5, 2004, the cure amount allegedly was $26,262.88.

22. By mid-November 2004 inquiry, however, the cure amount was $27,535.14. The foregoing amount was supposed to be accurate until the date of the scheduled foreclosure

on the 2nd Street Property, i.e., November 17, 2004.

23. Nonetheless, Defendants once again refused to be bound the account information in its own foreclosure notice and raised the number by an extra $3,000 the day before the scheduled foreclosure sale, or $30,525.14.

24. As such, in a final attempt to avert foreclosure, I was forced to obtain a HOEPA loan from Home Savers.

25. Defendants also knew when they approached Wilson concerning an emergency loan that Wilson was desperate to save his house from involuntary loss.

26. Finally, and perhaps most significantly, Defendants knew when they pursued Wilson concerning the "special loan program" that the value of 2nd Street Property vastly exceeded the outstanding balance of ABN AMRO's Note, i.e., there was substantial equity in Wilson's property at the time of the HOEPA loan transaction. A true and correct copy of the most recent Appraisal of the 2nd Street Property is attached as Exhibit "4" to the Verified Complaint.

27. The emergency loan I was forced to obtain to save my 2nd Street Property would have been totally unnecessary but for the unlawful acts and omissions of ABN AMRO and the Friedman Law Firm Defendants. The loan documents utilized by Home Savers in connection with the emergency loan are attached as Exhibit "5" to the Verified Complaint.

28. On November 16, 2004, the day before the scheduled Foreclosure of the 2nd Street Property, defendant Barrett Ware attempted to deliver a $27,535.14 Cashier's Check to ABN AMRO and the Friedman Law Firm to satisfy the alleged cure amount.

29. Much to my dismay, however, ABN AMRO and the Friedman Law Firm refused

to accept the Cashier's Check allegedly on the grounds that the cure amount some how had increased "at the eleventh hour" by another $3,000.

30. Defendants' artificially increased the cure amount by $3,000 under false pretenses or with a reckless indifference for whether the inflated cure amount was true or false, with the intent that Plaintiff would rely to his detriment on that misinformation.

31. To date, I have never received any written verification from ABN AMRO or the Friedman Law Firm of a new cure amount, or for that matter, how the new $3,000 figure was calculated.

32. I believe that ABN AMRO increased the cure amount in retaliation for appealing the Bankruptcy Court's Order and otherwise preventing ABN AMRO from obtaining the 2nd Street Property.

33. I relied to my detriment on ABN AMRO's and the Friedman Law Firm's false and materially misleading statements regarding his mortgage account by, among other things, taking out the emergency loan from Home Savers and further encumbering my 2nd Street Property.

34. As part of the "special loan program", I was required to execute numerous Home Savers required Wilson execute numerous "loan documents", one of which happens to be an actual deed to the house.

35. Under the emergency loan repayment terms, I am apparently required to pay $30,525.14 principal, 20% interest and 50% of the equity in my house.

36. At the same time I was executing these loan documents, I was given assurance by Hector that the documents were a formality because the loan was based on the equity in my house, and there was more than enough value in the property to satisfy the repayment

obligations.

37. Hector and Ware also reminded me that Home Saver existing network of lenders was at the ready to help me refinance the debt, so I had nothing to worry about in accepting this loan.

38. Although I did not know it at the time, I have come to understand from recent articles in the newspaper about foreclosure scams that I was required to sign this combination of land records and loan documents was orchestrated by Home Savers so they would be in total control over either the high repayment terms of the emergency loan, or in a strong position of advantage over me in terms of taking over the 2nd Street Property if I did not cooperate with all their demands.  Copies of these newspaper articles are attached to this Declaration as Exhibit "A".

39. During July and August 2005, Home Savers and its affiliates began to exercise some of its leverage against me by improperly interfering with Wilson's attempt to refinance the entire debt on the 2nd Street Property.

40. Specifically, I advised Hector and Ware that I would be attempting to refinance the mortgage on the 2nd Street Property as soon as I received a Discharge in his Chapter 13 Bankruptcy Case.  The D.C. Bankruptcy Court entered an Order of Discharge in my Chapter 13 case on July 1, 2005.

41. Shortly thereafter, I began working with Allstate Lending to make arrangements to refinance the 2nd Street Property.  Wilson gave notice of these good faith efforts to refinance the mortgage debt to Home Savers.

42. As a lender, Home Savers only obligation was to provide a good pay-off figure to Allstate Lending or its representatives so that the underwriting and documenting

functions of the refinancing could be completed by the end of August 2005.

43. Home Savers was on notice that a prompt summer 2005 refinancing was critical because ABN AMRO had mysteriously continued to withhold excess sums in Wilson's escrow account and given notice that it intended to increase his monthly mortgage payment beginning in September 2005.

44. Although Home Savers knew that I was working with Allstate Lending on a refinancing package, Home Savers, led by co-defendant Luther Hector, made numerous, albeit unauthorized, contacts with Allstate Lending or its affiliates and proceeded to provide false or materially misleading information to Allstate Lending or its affiliate Finance America concerning my relationship with ABN AMRO, as well as to demand that Allstate Lending cease certain parts of its work on my refinancing package so that Home Savers could further increase their take on the deal by assuming control of the title work and settlement of the refinancing for Wilson's house.

45. On August 5, 2005, my attorney sent a cease & desist letter to Home Savers requesting that the company stop interfering with the known business relationship between Wilson and Allstate Lending. A true and correct copy of the first C&D Letter is attached as Exhibit "6" to the Verified Complaint.

46. All these unauthorized contacts interrupted the normal business relationship between Wilson and Allstate Lending and ultimately led to a decision that Finance America would terminate or suspend further dealings with Wilson, i.e., Home Savers destroyed a planned refinancing that was well on its way toward consummation by the end of August 2005, thus further jeopardizing Wilson's fee ownership in the 2nd Street Property. A copy of Allstate Lending's letter to me is attached hereto as Exhibit "7" to

the Verified Complaint.

47. Thereafter, Plaintiff pursued other refinancing alternatives. Once again, my good faith efforts to refinance my mortgage obligations on the 2nd Street Property were unlawfully disturbed by Defendants, including the repeated demands that my prospective lenders at New Century Mortgage violate my rights under the Privacy Act under the threat that Defendants would seize the 2nd Street Property if these demands were not honored.

48. As a result, on November 8, 2005, my attorney issued a second C&D Letter to Defendants. A copy of the second C&D Letter is attached as Exhibit "8" to the Verified Complaint. I did not hear much of anything from Home Savers for the remainder of the year, so I believed at that point that Defendants understood their obligations.

49. Unfortunately, on or after November 9, 2005, Home Savers apparently recorded certain land sale documents with the D.C. Recorder of Deeds supposedly showing that I had sold all his right, title and interest in the 2nd Street Property to the Home Savers Group.

50. I did not receive any notice from Home Savers that they intended to file any documents with the D.C. government concerning the 2nd Street Property.

51. I never sold my house to Defendants on November 9, 2005 or any other time, and have no intention of doing so.

52. Additionally, in a letter dated January 7, 2006, Home Savers gave written notice to the other residents of the 2nd Street Property to the other residents of the 2nd Street Property that they bought the 2nd Street Property from Wilson, and would be attempting to make future arrangements to re-work existing landlord-tenant relationships. A true

and correct copy of Defendants' January 7, 2006 letter is attached as Exhibit "9" to the Verified Complaint.

53. I was made aware of this disturbing development by the tenants at the 2nd Street Property, all of whom expressed concern and confusion as to this alleged development.

54. Although I attempted to allay the residents' concerns about the situation, there are no guarantees that further disruptions will not occur with my ownership rights or to my tenants absent immediate Court action, particularly since Home Savers and its agents have shown in their past dealings with me and other interested parties that they will do whatever they want; whenever they want, regardless of who might be harmed by their misconduct as evidenced by this Court's January 12, 2006 Order, a true and correct copy of which is attached as Exhibit "10" to the Verified Complaint.

55. Unless the Court enters an order immediately stopping and preventing ABN AMRO and their attorneys from abusive and deceptive loan administration and related debt collection practices, I will continue to be subjected to undue stress and anguish arising out of the Defendants efforts to take my home, mishandle my escrow account or unfairly harm my credit history, even though I have been making my monthly mortgage payments on time.

56. I did not sell the 2nd Street Property to Defendants on November 9, 2005 or any other date. Rather, the Home Savers Group recorded alleged sale and related documents with the D.C. Recorder of Deeds because Wilson has resisted demands that he repay the high costs associated with this highly irregular loan.

57. The loan terms and conditions extended by Home Savers to Wilson for the express purpose of averting foreclosure by ABN AMRO and the Friedman Law Firm are

harsh, unfair and unreasonable because they would permit Defendants to take title to the 2nd Street Property (a property then worth $379,000 circa November 2004, and now worth over $425,000) for a mere $30,525.14 absent rescission of the transaction or other appropriate relief by this Court.

58. Notwithstanding Defendants' misconduct (including the improper recordation of sham land sale documents) Plaintiff remains in exclusive possession of the 2nd Street Property as of this date.

FURTHER DECLARANT SAYETH NOT.

**/s/Calvert M. Wilsor**
Calvert M. Wilson, an Individual
Plaintiff

# EXHIBIT "A"

**washingtonpost.com**

# Ehrlich Signs Bill Targeting Foreclosure Scams

By Sandra Fleishman
Washington Post Staff Writer
Friday, May 27, 2005; E02

Maryland Gov. Robert L. Ehrlich Jr. (R) yesterday signed legislation to protect struggling homeowners from so-called foreclosure rescue consultants who promise to help them avoid foreclosure but end up taking title to their house or stealing the built-up equity.

Consumer groups have hailed the Maryland effort as one of the toughest measures in the country against what they believe is an escalating nationwide problem, but some say still more needs to be done.

"We're very pleased that the legislature passed this bill because it's very comprehensive and it will benefit a lot of people," said Cheryl Hystad, executive director of the Maryland Consumer Rights Coalition.

Although there are no reliable statistics, Hystad said, Washington -- along with other areas where house prices are exploding -- "seems to be a hotbed" for the self-styled consultants who scan the foreclosure documents on file in local courts and then target the homeowners involved.

In a typical arrangement, the consultant promises to make the overdue mortgage payments to the lender, and in return, the homeowner transfers the deed to the property. The owner is given a year to buy the deed back, but the more common result is that the consultant ends up in possession of the home after paying thousands of dollars less than it is worth.

The new law, which takes effect immediately, makes such transactions a misdemeanor, punishable with prison terms of up to three years.

It also gives homeowners more time to lay plans to avoid a foreclosure. Maryland's 80-year-old foreclosure law let lenders notify homeowners as little as 10 days before a foreclosure sale. The new law, by requiring lenders to notify homeowners two days after they file foreclosure documents with the local court, will give homeowners as much as a month or two to raise the cash needed to bring their mortgage payments up to date or consider options such as selling the house on the open market.

The legislation was offered by Del. Doyle L. Niemann (D-Prince George's) and Sen. Brian E. Frosh (D-Montgomery) in response to a barrage of complaints from financially distressed homeowners -- particularly in Prince George's and Montgomery counties, Baltimore and the Eastern Shore -- who say they have lost their homes to people claiming to offer help.

"It's been happening more and more frequently because there is the potential for significant gains in this housing market," Niemann said.

© 2005 The Washington Post Company

**washingtonpost.com**

# Foreclosure Scams on the Rise

## Real Estate Boom Engenders Bogus 'Rescues,' Study Says

By Sandra Fleishman
Washington Post Staff Writer
Friday, June 3, 2005; D02

The real estate boom has contributed to a rise in foreclosure rescue scams, a national consumer advocacy group said yesterday.

Although there are no nationwide statistics on such scams, a survey of consumer groups and lawyers indicates that "many, many thousands" of people have been victimized, according to the authors of a report released by the National Consumer Law Center.

The run-up in housing prices has created a group of cash-strapped but house-rich owners who are particularly vulnerable when hit by emergencies, such as the loss of a job or medical problems, according to the authors. Some of those struggling with housing payments, especially minorities and the elderly, have sub-prime, high-cost mortgage loans, which compounds the problem, they said.

"Put those all together, and you've got a ripe opening for this type of scam," said Steve Tripoli, who wrote the report with the organization's attorney, Elizabeth Renuart.

The schemes can take several forms. Rescue consultants sometimes might promise help for a big fee and not deliver. Others persuade homeowners that they can sign over the title, become renters and buy the house back later. Instead, homeowners can never afford to repurchase.

There has also been an increase in scamming because "get-rich-quick" seminars teach people how to find desperate homeowners facing foreclosures and persuade them to turn over their property, according to the authors. "This kind of scam is being taught around the country," Tripoli said.

In California alone, one firm had 1,800 clients who paid basic fees of $750 to $1,250 for advice and never got help or refunds, according to the report. The firm on May 18 settled with California prosecutors for $500,000 and agreed to a permanent injunction.

"There have been major outbursts of these scams in the D.C./Maryland/Virginia region, Florida, New York, Ohio and many other states," the report said. "It's important to note that most . . . go either completely unexposed or unpunished" because homeowners don't even realize what happened or can't afford to hire attorneys or because state regulators lack investigative staff or the authority to act.

It warned that problems could worsen significantly if mortgage interest rates soon jump and foreclosures follow. The authors urged states to ban or restrict such activities.

Federal banking regulators have issued a warning that directs lenders to be more selective about who can get home equity loans and lines of credit because of concerns about the growth of risky interest-only loans and adjustable-rate mortgages. The fear is that rising interest rates could make it harder for people to repay their

loans, raising the possibility of increased foreclosures.

Julie L. Williams, acting U.S. comptroller of the currency, whose agency regulates the nation's banks, recently said there has been a clear spike in foreclosures in a number of major urban areas.

The report said many homeowners don't realize that the rising value of their homes means they might be able to work out a new payment plan or refinancing schedule based on the appreciated value of the house. They also don't realize that they can often sell before the foreclosure and make a profit.

Families are often evicted while they are trying to argue that they still own the home. Landlord-tenant courts generally don't hear these kinds of cases. To delay an eviction hearing so a case alleging fraud or deception can be heard in another court can require the posting of an expensive bond, according to the authors.

Wanda Walker, a Fort Washington homeowner who spoke at the news conference, said she had to give up on fighting in landlord-tenant court to get back her house because she couldn't afford to post a "$250,000 bond on a house that I paid $168,000 for" in 2001. She is still pursuing a civil suit.

"I'm angry and very disgusted" about losing the home, Walker said. Instead of getting help from consultant Robert C. Brown of RCB Group LLC, Walker alleged that the consultant copied her signature onto a deed transferring ownership of the five-bedroom duplex in return for the $10,900 owed on the mortgage. She says she never got the $157,290 listed as paid on the deed and that her mortgage has never been paid off.

Ronald M. Miller, Brown's lawyer, said this week that he was "hesitant to answer questions because the matter is still in litigation." But he said Walker signed an agreement and that she "is the wrong alleged victim to be arguing this after having a jury trial and losing, and filing an appeal and having dropped her appeal."

© 2005 The Washington Post Company

# EXHIBIT "2"

## AUTHORIZATION AND CONSENT

I, _CALVERT M. WILSON_, do hereby authorize <u>Barrett Ware</u> of Home-Savers, LLC and/or <u>Daniel Roth, Esquire</u>, of the Law offices of Obergh and Berlin, to: including but not limited to: inquire into my mortgage balance, payment history, etc, to make payments and to request pay-off statements. My Loan number is _0001019753_ ,
My social security number is _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_ ,
my date of birth is _03-29-71_ .


_CALVERT M. WILSON_                          _10-8-04_
                   PRINT NAME                    Date

CW 0821

# EXHIBIT "3"

*Friedman & MacFadyen, P.A.*

ALVIN E. FRIEDMAN*
KENNETH J. MACFADYEN
MARK H. FRIEDMAN*
MICHAEL T. CANTRELL*
DANIEL B. MENCHEL*
JAMES J. LOFTUS*
STEPHEN B. WOOD**
NICOLE ROSSI**
KATHRYN D. CLAYPOOLE
DAVID B. MINTZ*

*ADMITTED TO PRACTICE IN MD & D. C.
**ADMITTED TO PRACTICE IN VA

LAW OFFICES

TOTMAN BUILDING—SUITE 400
210 EAST REDWOOD STREET
BALTIMORE, MARYLAND 21202-3399
———
(410) 685-1763
FAX (410) 727-1759

PLEASE REPLY TO BALTIMORE ———
PLEASE REPLY TO VIRGINIA ———

SAMUEL S. LEVIN
(1897-1979)
———
D. C. OFFICE
5301 WISCONSIN AVENUE N. W.
SUITE 750
WASHINGTON, D. C. 20015

VIRGINIA OFFICE
1601 ROLLING HILLS DRIVE
SURRY BUILDING, SUITE 125
RICHMOND, VIRGINIA 23229
(804) 288-0088
FAX (804) 288-0052

# TELEFAX COMMUNICATION

**DATE:**     October 18, 2004
**TO:**       **Barrett Ware @ Home Savers Plus, LLC**
**FAX #:**    202-726-8870
**FROM:**     Tashea Glenn @ ext.139
**RE:**       **Property Address: 1905 2nd Street, NE, Washington, DC 20002**
              **Ln# 0001019753**
              **Our File # 519031**
              ### NUMBER OF PAGES (including this cover page): 6

**MESSAGE**
**Attached you will find the payoff and reinstatement figures you requested.**

**Breakdown of Reinstatement Figure**

| | |
|---|---|
| 8 payments @ $827.67: | $6,621.36 |
| 12 payments @ $1007.74: | $12,092.88 |
| Late Charges: | $161.24 |
| Corporate Advance: | $866.14 |
| Property Inspections: | $330.00 |
| Escrow Shortage: | $1056.67 |
| **Due to Lender:** | **$21,128.29** – |

**Breakdown of Payoff Figure**

| | |
|---|---|
| Principal Balance: | $84,995.16 |
| Interest (3/1/03-11/1/04): | $11,332.60 |
| Pro Rated MIP: | $102.15 |
| Escrow Advance: | $2,853.61 |
| Late Charges: | $866.14 |
| Fees Due: | $120.93 |
| Hazard Insurance: | $1,224.00 |
| Recording Fee: | $26.50 |
| Property Inspections: | $330.00 |
| **Due to Lender:** | **$101,566.09** |

## *Friedman & MacFadyen, P.A.*

ALVIN E. FRIEDMAN*
KENNETH J. MacFADYEN
MARK H. FRIEDMAN*
MICHAEL T. CANTRELL*
DANIEL B. MENCHEL*
JAMES J. LOFTUS*
STEPHEN B. WOOD**
NICOLE ROSSI**
KATHRYN D. CLAYPOOLE
DAVID B. MINTZ*

*ADMITTED TO PRACTICE IN MD & D. C.
**ADMITTED TO PRACTICE IN VA

TOTMAN BUILDING—SUITE 400
210 EAST REDWOOD STREET
BALTIMORE, MARYLAND 21202-3399
————
(410) 685-1763
FAX (410) 727-1759

PLEASE REPLY TO BALTIMORE ———
PLEASE REPLY TO VIRGINIA ———

SAMUEL S. LEVIN
(1897-1979)
————
D. C. OFFICE
5301 WISCONSIN AVENUE N. W.
SUITE 750
WASHINGTON, D. C. 20015

VIRGINIA OFFICE
1601 ROLLING HILLS DRIVE
SURRY BUILDING, SUITE 125
RICHMOND, VIRGINIA 23229
(804) 288-0088
FAX (804) 288-0052

October 18, 2004

Mr. Calvert M. Wilson
1905 2nd Street, N.E.
Washington, DC 20002

Re: 1905 2nd Street, N.E.
    Our File No.: 519031
    Our Quotation No.: 25455

Dear Mr. Wilson:

Pursuant to your recent request concerning payoff figures to payoff the above captioned loan with ABN AMRO Mortgage Group, Inc., please be advised that the amount needed, including foreclosure fees and expenses, is $105,325.68. This amount includes principal balance, interest, late charges, bad check fee and inspections to ABN AMRO Mortgage Group, Inc. in the amount of $104,133.24;  our fees and expenses are in the additional amount of $1,192.44.

Please be advised that the amount of $105,325.68 is good through 11/01/2004.

Please be further advised that all funds must be in the form of Certified Bank Check, Cashiers Check, Cash or Money Orders. We cannot accept Personal, Escrow, Credit Union or Attorney Checks. Please make your check payable to ABN AMRO Mortgage Group, Inc. and forward to Friedman and MacFadyen, P.A. Funds musts be received in our office prior to 12:00 P.M. on October 29, 2004. We recommend, to Insure that your reinstatement arrives prior to 12:00 P.M. on October 29, 2004, that you consider submission of your payoff funds by either federal express, express mail or a method that insures delivery of your funds on time.

These figures are subject to final verification upon receipt of funds by the noteholder. The noteholder reserves the right to adjust these figures and refuse any funds which are insufficient to payoff the loan in full for any reason, including, but not limited to error in calculation of payoff amount, previously dishonored check or money order, or additional disbursements made by the noteholder between the date of this payoff quote and the receipt of funds.

Please contact this office prior to any payoff by you.

Very truly yours,

FRIEDMAN & MacFADYEN, P.A.

Alvin E. Friedman

AF:tn6

LAW OFFICES

*Friedman & MacFadyen, P.A.*

ALVIN E. FRIEDMAN*
KENNETH J. MACFADYEN
MARK H. FRIEDMAN*
MICHAEL T. CANTRELL*
DANIEL B. MENCHEL*
JAMES J. LOFTUS*
STEPHEN B. WOOD**
NICOLE ROSSI*
KATHRYN D. CLAYPOOLE
DAVID B. MINTZ*

*ADMITTED TO PRACTICE IN MD & D. C.
**ADMITTED TO PRACTICE IN VA

TOTMAN BUILDING—SUITE 400
210 EAST REDWOOD STREET
BALTIMORE, MARYLAND 21202-3399

———
(410) 685-1763
FAX (410) 727-1759

PLEASE REPLY TO BALTIMORE _____
PLEASE REPLY TO VIRGINIA _____

SAMUEL S. LEVIN
(1897-1979)

D. C. OFFICE
5301 WISCONSIN AVENUE N. W.
SUITE 750
WASHINGTON, D. C. 20015

VIRGINIA OFFICE
1601 ROLLING HILLS DRIVE
SURRY BUILDING, SUITE 125
RICHMOND, VIRGINIA 23229
(804) 288-0088
FAX (804) 288-0052

October 18, 2004

Mr. Calvert M. Wilson
1905 2nd Street, N.E.
Washington, DC 20002

Re: 1905 2nd Street, N.E.
    Our File No.: 519031
    Our Quotation No.: 25456

Dear Mr. Wilson:

Pursuant to your recent request concerning reinstatement figures to bring the above captioned loan current with ABN AMRO Mortgage Group, Inc., please be advised that the amount needed, including foreclosure fees and expenses, is $26,262.88. This amount includes payments, late charges, bad check fee and inspections to ABN AMRO Mortgage Group, Inc. in the amount of $23,395.44; our fees and expenses are in the additional amount of $2,867.44.

Please be advised that the amount of $26,262.88 is good through 11/05/2004.

Please be further advised that all funds must be in the form of Certified Bank Check, Cashiers Check, Cash or Money Orders. We cannot accept Personal, Escrow, Credit Union or Attorney Checks. Please make your check payable to ABN AMRO Mortgage Group, Inc. and forward to Friedman and MacFadyen, P.A. Funds musts be received in our office prior to 12:00 P.M. on November 4, 2004. We recommend, to Insure that your reinstatement arrives prior to 12:00 P.M. on November 4, 2004, that you consider submission of your reinstatement funds by either federal express, express mail or a method that insures delivery of your funds on time.

These figures are subject to final verification upon receipt of funds by the noteholder. The noteholder reserves the right to adjust these figures and refuse any funds which are insufficient to reinstatement the loan in full for any reason, including, but not limited to error in calculation of reinstatement amount, previously dishonored check or money order, or additional disbursements made by the noteholder between the date of this reinstatement quote and the receipt of funds.

Please contact this office prior to any reinstatement by you.

Very truly yours,

FRIEDMAN & MacFADYEN, P.A.

Alvin L. Friedman

AF:tn6

# EXHIBIT "4"

File No. 07543  Page #2

**WILSON**

**LOCATED AT:**
1805 2ND ST NE
LOT: 0047  SQUARE: 3565
WASHINGTON., D.C.  20002-1362

**FOR:**
ALLSTATE LENDING SERVICES
1700 ELTON ROAD
SILVER SPRING, MD  20903

**AS OF:**
7/15/2005

**BY:**
RICHARD G. SHERMAN
RGS APPRAISING, INC.

RICHARD G. SHERMAN
DC#255

File No. 07543  Page #3

| | | |
|---|---|---|
| Borrower WILSON | | File No. 07543 |
| Property Address 1905 2ND ST NE | | |
| City WASHINGTON | County N/A | State D.C. | Zip Code 20002-1362 |
| Lender ALLSTATE LENDING SERVICES | | |

## APPRAISAL AND REPORT IDENTIFICATION

This appraisal conforms to one of the following definitions:

☒ **Complete Appraisal**  (The act or process of estimating value, or an opinion of value, performed without invoking the Departure Rule.)

☐ **Limited Appraisal**  (The act or process of estimating value, or an opinion of value, performed under and resulting from invoking the Departure Rule.)

This report is one of the following types:

☐ **Self Contained**  (A written report prepared under Standards Rule 2-2(a) of a Complete or Limited Appraisal performed under STANDARD 1.)

☒ **Summary**  (A written report prepared under Standards Rule 2-2(b) of a Complete or Limited Appraisal performed under STANDARD 1.)

☐ **Restricted**  (A written report prepared under Standards Rule 2-2(c) of a Complete or Limited Appraisal performed under STANDARD 1, restricted to the stated intended use by the specified client or intended user.)

## Comments on Standards Rule 2-3

I certify that, to the best of my knowledge and belief:

The statements of fact contained in this report are true and correct.

The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions and conclusions.

I have no (or the specified) present or prospective interest in the property that is the subject of this report, and no (or the specified) personal interest with respect to the parties involved.

I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.

My engagement in this assignment was not contingent upon developing or reporting predetermined results.

My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

My analyses, opinions and conclusions were developed and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

I have (or have not) made a personal inspection of the property that is the subject of this report.

No one provided significant real property appraisal assistance to the person signing this certification. (If there are exceptions, the name of each individual providing significant real property appraisal assistance must be stated.)

## Comments on Appraisal and Report Identification

Note any departures from Standards Rules 1-3 and 1-4, plus any USPAP-related issues requiring disclosure:

THIS SUMMARY APPRAISAL REPORT IS INTENDED FOR USE BY THE LENDER/CLIENT AND ASSIGNS FOR A MORTGAGE FINANCING PURPOSES ONLY. THIS REPORT IS NOT INTENDED FOR ANY OTHER USE.

THE COST APPROACH CAN BE A RELIABLE INDICATOR; HOWEVER, RELIABILITY DECREASES AS THE AGE OF THE IMPROVEMENTS INCREASES DUE TO THE DIFFICULTY OF ESTIMATING VARIOUS FORMS OF DEPRECIATION AND/OR OBSOLESCENCE. THE COST APPROACH, AS DEVELOPED IN THE URAR PROVIDES ONLY A ROUGH ESTIMATE WHICH DISTRIBUTES THE VALUE BETWEEN PHYSICAL IMPROVEMENTS AND THE LAND, LESS ANY DEDUCTIONS FOR DEPRECIATION AND/OR OBSOLESCENCE. THE ESTIMATED VALUE OF THE SITE IS NOT TO BE CONSTRUED AS A LAND APPRAISAL. WHEN THE COST APPROACH IS NOT COMPLETED, IT DOES NOT REPRESENT A DEPARTURE FROM STANDARDS RULES 1-2, 1-3, OR 1-4 AS ITS OMISSION IS DUE TO A LACK OF RELIABILITY.

THIS APPRAISAL REPORT UTILIZES A DIGITAL SIGNATURE, WHICH IS PERMITTED UNDER THE STATEMENT ON APPRAISAL STANDARDS No.8 (SMT-8) OF USPAP. THE APPRAISER CERTIFIES THAT SAFEGUARDS FOR THE PROTECTION AND AFFIXATION OF THE SIGNATURE DICTATED BY USPAP HAVE BEEN OBSERVED AND ARE UNDER THE CONTROL OF THE APPRAISER.

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: *Richard G. Sherman* | Signature: |
| Name: RICHARD G. SHERMAN | Name: |
| Date Signed: 7/17/2005 | Date Signed: |
| State Certification #: | State Certification #: |
| or State License #: 256 | or State License #: |
| State: DC | State: |
| Expiration Date of Certification or License: 2/28/2006 | Expiration Date of Certification or License: |
| | ☐ Did  ☐ Did Not  Inspect Property |

## SUPPLEMENTAL ADDENDUM

File No. 07543 Page #4

File No.  07543

| | | | | |
|---|---|---|---|---|
| Borrower/Client | WILSON | | | |
| Property Address | 1906 2ND ST NE | | | |
| City | WASHINGTON | County N/A | State D.C. | Zip Code 20002-1362 |
| Lender | ALLSTATE LENDING SERVICES | | | |

NO SURVEY OF THE PROPERTY HAS BEEN MADE BY THE APPRAISER AND NO RESPONSIBILITY IS ASSUMED IN CONNECTION WITH SUCH MATTERS. THE RELIABILITY OF THE INFORMATION CONTAINED ON ANY DOCUMENT PROVIDED TO OR USED IS ASSUMED BY THE APPRAISER AND CANNOT BE GUARANTEED TO BE CORRECT. A SURVEYOR SHOULD BE CONSULTED IF THERE IS ANY CONCERN ON SIZE, BOUNDARIES, SETBACKS, FLOOD HAZARD AREAS, ENCROACHMENTS, OR OTHER SURVEY MATTERS.

NO TITLE SEARCH OR REPORT WAS PRESENTED TO, NOR PERFORMED BY THE APPRAISER OF THIS REPORT. AS A TITLE SEARCH AND REPORT GOES BEYOND THE EXPERTISE OF THE APPRAISER, NO RESPONSIBILITY IS GIVEN IN THIS REPORT IN ANY MATTER INVOLVING ENCUMBRANCES, PENDING LITIGATION, SPECIAL ASSESSMENTS OR EASEMENTS ON THE SUBJECT PROPERTY. A LICENSED ATTORNEY SHOULD BE CONSULTED IF ANY READER OF THIS REPORT HAS ANY QUESTIONS ON SUCH MATTERS.

THE SUBJECT IS IN GENERAL COMPLIANCE WITH THE LOCAL ZONING, PERMITS FOR ANY IMPROVEMENTS, WHICH MAY HAVE TAKEN PLACE SINCE THE TIME OF CONSTRUCTION, HAVE NOT BEEN PRESENTED TO THE APPRAISER. IT IS ASSUMED THAT ALL REQUIRED ZONING AND BUILDING USE REGULATIONS FOR THE SUBJECT PROPERTY HAVE BEEN COMPLIED WITH OR COULD BE COMPLIED WITH BY THE OWNER IN THIS REPORT. ANY INFORMATION AND ANALYSIS SHOWN IN THIS REPORT IS BASED ONLY ON A PRELIMINARY INVESTIGATION. A COMPREHENSIVE EXAMINATION OF LAWS AND REGULATIONS AFFECTING THE SUBJECT PROPERTY WAS NOT PERFORMED FOR THIS APPRAISAL. APPROPRIATE GOVERNMENT OFFICIALS AND/OR AN ATTORNEY SHOULD BE CONSULTED IF AN INTERESTED PARTY HAS ANY QUESTIONS OR CONCERNS ON IMPROVEMENTS OR SITE.

BECAUSE NO EXTENSIVE INSPECTION WAS MADE, AND BECAUSE SUCH KNOWLEDGE GOES BEYOND THE SCOPE OF THIS APPRAISAL, ANY OBSERVED CONDITION OR OTHER COMMENTS GIVEN IN THIS APPRAISAL REPORT SHOULD NOT BE TAKEN AS A GUARANTEE THAT A PROBLEM DOES NOT EXIST. SPECIFICALLY, NO GUARANTEE IS MADE AS TO THE ADEQUACY OF THE FOUNDATION, ROOF, EXTERIOR WALLS, INTERIOR WALLS, FLOORS, HEATING SYSTEMS, AIR CONDITIONING SYSTEM, PLUMBING, ELECTRICAL SERVICE, INSULATION, WELL/SEPTIC SYSTEM, FIRE RETARDANT PLYWOOD, OR ANY OTHER DETAILED CONSTRUCTION MATTERS. IF ANY INTERESTED PARTY IS CONCERNED ABOUT THE EXISTENCE, CONDITION, OR ADEQUACY OF ANY PARTICULAR ITEM, WE WOULD STRONGLY SUGGEST THAT A CONSTRUCTION EXPERT BE HIRED FOR A DETAILED INVESTIGATION.

THIS APPRAISAL IS NO SUBSTITUTE FOR A HOME INSPECTION.

PERSONAL PROPERTY IS NOT INCLUDED IN THE FINAL VALUATION.

INFORMATION ON SUBJECT AND COMPARABLE SALE DATA WHICH WAS USED IN THIS REPORT WAS PROVIDED BY FINANCIAL INSTITUTIONS, GOVERNMENT AGENCIES, SALES AGENTS, REAL ESTATE FIRMS AND TAX RECORDS WHICH WERE AVAILABLE AT THE TIME OF INSPECTION. AS TAX RECORDS ARE ONLY PERIODICALLY UPDATED AND SOMETIMES INCOMPLETE, IT IS NECESSARY TO SUPPLEMENT SOME SALES DATA WITH REAL ESTATE FIRMS AND THEIR INFORMATION SERVICES AND ALSO TO HAVE FIELD ESTIMATES OF SQUARE FOOTAGE. THIS INFORMATION IS ASSUMED TO BE TRUE, CORRECT, AND RELIABLE. NO RESPONSIBILITY FOR THE ACCURACY OF SUCH INFORMATION IS ASSUMED BY THE APPRAISER.

OPINIONS AND ESTIMATES EXPRESSED HEREIN REPRESENT OUR BEST JUDGEMENT BUT SHOULD NOT BE CONSTRUED AS ADVICE OR RECOMMENDATION TO ACT. ANY ACTIONS TAKEN BY YOU, THE CLIENT, OR ANY OTHERS SHOULD BE BASED UPON YOUR OWN JUDGEMENT, AND THE DECISION PROCESS SHOULD CONSIDER MANY FACTORS OTHER THAN JUST THE VALUE ESTIMATE AND INFORMATION GIVEN IN THIS REPORT. THE APPRAISER SHOULD BE CONTACTED WITH ANY QUESTIONS BEFORE THIS REPORT IS RELIED UPON FOR DECISION MAKING. THIS APPRAISAL IS AN ESTIMATE OF VALUE BASED ON AN ANALYSIS OF INFORMATION KNOWN TO US AT THE TIME THE APPRAISAL WAS COMPLETED. WE DO NOT ASSUME ANY RESPONSIBILITY FOR INCORRECT ANALYSIS BECAUSE OF INCORRECT OR INCOMPLETE INFORMATION WHICH WAS PROVIDED TO THE APPRAISER. IF NEW DATA OR DOCUMENTATION IS PROVIDED TO THE APPRAISER, THE VALUE IN THIS REPORT IS SUBJECT TO CHANGE BASED ON THE SIGNIFICANCE OF THIS NEW DATA.

THE EXTERIOR DIMENSIONS AND GROSS LIVING AREAS OF THE SUBJECT AND THE COMPARABLES, REPORTED THROUGHOUT THIS REPORT, ARE OFTEN ESTIMATED DUE TO THE EXISTENCE OF VARIOUS ITEMS WHICH MAY IMPEDE DIRECT MEASUREMENT OF EXTERIOR WALLS. FURTHERMORE, THE MEASUREMENT OF UPPER-LEVELS ARE ESTIMATED FROM THE GROUND LEVEL, AND MAY NOT BE ACCURATE. THE DIRECT MEASUREMENT OF THE COMPARABLES IS OFTEN DIFFICULT DUE TO THE OBJECTIONS OF HOMEOWNERS. IF DIRECT MEASUREMENT WAS NOT POSSIBLE, THE APPRAISER BASED THE ESTIMATE OF GROSS LIVING AREA ON THE SQUARE FOOTAGE OF A SIMILAR MODEL LOCATED IN THE SAME NEIGHBORHOOD. IF ANY DIMENSIONS WERE ESTIMATED ON COMPARABLES, THE LETTER 'E' IS TO BE INCLUDED AFTER THE ESTIMATE.

INFORMATION REGARDING THE NEIGHBORHOOD TRENDS SUCH AS GROWTH RATE, PROPERTY VALUES, DEMAND/SUPPLY AND MARKETING TIME IS BASED ON RESEARCH FROM THE PREVIOUS 6-12 MONTHS. THE DATA PRESENTED IN THIS REPORT IS NOT TO BE CONSTRUED AS A PREDICTION, BUT RATHER A REFLECTION OF THE CURRENT MARKET CONDITIONS AS OF THE EFFECTIVE DATE OF THIS APPRAISAL.

File No. 07543 Page #6

# SMALL RESIDENTIAL INCOME PROPERTY APPRAISAL REPORT

| General description | | Exterior description | (Materials/condition) | Foundation | | Insulation (R-value if known) | |
|---|---|---|---|---|---|---|---|
| Units/bldg. | 4 / ONE | Foundation | MASONRY | Slab | NONE | ☒ Roof | ASSUMED |
| Stories | 2 | Exterior walls | BRICK | Crawl space | PARTIAL | ☒ Ceiling | ASSUMED |
| Type (det./att.) | semi-ATTACHED | Roof surface | FLAT | Sump Pump | NONE | ☒ Walls | ASSUMED |
| Design (style) | GARDEN | Gutters & dwnspts. | ALUMINUM | Dampness | NOT NOTED | ☐ Floor | |
| Existing/proposed | EXISTING | Window type | DOUBLE HUNG | Settlement | NOT NOTED | ☐ None | |
| Under construction | N/A | Storm sash/Screens | THERMALS | Infestation | NOT NOTED | ☐ Adequacy | |
| Year Built | 1938+- | Manufactured housing | ☐ Yes ☒ No | Basement | 25 % of 1st floor area | Energy efficient items | |
| Effective age(yrs.) | 10 YEARS | *(Complies with the HUD Manufactured Housing | | Basement finish | UNFINISHED | THERMAL WINDOWS | |
| 60 YRS+-REMAINING ECON.LIFE | | Construction and Safety Standards.) | | STORAGE,UTILITIES | | New HWH | |

| Units | Family() | Foyer | Living | Dining | Kitchen | Den | Family rm | Bedroom | # Baths | Laundry | Other | Sq. ft./unit | Total | ☐ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | | X | X | X | | | 2 | 1 | | | 700 | 700 | |
| 1 | 1 | | X | X | X | 1 | | 1 | 1 | | | 700 | 700 | |
| 1 | 1 | | X | X | X | | | 2 | 1 | | | 700 | 700 | |
| 1 | 1 | | X | X | X | 1 | X | 1 | 1 | | | 700 | 700 | |

Improvements contain:    20 Rooms;    6 Bedroom(s);    4 Bath(s):    2,800 Square feet of GROSS LIVING AREA

GROSS BUILDING AREA (GBA) IS DEFINED AS THE TOTAL FINISHED AREA (INCLUDING COMMON AREAS) OF THE IMPROVEMENTS BASED UPON EXTERIOR MEASUREMENTS.

| Surfaces | (Materials/condition) | Heating | | Kitchen equip. | (# / unit-cond.) | Attic | | Car Storage | No. Cars |
|---|---|---|---|---|---|---|---|---|---|
| Floors | HdW,CPT,CT/GOOD | Type | FWA | Refrigerator | 4/GOOD | ☒ None | | Garage | |
| Walls | PLSTR,DRYW/GOOD | Fuel | GAS | Range/oven | 4/GOOD | ☐ Stairs | | Carport | |
| Trim/Finish | PAINT /GOOD | Condition | GOOD | Disposal | 4/GOOD | ☐ Drop stair | | Attached | |
| Bath floor | CER TILE /GD | | | Dishwasher | NONE | ☐ Scuttle | | Detached | |
| Bath wainscot | CER TILE /30 | Cooling | | Fan/hood | 4/GOOD | ☐ Floor | | Adequate | |
| Doors | INT:Hd/Pnl /GD | Central | YES | Compactor | NONE | ☐ Heated | | Inadequate | |
| | | Other | N/A | Washer/dryer | NONE | ☐ Finished | | Offstreet | |
| | | Condition | GOOD | Microwave | NONE | ☐ Unfinished | | None | ☒ |
| Fireplace(s) NONE | # 0 | | | Intercom | NONE | | | | |

Condition of the improvements, repairs needed, quality of construction, additional features, modernization, etc.:    THE SUBJECT IS A SEMI-DETACHED GARDEN MULTI-FAMILY DWELLING WITH ADDITIONAL SIDE WINDOWS AND VIEWS FOR UNITS 1 & 3. IT IS COMPRISED OF TWO (2) - TWO BEDROOM,ONE BATHROOM UNITS AND TWO (2) ONE BEDROOM, DEN WITH ONE FULL BATHROOM UNITS. DWELLING HAS THERMAL REPLACEMENT WINDOWS AND NEW HOT WATER HEATER AND FURNACE. UPDATED ELECTRICAL SERVICE. UNITS HAVE NEW KITCHEN CABINETS, COUNTERS AND APPLIANCES. UPDATED BATHROOMS, FRESHLY PAINTED AND REFINISHED FLOORS AND NEW FLOORING IN THE KITCHENS.
SEE ATTACHED INTERIOR PHOTOS

Depreciation (physical, functional, and external inadequacies, etc.):    THE SUBJECT IS IN GOOD CONDITION DUE TO SUBSTANTIAL NEW QUALITY RENOVATIONS AND UPDATES FOR THIS MARKET AREA. NO FUNCTIONAL DEPRECIATION NOTED AT THE TIME OF INSPECTION. LOWER EFFECTIVE AGE THAN CHRONOLOGICAL AGE DUE TO GOOD MAINTENANCE AND UPDATES. EXTERNAL DEPRECIATION DUE TO SOME "BOARD UPS" IN THE MARKET AREA WHICH IS COMMON TO THIS AREA. PRESENCE OF "BOARD UPS" IN THE AREA SIMILARLY AFFECTS COMPS AS THE SUBJECT.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property:    AT THE TIME OF THE INSPECTION, THE APPRAISER WAS NOT AWARE NOR INFORMED OF ANY ADVERSE ENVIRONMENTAL CONDITIONS, OR ANY OTHER ADVERSE SITE OR SITUS CONDITIONS. SEE ATTACHED CERTIFICATION AND STATEMENT OF LIMITING CONDITIONS RE: ENVIRONMENTAL DISCLAIMER.

## VALUATION ANALYSIS

ESTIMATED SITE VALUE ............................... = $ 125,000

ESTIMATED REPRODUCTION COST-NEW OF IMPROVEMENTS:

| | | | | |
|---|---|---|---|---|
| 2,800 | Sq. Ft. @ $ | 110.00 | = $ | 308,000 |
| | Sq. Ft. @ $ | | = $ | |
| | Sq. Ft. @ $ | | = $ | |
| | Sq. Ft. @ $ | | = $ | |
| | Sq. Ft. @ $ | | = $ | |
| | | | = $ | |
| | | | = $ | |
| | | | = $ | |
| | | | = $ | |

Special Energy Efficient Items ............... = $
Porches, Patios, etc. ........................ = $
Total Estimated Cost New ..................... = $ 308,000

| | Physical | Functional | External | |
|---|---|---|---|---|
| Less Depreciation | | | | = $ |

Depreciated Value of Improvements ........... = $ 308,000
"As Is" Value of Site Improvements .......... = $ 8,000
INDICATED VALUE BY COST APPROACH ............ = $ 439,000

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and, for HUD and VA, the estimated remaining economic life of the property): COST FIGURES DERIVED FROM MARSHALL & SWIFT COST HANDBOOK AND LOCAL BUILDERS. THE LAND VALUE REFLECTS A SYNTHESIS OF ASSESSMENT RATIOS AND LAND SALES,IF AVAILABLE. LAND TO VALUE RATIO IS TYPICAL FOR THE AREA AND IS WITHOUT ADVERSE AFFECT ON VALUE OR MARKETABILITY. THE COMPARABLES EXHIBIT SIMILAR RATIOS.

File No. 07543 Page #7

## SMALL RESIDENTIAL INCOME PROPERTY APPRAISAL REPORT

At least three rental comparables should be reported and analyzed in this section. The rental comparables should represent the most current rental information on properties as similar and proximate to the subject property as possible. (This comparison is based on current rental data, therefore, the rental comparables typically are not the same comparables used in the sales comparison analysis.) The appraisal report should assure the reader that the units and properties selected as comparables are comparable to the subject property (both the units and the overall property) and accurately represent the rental market for the subject property (unless otherwise stated within the report).

| ITEM | SUBJECT | COMPARABLE RENTAL NO. 1 | COMPARABLE RENTAL NO. 2 | COMPARABLE RENTAL NO. 3 |
|---|---|---|---|---|
| Address | 1905 2ND ST NE WASHINGTON, D.C. 20002 | 1700 WEST VIRGINIA AV, N.E. WASHINGTON, D.C. 20002 | 2213 M STREET, N.E. WASHINGTON, D.C. 20002 | 1232 18TH STREET, N.E. WASHINGTON, D.C. 20002 |
| Proximity to subject | | 0.99 miles | 1.81 miles | 1.53 miles |
| Lease dates (if available) | MIXED(SeeBelow) | MIXED | MIXED | MIXED |
| Rent survey date | 7/15/2005 | 7/15/2005 | 7/15/2005 | 7/15/2005 |
| Data source | INT.INSPECTION/ TAX RECORDS | MLS/EXT.INSPECTION/ TAX RECORDS | MLS/EXT INSPECTION/ TAX RECORDS | INT.INSPECTION/ TAX RECORDS |
| Rent concessions | NO CONCESSIONS NOTED | NO CONCESSIONS NOTED | NO CONCESSIONS NOTED | NO CONCESSIONS NOTED |
| Description of property-units, design, appeal, age, vacancies, and conditions | No. Units 4   No Vac. Yr. Blt. 1934+. GARDEN 2 LEVELS GOOD CONDITION NO VACANCIES | No. Units 4   No Vac.0   Yr. Blt. 1931 GARDEN 2 LEVELS GOOD CONDITION SIMILAR DESIGN & APPEAL NO VACANCIES | No. Units 4   No Vac. O   Yr. Blt.1944 GARDEN 2 LEVELS AVG-GOOD CONDITION SIMILAR DESIGN & APPEAL NO VACANCIES | No. Units 4   No.Vac. O   Yr. Blt. 1941 GARDEN 2 LEVELS AVG-GOOD CONDITION SIMILAR DESIGN & APPEAL NO VACANCIES |

| | SUBJECT | | | | COMPARABLE RENTAL NO. 1 | | | | | COMPARABLE RENTAL NO. 2 | | | | | COMPARABLE RENTAL NO. 3 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rm. Count | | | Size | Rm. Count | | | Size | Total | Rm. Count | | | Size | Total | Rm. Count | | | Size | Total |
| Individual unit breakdown | Tot | Br | Ba | Sq. Ft. | Tot | Br | Ba | Sq. Ft. | Monthly Rent | Tot | Br | Ba | Sq. Ft. | Monthly Rent | Tot | Br | Ba | Sq. Ft. | Monthly Rent |
| | 5 | 2 | 1 | 700 | 5 | 2 | 1 | 800 | 1,200 | 4 | 1 | 1 | 600 | 750 | 4 | 1 | 1 | 650 | 700 |
| | 5 | 1 | 1 | 700 | 5 | 2 | 1 | 800 | 1,200 | 4 | 1 | 1 | 600 | 750 | 4 | 1 | 1 | 650 | 700 |
| | 5 | 2 | 1 | 700 | 5 | 2 | 1 | 800 | 1,200 | 4 | 1 | 1 | 600 | 750 | 5 | 2 | 1 | 800 | 900 |
| | 5 | 1 | 1 | 700 | 5 | 2 | 1 | 800 | 1,200 | 4 | 1 | 1 | 600 | 750 | 5 | 2 | 1 | 800 | 900 |
| Utilities, furniture, and amenities included in rent | UTILITIES NOT INCL.UNFURNISHD NONE INCLUDED | UTILITIES NOT INCL. UNFURNISHED NONE INCLUDED | UTILITIES NOT INCL. UNFURNISHED NONE INCLUDED | UTILITIES NOT INCL. UNFURNISHED NONE INCLUDED |
| Functional utility, basement, heating/cooling, project amenities, etc. | CELLAR RDTR/NoCAC NEWER KIT,BATHS THERMALS ON STREET PARK | NO BASEMENT FWA/CAC SIMILAR UPDATES 4 LAUNDRIES THERMALS OFF STREET PARKING | NO BASEMENT RDTR/NoCAC SIMILAR UPDATES NO LAUNDRIES THERMALS ON STREET PARKING | NO BASEMENT RDTR/NO CAC PARTIAL UPDATES NO LAUNDRIES THERMALS ON STREET PARKING |

Analysis of rental data and support for estimated market rents for the individual subject units (including the adjustments used, the adequacy of comparables, rental concessions, etc.)
CITED COMPS WERE ABSTRACTED FROM WITHIN THE AREA AND ARE CONSIDERED REASONABLE INDICATORS OF VALUE FOR THE SUBJECT DUE TO THEIR SIMILARITIES TO THE SUBJECT IN TERMS OF LOCATION, DESIGN, APPEAL, AGE AND OVERALL UTILITY. ON AVERAGE, RENTS ON ONE BEDROOM UNITS RANGE FROM $450. TO $800. PER MONTH, UNFURNISHED AND TWO BEDROOMS RANGE FOR $600 TO $1,200. PER MONTH, UNFURNISHED. RENTAL COMP 1 IS A SIMILAR HIGHLY RENOVATED DWELLING WHICH COMMAND HIGHER RENTALS THAN COMPS 2 & 3 WHICH ARE IN INFERIOR OVERALL CONDITION AS COMPARED TO THE SUBJECT.

Subject's rent schedule  The rent schedule reconciles the applicable indicated monthly market rents to the appropriate subject unit, and provides the estimated rents for the subject property. The appraiser must review the rent characteristics of the comparable sales to determine whether estimated rents should reflect actual or market rents. For example, if actual rents were available on the sales comparables and used to derive the gross rent multiplier (GRM), actual rents for the subject should be used. If market rents were used to construct the comparables' rents and derive the GRM, market rents should be used. The total gross estimated rent must represent rent characteristics consistent with the sales comparable data used to derive the GRM. The total gross estimated rent is not adjusted for vacancy.

| Unit | LEASES | | No. Units Vacant | ACTUAL RENTS | | | ESTIMATED RENTS | | |
|---|---|---|---|---|---|---|---|---|---|
| | Lease Date | | | Per Unit | | Total Rents | Per Unit | | Total Rents |
| | Begin | End | | Unfurnished | Furnished | | Unfurnished | Furnished | |
| 1 | 12/1/04 | 11/30/05 | 0 | $ 1,100 | $ | 1,100 | $ 1,100 | $ | $ 1,100 |
| 1 | 8/1/04 | 7/31/05 | 0 | 925 | | 925 | 1,150 | | 1,150 |
| 1 | owner | occupied | | | | | 1,100 | | 1,100 |
| 1 | 9/1/04 | 8/31/05 | 0 | 1,025 | | 1,025 | 1,050 | | 1,050 |
| 4 | | | | | | $ 3,050 | | | 4,400 |

Other monthly income (itemize)  NONE NOTED  $
Vacancy:   Actual last year UNK %   Previous year UNK %   Estimated: 8.33 % $ 4,398   Annually   Total gross estimated rent $ 4,400
Utilities included in estimated rents: ☐ Electric ☐ Water ☒ Sewer ☐ Gas ☐ Oil ☒ Trash collection ☐

Comments on the rent schedule, actual rents, estimated rents (especially regarding differences between actual and estimated rents), utilities, etc.:   THE SUBJECT HAS BEEN SUBSTANTIALLY RENOVATED AND HAS ONE OWNER OCCUPIED UNIT. ALL COMPARABLE RENTAL UNITS ARE SUBJECT TO RENTAL CONTROLS. MONTH TO MONTH LEASES ARE COMMON TO THIS MARKET AREA AND ARE NOT CONSIDERED ADVERSE. ACTUAL RENTS AND ESTIMATED RENTAL FOR THIS DWELLING ARE THE SAME DUE TO SIMILAR OVERALL HIGHLY RENOVATED CONDITION, DESIGN AND UTILITY.

File No. 07343 Page #8

## SMALL RESIDENTIAL INCOME PROPERTY APPRAISAL REPORT

The undersigned has recited three recent sales of properties most similar and proximate to the subject property and has described and analyzed these in this analysis. If there is a significant variation between the subject and comparable properties, the analysis includes a dollar adjustment reflecting the market reaction to those items or an explanation supported by the market data. If a significant item in the comparable property is superior to, or more favorable than, the subject property, a minus (−) adjustment is made, thus reducing the adjusted sales price of the comparable property; if a significant item in the comparable property is inferior to, or less favorable than, the subject property, a plus (+) adjustment is made, thus increasing the adjusted sales price of the comparable property. [(I) Sales Price / Gross Monthly Rent]

| ITEM | SUBJECT | COMPARABLE SALE NO. 1 | | COMPARABLE SALE NO. 2 | | COMPARABLE SALE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 1905 2ND ST NE WASHINGTON, D.C. 20002 | 320 18TH PLACE, N.E. WASHINGTON, D.C. 20002 | | 2213 M STREET, N.E. WASHINGTON, D.C. 20002 | | 1317 ORREN TREET, N.E. WASHINGTON, D.C. 20002 | |
| Proximity to subject | | 2.05 miles | | 1.81 miles | | 1.31 miles | |
| Sales price | $ AV428,000 | ☒ Unf. ☐ Furn. $ 432,000 | | ☒ Unf. ☐ Furn. $ 415,000 | | ☒ Unf. ☐ Furn. $ 376,000 | |
| Sales price per GBA | $ 151.09 | $ 129.81 | | $ 170.08 | | $ 145.51 | |
| Gross monthly rent | $ 4,400.00 | $ 2,125.00 | | $ 3,000.00 | | $ 3,000.00 | |
| Gross mo. rent mult. (1) | 96.14 | 203.29 | | 138.33 | | 125.33 | |
| Sales price per unit | $ 105,750 | $ 108,000 | | $ 103,750 | | $ 94,000 | |
| Sales price per room | $ 12,160 | $ 24,000 | | $ 25,938 | | $ 23,500 | |
| Data and/or Verification Sources | INSP/TxRod TAX RECORDS | MLS/EXT.INSPECTION/ TAX RECORDS/AGENT | | MLS/EXT.INSPECTION/ TAX RECORDS/AGENT | | MLS/EXT. INSPECTION/ TAX RECORDS | |
| ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + (−) $ Adjustment | DESCRIPTION | + (−) $ Adjustment | DESCRIPTION | + (−) $ Adjustment |
| Sales or financing concessions | | CONV. CL: -◊- | | CONV. CL: -0- | | CONV. CL: -0- | |
| Date of sale/time | | c3-05 s4-05 | | c5-05  s6-05 | | c4-05 s6-05 | |
| Location | ECKINGTON | OLD CITY I | | TRINIDAD | | TRINIDAD | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | .06AC+- NO PLAT | .09+-/SIM. | | .07AC+-/SIM. | -0- | .06AC+-/SIM. | -0- |
| View | TYPICAL | SIMILAR | | SIMILAR | | SIMILAR | |
| Design and appeal | GARDEN | GARDEN | | GARDEN | | GARDEN | |
| Quality of construction | AVERAGE | SIMILAR | | SIMILAR | | SIMILAR | |
| Age | 67 YRS | 68 YRS | | 61 YRS | | 73 YRS | |
| Condition | RENOV/GOOD | EQUIVALENT | | EQUIVALENT | | AVERAGE/INF. | +20,000 |
| Gross Building Area | 2,838 Sq. ft. | 3,328 Sq. ft. | | 2,440 Sq. ft. | See Utility | 2,584 Sq. ft. | See Utility |
| Unit breakdown | No. of units 1 5 2 1 0 / 1 5 1 1 0 / 1 5 2 1 0 / 1 5 1 1 0 | Rm. count No. Tot Br Ba Vac 1 4 1 1 0 / 1 4 1 2 0 / 1 4 1 1 0 / 1 5 2 1 0 | | Rm. count No. Tot Br Ba Vac 1 4 1 1 0 / 1 4 1 1 0 / 1 4 1 1 0 / 1 4 1 1 0 | See Utility | Rm. count No. Tot Br Ba Vac 1 4 1 1 1 / 1 4 1 1 1 / 1 4 1 1 1 / 1 4 1 1 1 | |
| Basement description | PART BSMT | NO BSMT. | | FULL BSMT. | -5,000 | NO BSMT | +3,000 |
| Functional utility | GOOD UTILITY | SIM.# of BRs | | INF # of BRs | 20,000 | inf # OF BRs | 20,000 |
| Heating/cooling | RDTR/NoCAC | RDTR/NoCAC | | RDTR/NO CAC | | RDTR/NO CAC | |
| Parking on/off site | ON ST PARK | ON STREET | | ON STREET | | ON STREET | |
| Project amenities and fee (if applicable) | NO PORCHES Newer KIT.BATHS | NO PORCHES SIM. UPDATES | -4,000 | 4 PORCHES SIM. UPDATES | -8,000 | 4 PORCHES Older Updates | -8,000 +12,000 |
| Net Adj. (total) | | ☐ + ☒ - $ | 4,000 | ☒ + ☐ - $ | 7,000 | ☒ + ☐ - $ | 47,000 |
| Adjusted sales price of comparable | | $ | 428,000 | $ | 422,000 | $ | 423,000 |

Comments on sales comparison (including reconciliation of all indicators of value as to consistency and relative strength and evaluation of the typical investor's/purchaser's motivation in that market):   See attached addenda.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source for prior sales within year of appraisal | SEE BELOW | NO OTHER SALES REPORTED WITHIN THE PAST 3 YEARS | $193,000 5/27/2003 PER TAX RECORDS | NO OTHER SALES REPORTED WITHIN THE PAST 3 YEARS |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal:  NO LISTINGS OR SALES FOR THE SUBJECT WITHIN THE PAST THREE YEARS.

Total gross monthly estimated rent $ 4,400   X gross rent multiplier (GRM) 125.33   = $ 551,452   INDICATED VALUE BY INCOME APPROACH
Comments on income approach (including expense ratios, if available, and reconciliation of the GRM)   *GRM DEVELOPED FROM SALES/RENTAL COMPS UTILIZED DO REFLECT LASTEST VALUES IN THIS RISING MARKET AREA, SINCE RENTALS HAVE SIGNIFICANTLY INCREASED.

| INDICATED VALUE BY SALES COMPARISON APPROACH | $ 423,000 |
|---|---|
| INDICATED VALUE BY INCOME APPROACH | $ 551,452 |
| INDICATED VALUE BY COST APPROACH | $ 439,000 |

This appraisal is made ☒ "as is" ☐ subject to the repairs, alterations, inspections, or conditions listed below ☐ subject to completion per plans and specifications.
Comments and conditions of appraisal:  THIS REPORT AND THE FINAL ESTIMATE OF VALUE IS FOR THE SUBJECT "AS IS". SEE ATTACHED PHOTOS

Final reconciliation:  CONSIDERATION WAS GIVEN TO ALL APPROACHES; HOWEVER, THE SALES AND INCOME APPROACHES ARE THE MOST RELIABLE.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/Fannie Mae Form 1004B (Revised  ).
I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF   7/15/2005
(WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $   423,000

| APPRAISER: RGS APPRAISING, INC. | SUPERVISORY APPRAISER (ONLY IF REQUIRED): |
|---|---|
| Signature | Signature       ☐ Did ☐ Did Not Inspect Property |
| Name RICHARD G SHERMAN | Name |
| Date Report Signed 7/17/2005 | Date Report Signed |
| State Certification #  | State Certification # |
| Or State License #  256       State DC | Or State License #       State |

Freddie Mac Form 72 10-94                      PAGE 4 OF 4                      Fannie Mae Form 1025 10-94

Form SR3 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 07543 Page #9

## SUPPLEMENTAL ADDENDUM

File No.    07543

| | | | |
|---|---|---|---|
| Borrower/Client  WILSON | | | |
| Property Address  1905 2ND ST NE | | | |
| City  WASHINGTON, | County  N/A | State  D.C. | Zip Code  20002-1362 |
| Lender  ALLSTATE LENDING SERVICES | | | |

### MARKET DATA GRID COMMENTS

DUE TO A PAUCITY OF RECENTLY SETTLED SALES OF SIMILAR 4 UNIT DWELLING LIKE THE SUBJECT, THE COMPS UTILIZED ARE AMONG THE BEST AVAILABLE. ALTHOUGH COMP #3 IS AN OLDER SALE, IT REMAINS A RELIABLE SUPPORTER OF VALUE SINCE VALUES HAVE SUBSTANTIALLY INCREASED OVER THE PAST YEAR DUE TO A SHORTAGE OF SUPPLY AND FAVORABLE RATES, WARRANTING A 15% "TIME ADJUSTMENT".

COMP #1 WAS ADJUSTED FOR ITS SIGNIFICANTLY SUPERIOR SIZE LOT AS COMPARED TO THE SUBJECT.

COMPS 2 & 3 WERE ADJUSTED +$3,000 PER UNIT FOR THEIR OVERALL INFERIOR AVERAGE CONDITION FOR ALL FOUR UNITS IN ADDITION TO A +$3,000 PER UNIT FOR THEIR OLDER KITCHENS AND BATHROOMS.

COMPS WERE ADJUSTED +or -$5,000 PER THEIR BEDROOM COUNT (UTILITY) AS COMPARED TO THE SUBJECT.

AN EXTERIOR INSPECTION OF THE COMPARABLES WAS PERFORMED; HOWEVER, THE PHOTOS WERE TAKEN FROM THE MRIS SYSTEM AND HAVE NOT BEEN ALTERED OR ENHANCED BY ANY MEANS.

ALTHOUGH THE FINAL ESTIMATE OF VALUE EXCEEDS THE PREDOMINANT VALUE, IT IS NOT AN OVER-IMPROVEMENT FOR A SUBSTANTIALLY RENOVATED DWELLING. NUMEROUS OTHER SIMILAR MULTI-FAMILY DWELLINGS LIKE THE SUBJECT EXIST; HOWEVER, FEW HAVE BEEN PLACED UPON THE MARKET FOR SALE.

## Operating Income Statement
### One- to Four-Family Investment Property and Two- to Four-Family Owner-Occupied Property

Property Address

Street 1905 2ND ST NE     City WASHINGTON.     State D.C.     Zip Code 20002-1382

**General Instructions:** This form is to be prepared jointly by the loan applicant, the appraiser, and the lender's underwriter. The applicant must complete the following schedule indicating each unit's rental status, lease expiration date, current rent, market rent, and the responsibility for utility expenses. Rental figures must be based on the rent for an "unfurnished" unit.

| | Currently Rented | | Expiration Date | Current Rent Per Month | Market Rent Per Month | Utility Expense | Paid By Owner | Paid By Tenant |
|---|---|---|---|---|---|---|---|---|
| Unit No. 1 | Yes ☒ | No ☐ | 11/30/05 | $ 1,100 | $ 1,100 | Electricity | ☐ | ☒ |
| Unit No. 2 | Yes ☒ | No ☐ | 7/31/05 | $ 925 | $ 1,050 | Gas | ☐ | ☒ |
| Unit No. 3 | Yes ☐ | No ☒ | OWNER | | $ 1,100 | Fuel Oil | ☐ | ☐ |
| Unit No. 4 | Yes ☒ | No ☐ | 8/31/05 | $ 1,025 | $ 1,050 | Fuel (Other) | ☐ | ☐ |
| Total | | | | $ 3,050 | $ 4,300 | Water/Sewer | ☒ | ☐ |
| | | | | | | Trash Removal | ☒ | ☐ |

The applicant should complete all of the income and expense projections and for existing properties provide actual year-end operating statements for the past two years (for new properties the applicant's projected income and expenses must be provided). This Operating Income Statement and any previous operating statements the applicant provides must then be sent to the appraiser for review, comment, and/or adjustments next to the applicant's figures (e.g. Applicant/Appraiser 288/300). If the appraiser is retained to complete the form instead of the applicant, the lender must provide the appraiser the aforementioned operating statements, mortgage insurance premium, HOA dues, leasehold payments, subordinate financing, and/or any other relevant information as to the income and expenses of the subject property received from the applicant to substantiate the projections. The underwriter should carefully review the applicant's/appraiser's projections and the appraiser's comments concerning those projections. The underwriter should make any final adjustments that are necessary to more accurately reflect any income or expense items that appear unreasonable for the market. (Real estate taxes and insurance on these types of properties are included in PITI and not calculated as an annual expense item.) Income should be based on the current rents, but should not exceed market rents. When there are no current rents because the property is proposed, new, or currently vacant, market rents should be used.

### Annual Income and Expense Projection for Next 12 months

| | | By Applicant/Appraiser | | Adjustments by Lender's Underwriter |
|---|---|---|---|---|
| **Income (Do not include income for owner-occupied units)** | | | | |
| Gross Annual Rental (from unit(s) to be rented) | | 51,600 | $ | |
| Other Income (include sources) | + | | | |
| Total | | 51,600 | | |
| Less Vacancy/Rent Loss | $ | 4,128  ( 8%) | – | ( %) |
| Effective Gross Income | $ | 47,472 | $ | |
| **Expenses (Do not include expenses for owner-occupied units)** | | | | |
| Electricity | | | | |
| Gas | | 0 | | |
| Fuel Oil | | 0 | | |
| Fuel | (Type _____) | 0 | | |
| Water/Sewer | | 0 | | |
| Trash Removal | | 1,200 | | |
| Pest Control | | 200 | | |
| Other Taxes or Licenses | | 0 | | |
| Casual Labor | | 0 | | |
| | This includes the costs for public area cleaning, snow removal, etc., even though the applicant may not elect to contract for such services. | | | |
| Interior Paint/Decorating | | 0 | | |
| | This includes the costs of contract labor and materials that are required to maintain the interiors of the living unit. | | | |
| General Repairs/Maintenance | | 0 | | |
| | This includes the costs of contract labor and materials that are required to maintain the public corridors, stairways, roofs, mechanical systems, grounds, etc. | | | |
| Management Expenses | | 4,300 | | |
| | These are the customary expenses that a professional management company would charge to manage the property. | | | |
| Supplies | | 0 | | |
| | This includes the costs of items like light bulbs, janitorial supplies, etc. | | | |
| Total Replacement Reserves - See Schedule on Pg. 2 | | 2,162 | | |
| Miscellaneous | | | | |
| | | | | |
| **Total Operating Expenses** | $ | 7,862 | $ | |

Freddie Mac
Form 998 Aug 88

Fannie Mae
Form 216 Aug 88

File No. 07-543] Page #11

## Replacement Reserve Schedule

Adequate replacement reserves must be calculated regardless of whether actual reserves are provided for on the owner's operating statements or are customary in the local market. This represents the total average yearly reserves. Generally, all equipment and components that have a remaining life of more than one year-such as refrigerators, stoves, clothes washers/dryers, trash compactors, furnaces, roofs, and carpeting, etc. - should be expensed on a replacement cost basis.

| Equipment | | Replacement Cost | | | Remaining Life | | | | | | By Applicant/ Appraiser | Lender Adjustments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stoves/Ranges | @ | $ 750 | ea. / | 15 Yrs. | x | 4 | Units | = | $ | 200.00 | $ | |
| Refrigerators | @ | $ 750 | ea. / | 15 Yrs. | x | 4 | Units | = | $ | 200.00 | $ | |
| Dishwashers | @ | $ 500 | ea. / | 12 Yrs. | x | 1 | Units | = | $ | 41.67 | $ | |
| A/C Units | @ | $ | ea. / | Yrs. | x | | Units | = | $ | | $ | |
| C. Washer/Dryers | @ | $ | ea. / | Yrs. | x | | Units | = | $ | | $ | |
| HW Heaters | @ | $ 800 | ea. / | 20 Yrs. | x | 4 | Units | = | $ | 160.00 | $ | |
| Furnace(s) | @ | $ 3,000 | ea. / | 10 Yrs. | x | 4 | Units | = | $ | 1,200.00 | $ | |
| (Other) | @ | $ | ea. / | Yrs. | x | | Units | = | $ | | $ | |
| Roof | @ | $ 4,000 | / | 20 Yrs. | x | One Bldg. | | | $ | 200 | $ | |

| Carpeting   (Wall to Wall) | | | | Remaining Life | | | |
|---|---|---|---|---|---|---|---|
| (Units) | 80 Total Sq. Yds. @ | $ 20.00 Per Sq. Yd. / | 10 Yrs. | = | $ | 160 | $ |
| (Public Areas) | N/A Total Sq. Yds. @ | $ Per Sq. Yd. / | Yrs. | = | $ | | $ |

| Total Replacement Reserves. (Enter on Pg. 1) | | | $ 2,161.67 | $ |
|---|---|---|---|---|

## Operating Income Reconciliation

$ 47,472 — $ 7,862 = $ 39,610 / 12 = $ 3,301
Effective Gross Income        Total Operating Expenses        Operating Income                Monthly Operating Income

$ 3,301 — $ PROV. BY LNDR = $ 3,301
Monthly Operating Income        Monthly Housing Expense        Net Cash Flow

(Note: Monthly Housing Expense includes principal and interest on the mortgage, hazard insurance premiums, real estate taxes, mortgage insurance premiums, HOA dues, leasehold payments, and subordinate financing payments.)

### Underwriter's Instructions for 2-4 Family Owner-Occupied Properties

* If Monthly Operating Income is a positive number, enter as "Net Rental Income" in the "Gross Monthly Income" section of Freddie Mac Form 65/Fannie Mae Form 1003. If Monthly Operating Income is a negative number, it must be included as a liability for qualification purposes.

* The borrower's monthly housing expense-to-income ratio must be calculated by comparing the total Monthly Housing Expense for the subject property to the borrower's stable monthly income.

### Underwriter's instructions for 1-4 Family Investment Properties

* If Net Cash Flow is a positive number, enter as "Net Rental Income" in the "Gross Monthly Income" section of Freddie Mac Form 65/Fannie Mae Form 1003. If Net Cash Flow is a negative number, it must be included as a liability for qualification purposes.

* The borrower's monthly housing expense-to-income ratio must be calculated by comparing the total monthly housing expense for the borrower's primary residence to the borrower's stable monthly income.

### Appraiser's Comments  (including sources for data and rationale for the projections)

YEAR END OPEATING STATEMENTS WERE NOT PROVIDED TO THE APPRAISER. SOME FIGURES HOWEVER REFLECT ESTIMATES & AVERAGES FOR ESTIMATED REMAINING LIFE. FIGURES FOR REPLACEMENT RESERVES DERIVED FROM MARKET ANALYSIS AND DISCUSSION WITH LOCAL CONTRACTORS. MARKET RENT DERIVED VIA AN ANALYSIS OF MLS RECORDS. ACCORDING TO OWNER ROOF IS NEARLY NEW AND ALL OF THE COMPONENTS ARE AT THE BEGINNING OF THEIR ECONOMIC LIFE.

RICHARD G. SHERMAN                  Richard G. Sherman                  JULY 17, 2005
Appraiser Name                            Appraiser Signature                      Date

### Underwriter's Comments and Rationale for Adjustments

_____                  _____                  _____
Underwriter Name                          Underwriter Signature                    Date

Freddie Mac
Form 998 Aug 88                                                                                              Fannie Mae
                                                                                                          Form 216 Aug 88

Form #/C — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

**APPRAISER'S CERTIFICATION:** The appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:** 1905 2ND ST NE, WASHINGTON, D.C. 20002-1362

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: | Signature: |
| Name: RICHARD D. SHERMAN | Name: |
| Date Signed: July 17, 2005 | Date Signed: |
| State Certification #: | State Certification #: |
| or State License #: 256 | or State License #: |
| State: DC | State: |
| Expiration Date of Certification or License: 2/28/2006 | Expiration Date of Certification or License: |
| | ☐ Did    ☐ Did Not Inspect Property |

Form ACR_DEFD — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Location Map

| Borrower/Client | WILSON | | | | |
|---|---|---|---|---|---|
| Property Address | 1905 2ND ST NE | | | | |
| City | WASHINGTON. | County | N/A | State | D.C. | Zip Code | 20002-1362 |
| Lender | ALLSTATE LENDING SERVICES | | | | |



File No. 07549  Page #15

**Building Sketch (Page - 1)**

| | | | |
|---|---|---|---|
| Borrower/Client  WILSON | | | |
| Property Address 1905 2ND ST NE | | | |
| City  WASHINGTON. | County  N/A | State  D.C. | Zip Code  20002-1362 |
| Lender  ALLSTATE LENDING SERVICES | | | |



UNIT #1    UNIT #2    UNIT #3    UNIT #4

Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Size | Net Totals |
| GLA1 | First Floor | 1448.00 | 1449.00 |
| GLA2 | Second Floor | 1449.00 | 1449.00 |
| TOTAL LIVABLE | (rounded) | | 2898 |

| LIVING AREA BREAKDOWN | |
|---|---|
| Breakdown | Subtotals |
| First Floor | |
| 34.5 x 42.0 | 1449.00 |
| Second Floor | |
| 34.5 x 42.0 | 1449.00 |
| 2 Calculations Total (rounded) | 2898 |

Form SKT.BldSkI — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 07e43 Page #16

**Subject Photo Page**

| Borrower/Client | WILSON | | | | |
|---|---|---|---|---|---|
| Property Address | 1905 2ND ST NE | | | | |
| City | WASHINGTON. | County N/A | | State D.C. | Zip Code 20002-1362 |
| Lender | ALLSTATE LENDING SERVICES | | | | |



**Subject Front**

1905 2ND ST NE
Sales Price:    AV423,000
GBA:           2,696
Age:           67 YRS



**Subject Rear**



**Subject Street**

Form PICPIX.SC — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 07543 Page #17

## Subject Interior Photo Page

| Borrower/Client | WILSON | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1905 2ND ST NE | | | | | |
| City | WASHINGTON. | County | N/A | State | D.C. | Zip Code | 20002-1362 |
| Lender | ALLSTATE LENDING SERVICES | | | | | |



**Subject Interior**

| 1905 2ND ST NE | |
|---|---|
| Sales Price | AV423,000 |
| Gross Living Area | |
| Total Rooms | 20 |
| Total Bedrooms | 6 |
| Total Bathrooms | 4 |
| Location | ECKINGTON |
| View | TYPICAL |
| Site | .06AC+- NO PLAT AVAILABLE |
| Quality | AVERAGE |
| Age | 67 YRS |

TYPICAL
LIVING ROOM



**Subject Interior**

TYPICAL
KITCHEN



**Subject Interior**

TYPICAL
BATHROOM

File No. 07543 Page #18

## LISTINGS PHOTOGRAPH ADDENDUM

| Borrower/Client | WILSON | | | | |
|---|---|---|---|---|---|
| Property Address | 1905 2ND ST NE | | | | |
| City | WASHINGTON, | County N/A | | State D.C. | Zip Code 20002-1362 |
| Lender | ALLSTATE LENDING SERVICES | | | | |



COMP LISTING #1
1921 ROSEDALE STREET, N.E.



COMP LISTING
#1216 RAU, STREET, N.E



LISTING #3
1869 KENDALL STREET, N.E.

File No. 07543 Page #19

## RENTALS PHOTOGRAPH ADDENDUM

| Borrower/Client | WILSON | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1905 2ND ST NE | | | | | | |
| City | WASHINGTON | County | N/A | | State | D.C. | Zip Code 20002-1362 |
| Lender | ALLSTATE LENDING SERVICES | | | | | | |



COMP RENTAL #1
1700 WEST VIRGINIA AVENUE, N.E.



COMP RENTAL #2
1723 H STREET, N.E.



COMP RENTAL #3
1232 18TH STREET, N.E.

File No. 07543| Page #20

## Comparable Photo Page

| | | | | |
|---|---|---|---|---|
| Borrower/Client  WILSON | | | | |
| Property Address  1905 2ND ST NE | | | | |
| City  WASHINGTON. | County  N/A | | State  D.C. | Zip Code  20002-1362 |
| Lender  ALLSTATE LENDING SERVICES | | | | |



**Comparable 1**
320 18TH PLACE, N.E.
Sales Price:    432,000
GBA:    3,328
Age:    68 YRS



**Comparable 2**
2213 M  STREET, N.E.
Sales Price:    415,000
GBA:    2,440
Age:    81 YRS



**Comparable 3**
1317 ORREN TREET, N.E.
Sales Price:    376,000
GBA:    2,564
Age:    73 YRS

# EXHIBIT "5"

After Recording Return To:
1905 2ND ST NE, LLC
1717 K ST NW, SUITE #600
WASHINGTON, DC 20036

Loan Number:    2928800004

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated ___November 17, 2004___, together with all Riders to this document.

**(B) "Borrower"** is ___Calvert M. Wilson___. Borrower's address is ___1118 47TH PL. NE, Washington, DC 20019___. Borrower is the trustor under this Security Instrument.

**(C) "Lender"** 1905 2ND ST NE, LLC. Lender is a ___limited liability company___ organized and existing under the laws of ___the District of Columbia___. Lender's address 1717 K Street, NW, Suite 600, Washington, DC 20036. Lender is the beneficiary under this Security Instrument.

**(D) "Trustee"** is ___Andrew R. Polott and Richard C. Sterm___, attorneys in good standing with the District of Columbia Trustee's address is ___15400 Calhoun Drive, Suite 140, Rockville, MD 20855___.

**(E) "Note"** means the Agreement by and between Borrower and Lender and dated ___November 14, 2004___. The Note states that Borrower owes Lender ___Thirty-Thousand Five hundred and thirty-five dollars___ Dollars (U.S. $ 30,535.14) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than ___January 19, 2005___.

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

Initials: _____

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ VA Rider |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

Initials: _____  _____

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property

located in the _____ **District** _____ of _____ **Columbia** _____

### SEE EXHIBIT "A" ATTACHED
### HERETO AND MADE A PART HEREOF

which currently has the address of _____ **1905 Second Street, NE** _____

Washington, District of Columbia _____ **20002** _____ ("Property Address")

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender

Initials: _____ _____

DISTRICT OF COLUMBIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3009   1/01 (page 3 of 17 pages)

unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.

Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to

Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate

from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall NOT occupy, establish, and use the Property as Borrower's principal residence within 90 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Initials: _____  _____

# *HOME SAVERS PLUS, LLC*
## *1717 K ST NW, SUITE # 600*
## *WASHINGTON, DC 20036*

### EQUITY-SHARE PLUS ™

**THIS AGREEMENT** is entered into on this 14TH day of November, 2004, by and between <u>CALVERT M WILSON</u> of 1118 47TH PL NE, Washington, DC 20019 ("WILSON") and Home Savers Plus, LLC, 1717 K St. NW, Suite 600, Washington, D.C. 20036 ("Home Savers Plus"), and witnesses:

**WHEREAS**, Home Savers Plus, specializes in stopping foreclosures; and

**WHEREAS**, Home Savers Plus has a program in which the equity in a property is shared between the property owner and itself in exchange for stopping a foreclosure; and

**WHEREAS**, <u>Calvert M. Wilson</u> own a property located at <u>1905 Second St. NE</u> <u>Washington, DC ,20049</u> and for the purposes of assessment and taxation is known as 3565-0000-0047, ("the Property") is behind in mortgage payments and is scheduled to go to foreclosure sale on <u>NOVEMBER 17, 2004 @11:24 AM</u> and desires to keep the property; and

**NOW THEREFORE,** in consideration of the above, and the mutual agreement of the parties, the parties hereof agree as follows:

**A.     Home Savers Plus, for its part, agrees to perform the following services:**

1)     Pay the amount needed to stop said foreclosure in the amount of $27,535.14:
2)     The amount paid shall serve as the deposit for the purchase contract executed in conjunction with this agreement and/or applied to the purchase price if purchased.
3)     Give WILSON 60 days in which to refinance said loan now in default. The loan in questioned is designated by loan <u># 0001019753</u> .The amount to stop the foreclosure is:

"<u>$27,535.14</u>  plus attorney's fees, foreclosure costs and all accruals…".
4)     Hold all executed documents in escrow until the expiration of this agreement.

**B.    WILSON for his part, agrees to do the following:**

1.    Provide all needed information and releases such that Home Savers Plus may gather the needed information such as re-instatement amounts and loan pay-off amounts.

2.    Pay the mortgage on time and in full once the loan has been re-instated.

3.    Maintain the proper level of insurance on the property at all times.

4.    Maintain the physical condition and integrity of the property at all times, including regular maintenance.

5.    Pay any and all amounts due to the District of Columbia for taxes, assessments and charges that may be owed on the property.

6.    Re-finance the Property for a minimum of **$230,000**. The proceeds of the refinance shall be used to payoff the original loans and Home Savers Plus first. Any proceeds remaining shall be distributed as to the instructions of the Wilson.

7.    Pay directly from settlement of the re-finance of the Property to Home Savers Plus the sum of **$122,656.07** plus any costs advanced to stop the foreclosure.

8.    Pay directly from settlement any costs advanced for repairs made to the property, including but not limited to , labor, materials, permits, etc.

9.    Execute the needed documents to protect the interests of Home Savers Plus including, deeds, deeds of trusts, and related settlement documents.

10.    In the event that that the refinance does not take place within the specified time-frame, the documents held in escrow shall be released and recorded. This includes the deed that transfers ownership of the property.

11.    In addition to the options available to Home Savers Plus, Home Savers Plus shall also be entitled to liquidated damages in the amount of $100,000 if the terms of this agreement are not followed or complied with in a timely manner.

12.    TIME IS OF THE ABSOLUTE ESSENCE.

**C.    In consideration of the above, the parties further agree as follows:**

1.    This agreement shall not be amended, modified nor terminated, in whole or in part, nor any of the terms, covenants, representations, warranties, or conditions hereof waived, without the express mutual intention of the parties, as such intention shall be shown by a written instrument executed by a duly authorized officer of each party, or, in the case of a waiver or consent, by or on behalf of the party or parties waiving compliance or giving such consent.

2.  This agreement and all questions relating to its validity, interpretation, performance and enforcement shall be governed by and construed, interpreted, and enforced in accordance with the laws of the District of Columbia, notwithstanding any District of Columbia or other Choice-of-law rules to the contrary. The parties hereto waive the right to trial by jury as to any issue as to which they would be entitled to a jury trial.

3.  The failure of any party at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by any party of any condition, or of any breach of any covenant, agreement, representation, or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such covenant, agreement, representation, or warranty.

4.  This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith. No covenant, representation, or condition not expressed in this Agreement shall be binding upon the parties hereto or shall affect or be effective to interpret, change, or restrict the provisions of this Agreement.

5.  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable, this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof; and the remaining provisions of the Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.

**Barrett Ware**

_____          _____
Barrett Ware, managing member             Date

**Calvert M. Wilson**

_____          _____
Calvert M. Wilson                         Date

I, _Levi L. Holliday_ a duly commissioned and qualified Notary Public of the District of Columbia, do hereby certify that on this _14th_ day of, **November 2004**, before me personally appeared <u>Calvert M. Wilson</u> to me known to be the persons described in and who executed the foregoing Agreement and acknowledged to me that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal,

Notary Public

My Commission expires on _____

Levi L. Holliday
Notary Public, District of Columbia
My Commission Expires 06-14-2009

I, _Levi L. Holliday_ a duly commissioned and qualified Notary Public of the District of Columba, do hereby certify that on this **14th day of, November 2004**, before me personally appeared Barrett Ware to me known to be the persons described in and who executed the foregoing Agreement and acknowledged to me that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal,

_____
Notary Public

Levi L. Holliday
Notary Public, District of Columbia
My Commission Expires 06-14-2009

My Commission on _____.

# POWER OF ATTORNEY

THIS POWER OF ATTORNEY AUTHORIZES THE PERSON NAMED BELOW, AS MY ATTORNEY-IN-FACT, TO DO ONE OR MORE OF THE FOLLOWING: TO PURCHASE, SELL, LEASE, GRANT, ENCUMBER, RELEASE OR OTHERWISE CONVEY ANY INTEREST I MAY HAVE, BE IT ACTUAL OWNERSHIP OR AN INTEREST BY VIRTUE OF STATUTORY DOWER OR CURTESY RIGHTS IN REAL PROPERTY SITUATED IN THE DISTRICT OF COLUMBIA AND TO EXECUTE DEEDS, DEEDS OF TRUST, MORTGAGES AND ALL OTHER INSTRUMENTS ON MY BEHALF, SPECIFIC TO REAL PROPERTY.

I, **Calvert M. Wilson**, have made, constituted, appointed and by these presents do make, constitute and appoint **Barrett Ware** as my true and lawful Attorney-in-Fact for me and in my name, place and stead to represent me at settlement and closing of the real property being known as 1905 2ᴺᴰ ST NE, **WASHINGTON, DC 20002**, being more particularly described as:

> LOT NUMBERED 47 IN A SUBDIVISION MADE BY NATIONAL SAVINGS AND TRUST COMPANY OF LOTS IN SQUARE 3565 AS PER PLAT RECORDED IN LIBER 105 AT FOLIO 194 IN THE OFFICE OF THE SURVEYOR FOR THE DISTRICT OF COLUMBIA.
> TAX ID # 3565/0047

and to execute, seal, acknowledge and deliver Deeds, Deeds of Trust, Promissory Notes, settlement/Closing Statements, Contracts, Addendums to Contracts, Recordation Tax Returns, Affidavits, Checks and Drafts payable to my order, and any and all other documents necessary to complete the sale or refinance of the aforesaid property:

I give and grant to my said Attorney-in-Fact full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the aforesaid property, including, but not limited to executing the Settlement Statement on my behalf, and to make changes, adjustments or deductions or additions thereon, as fully to all intents and purposes as I might or could do if personally present at the doing thereof, hereby ratifying and confirming all that said Attorney-in-Fact shall have lawfully done pursuant hereto.

This Instrument is to be construed and interpreted as a Limited Power of Attorney within the powers expressed herein and the enumerations of specific items, acts, rights or powers herein shall not limit or restrict and shall not be construed or interpreted as limiting or restricting the powers granted to my Attorney-in-Fact, and I hereby ratify and confirm all that my said Attorney-in-Fact shall do or cause to be done in connection herewith.

This Power of Attorney shall not be affected by my subsequent disability or incapacity, it being my intention and direction that the authority conferred hereby shall be exercisable notwithstanding my subsequent disability or incapacity.
Page 1 of 3

IN TESTIMONY WHEREOF, I have hereunto set my hand and seal this **14** day of November, 2004.

_Calvert M. Wilson_
Calvert M. Wilson

Address: 1905 2nd ST. NE, Wash.,DC 20002

## CERTIFICATE OF ACKNOWLEDGEMENT OF AN INSTRUMENT

I, _Levi L. Holleda_ a duly commissioned and qualified Notary Public of the District of Columbia, do hereby certify that on this ___ day of November, 2004, before me personally appeared Calvert M. Wilson and being informed by me of the contents of said Instrument, he duly acknowledged to me that he executed the same freely and voluntarily for the sues and purposes therein contained,

IN WITNESS WHEREOF, I have hereunto set my hand and official seal,

Levi L. Holleday Public
Notary Public, District of Columbia
My Commission Expires 06-14-2009

My Commission Expires on _____

Page 3 of 3

# ASSIGNMENT OF PROCEEDS

For value received, **Calvert M. Wilson** (the "Assignor"), has on this **14**[th] day of **NOVEMBER, 2004**, transferred, sold, assigned, conveyed and set over to **1905 2**[ND] **ST NE, LLC** (the "Assignee"), its successors, representatives and assigns, all its rights and interest in and to certain proceeds from settlement on the property commonly known as **1905 2**[ND] **ST NE, WASHINGTON, DC 20002**, hereinafter referred to as (the "Property") and as described by the District of Columbia, for the purposes of taxation and assessment as **3565-0000-0047** and further described as follows:

```
LOT NUMBERED 47 IN A SUBDIVISION MADE BY NATIONAL
SAVINGS AND TRUST COMPANY OF LOTS IN SQUARE 3565 AS
PER PLAT RECORDED IN LIBER 105 AT FOLIO 194 IN THE
OFFICE OF THE SURVEYOR FOR THE DISTRICT OF
COLUMBIA.
TAX ID # 3565/0047
```

The assignment of proceeds from settlement shall be distributed completely up to the amount of $122,656.07. This includes the monies advanced to stop the foreclosure sale.

This agreement shall not changed, altered, modified, canceled, revoked or otherwise molested unless done so in writing with the mutual consent of both parties.

NOW THEREFORE, in consideration of the matters recited above and the mutual covenants and agreements contained herein, the parties hereto herby direct the settlement company of _____ to distribute the proceeds of settlement to **1905 2**[ND] **ST NE, LLC** as dictated by the terms of this agreement.

ATTEST: _____
CALVERT M. WILSON

I, _____ a duly commissioned and qualified Notary Public of the District of Columbia, do hereby certify that on this _____ **14 th** **Day of, November 2004**, before me personally appeared Calvert M. Wilson to me known to be the person described in and who executed the foregoing document and acknowledged to me that he executed the same as his free act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____ Notary Public

Levi L. Holliday
Notary Public, District of Columbia
My Commission Expires 06-14-2009

My Commission Expires on: _____

Case No. _____

# *AFFIDAVIT*
## (Seller-Owner)

District of Columbia, to wit:

This day appeared personally before the undersigned, a Notary Public in and for the aforementioned jurisdiction, Calvert M. Wilson who being first duly sworn, made oath before me that: I am the seller of that certain real property known as 3565-0047 located at 1905 2ND St. NE, Washington, DC 20002. That there are no District of Columbia, State of Maryland, State of Virginia, or federal tax liens against me. That there are no outstanding judgments or pending lawsuits, or suits in equity against me among the land records of the Office of the Recorder of Deeds for the District of Columbia, or the Court Records of the District of Columbia, the State of Maryland, or the State of Virginia, except as hereinafter set forth:_____N/A_____.

That said property is:                              That my marital status is:
Tenant occupied at present.        ( X )      Single (not married)        (      )
That said property has been                      Divorced and not remarried (     )
Occupied by me                      (      )      Married/Widowed             ( X )
That said property is Vacant        (      )      (Spouse's Name):  Perelta Wilson

That there have been no improvements made to said property within the past six (6) months, except as hereinafter specified:_____N/A_____.

All labor and materials used in the construction of improvements on the above described property have been paid for and there are now no unpaid labor or material claims against the improvements or the property upon which same are situated, and I hereby declare that all sums of money due for the erection of improvements have been fully paid and satisfied. I certify that the requirements of Title IV of the District of Columbia Law 2-54, Rental Housing Conversion and Sale Act of 1980, have been complied with, and that tenant has not exercised his rights thereunder. The purpose of this affidavit is to induce the settlement company _____ to make and complete settlement on the aforesaid property and to issue its title insurance policy without exception as to judgments, District of Columbia, State of Maryland, and State of Virginia, or Federal tax liens. That protection under applicable Bankruptcy laws has not been applied for by the undersigned or any party in interest in the property. That there are no unpaid or delinquent real estate taxes, assessments, water connection or tap fees and/or rezoning, agricultural or development transfer taxes assessed or applicable to the subject property, except as listed:

_____

That I state that my United States identification number(s) or Social Security number(s) are those as set forth below and that I am not a foreign person with in the meaning of the United States Internal Revenue Code. This statement may be disclosed to the Internal Revenue Service.

CALVERT M. WILSON _____ Social Security Number: 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

Subscribed, sworn to, and acknowledged before me this __1st__ day of Novemeber 2004.

_____
Notary Public

My Commission Expires:       Levi L. Holliday
                             Notary Public, District of Columbia
                             My Commission Expires 06-14-2009

NO TITLE EXAMINATION

### THIS DEED

Made this 14TH day of November, 2004, by and between CALVERT M. WILSON, party of the first part, to 1905 2ND ST NE, LLC, party of the second part,

WITNESSETH, that for and in consideration of the sum of One Hundred and Sixty Thousand Dollars ($160,000.00), the receipt whereof is hereby acknowledged, the said party of the first part does grant unto the party of the second part, in fee simple, the following described land and premises, situate in the District of Columbia and known and distinguished as

LOT NUMBERED 47 IN A SUBDIVISION MADE BY NATIONAL SAVINGS AND TRUST COMPANY OF LOTS IN SQUARE 3565 AS PER PLAT RECORDED IN LIBER 105 AT FOLIO 194 IN THE OFFICE OF THE SURVEYOR FOR THE DISTRICT OF COLUMBIA.
TAX ID # 3565/0047

which has the address of 1905 2ND ST NE.

TOGETHER with all and singular the ways, easements, rights, privileges and appurtenances, to the same belonging, or in anywise - appertaining, and all the estate, right, title, interest, and claim, either at law or in equity, or otherwise however, of the said party of the first part, of, in, to, or out of the said land and premises, except as reserved herein.

AND the said party of the first part covenants that he will warrant specially the property hereby conveyed; and that he will execute such further assurances of said land as may be requisite.

WITNESS his hand and seal on the day and year first hereinbefore written.

_____ [SEAL]

DISTRICT OF COLUMBIA, SS:

On the 14th day of November, 2004, before me, the undersigned officer, personally appeared Calvert M. Wilson, known to me to be the person whose name is subscribed to the within instrument bearing date of the 14th day of November, 2004 and acknowledged that he has executed the same for the purpose therein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____ Notary Public
Levi L. Holliday
Notary Public, District of Columbia
My Commission Expires 06-14-2009

My commission expires _____

AFTER RECORDING, PLEASE MAIL TO:

1905 2ND ST NE, LLC
1717 K ST NW, SUITE #600
WASHINGTON, DC 20036



**Government of the District of Columbia**
Office of Tax
and Revenue
Recorder of Deeds
515 D Street, NW
Washington, DC 20001
Phone (202)727-5374

| 3565 | 0000 | 0047 |
|---|---|---|
| Square | Suffix | Lot |

## PART K - Computation of Tax

| | | |
|---|---|---|
| 1. Recordation of Tax | 1.1% of Line 2 or Line 3, Part J | $ |
| 1. Transfer Tax | 1.1% of Line 2 or Line 3, Part J | $ |
| 1. Recordation Tax | 1.1% of Line 1 (Construction Loan) | $ |
| 2. Recordation of Tax | 1.5% of Line 2 or Line 3, Part J | $ |
| 2. Transfer Tax | 1.5% of Line 2 or Line 3, Part J | $ |
| 2. Recordation Tax | 1.5% of Line 1 (Commercial Construction Loan) | $ |
| 3. Total of Lines 1 or 2 | .......................................... | $ |

## PART L - Affidavit (Part A to L)

I/We hereby swear or affirm under penalty of perjury that this return, including any accompanying schedules/documents/and statements, has been examined by me/us and to the best of my/our knowledge and belief, the statements and representations are correct and true. I/We hereby acknowledge that any false statement or misrepresentations I/We made on this return is punishable by criminal penalties under the laws of the District of Columbia.

### Grantor(s)

CARLOTTO M WILSON
Typed Name

_signature_
Signature

Date  11-14-04

Subscribed to and sworn to before me
by Grantor(s) this 14th day of
November , 200 4 .

_signature_
Notary Public
Levi L. Holliday
Notary Public, District of Columbia
My Commission Expires 06-14-2009
mm/dd/yyyy

### Grantee(s)

1905 2nd St NE U.U
Typed Name

_signature_
Signature

Date  11/14/2004

Subscribed to and sworn to before me
by Grantee(s) this 14th day of
November , 200 4 .

_signature_
Notary Public
Levi L. Holliday
Notary Public, District of Columbia
My Commission Expires 06-14-2009
mm/dd/yyyy

**This information is subject to audit within three years of filing.
Please keep all supporting documentation.**

After Recording Return To:
1905 2ND ST NE,LLC
1717 K ST NW, SUITE #600
WASHINGTON, DC 20036

Loan Number:    2928800004

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated ___November 17, 2004___, together with all Riders to this document.

**(B) "Borrower"** is ___Calvert M. Wilson___. Borrower's address is ___1118 47TH PL. NE, Washington, DC 20019___. Borrower is the trustor under this Security Instrument.

**(C) "Lender"** 1905 2ND ST NE, LLC. Lender is a ___limited liability company___ organized and existing under the laws of ___the District of Columbia___. Lender's address 1717 K Street, NW, Suite 600, Washington, DC 20036. Lender is the beneficiary under this Security Instrument.

**(D) "Trustee"** is ___Andrew R. Polott and Richard C. Sterrn___, attorneys in good standing with the District of Columbia Trustee's address is ___15400 Callhoun Drive, Suite 140, Rockville, MD 20855___.

**(E) "Note"** means the Agreement by and between Borrower and Lender and dated ___November 14, 2004___. The Note states that Borrower owes Lender Thirty-Thousand Five hundred and thirty-five dollars Dollars (U.S. $ 30,535.14) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than ___January 19, 2005___.

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

Initials: _____

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider
☐ Balloon Rider    ☐ Planned Unit Development Rider    ☐ VA Rider
☐ 1-4 Family Rider    ☐ Biweekly Payment Rider    ☐ Other(s) [specify]

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

Initials: _C.M.G._

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the _____ **District** _____ of _____ **Columbia** _____

### SEE EXHIBIT "A" ATTACHED
### HERETO AND MADE A PART HEREOF

which currently has the address of _____ **1905 Second Street, NE** _____

Washington, District of Columbia _____ **20002** _____ ("Property Address")

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender

Initials: _CmR/_

unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.

Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to

Initials: _CMC_

Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Initials: _CM_

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate

Initials: _C. M__/

from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall NOT occupy, establish, and use the Property as Borrower's principal residence within 90 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

Initials: _____

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Initials: _____

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's

Initials: _____

payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking,

destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.

Initials: _____

Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable Law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this

Initials: _____

Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain

Initials: _C M_

presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall send written notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall give notice of sale by public advertisement as Trustee deems proper to protect the interests of Borrower and Lender. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

Initials: _C٧W٥٧_

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of ____5____ % of the gross sale price and reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by recording a Deed of Appointment. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____      _____ (Seal)
Luther Hector                                                    - Borrower
                                                         **Calvert M. Wilson**
                                                         1905 Second St., NE
                                                         Washington, DC 20002


_____      _____ (Seal)
                                                                 - Borrower


SARAH L. TILLMAN
NOTARY PUBLIC
DISTRICT OF COLUMBIA

MY COMMISSION EXPIRES: _July 31, 2006_


Initials: _____

DISTRICT OF COLUMBIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3009  1/01  (page 16 of 17 pages)

STATE OF Washington , COUNTY OF District of Columbia ss:

I, Sarah L. Tillman , a Notary Public in and for the jurisdiction aforesaid, do hereby certify that **Calvert M. Wilson**, personally known to me as the person who executed the foregoing instrument bearing date of November 17, 2004 , personally appeared before me in said jurisdiction and acknowledged said instrument to be his act and deed and that he executed said instrument for the purposes therein contained.

Witness my hand and official seal this 17th day of November, 2004 .

Notary Public

My commission expires My 31, 2006

Document Prepared By:
DEMOCRACY TITLE CORPORATION
Telephone: 240-499-2300
15400 Calhoun Drive
Suite 140
Rockville, MD 20855

Initials: CMW

DISTRICT OF COLUMBIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3009  1/01  *(page 17 of 17 pages)*

Loan Number:    2928800004

## EXHIBIT A

LOT NUMBERED 47 IN A SUBDIVISION MADE BY NATIONAL
SAVINGS AND TRUST COMPANY OF LOTS IN SQUARE 3565 AS PER
PLAT RECORDED IN LIBER 105 AT FOLIO 194 IN THE OFFICE OF
THE SURVEYOR FOR THE DISTRICT OF COLUMBIA.
TAX ID # 3565/0047

# AFFIDAVIT

I, the owner of the real property described within certify, subject to criminal penalties for making false statements pursuant to section 404 of the District of Columbia Theft and White Collar Crimes Act of 1982, effective December 1, 1982 (D.C. law 4-164; D.C. Code Sec. 22-2514), that the real property described within is either Class 1 Property or Class 2 Property, as those classes of property are established pursuant to section 412a of the District of Columbia Real Property Tax Revision Act of 1974, approved September 3, 1974 (88 Stat. 1051; D.C. Code Sec. 47-813), with 5 or fewer units.

**Calvert M. Wilson**

Witness - Luther Hector

STATE OF  Washington

COUNTY OF   District of Columbia        , TO WIT;

I Hereby Certify, That on this 17th day of  November    , 20 04, before me, the subscriber, a Notary Public of the State aforesaid, personally appear **Calvert M. Wilson** known to me (or satisfactorily proven) to be the persons whose names are subscribed to the within instrument and acknowledged the foregoing Deed to be his act, and in my presence signed and sealed the same.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

NOTARY PUBLIC

My Commission Expires: May 31, 2006

★★★

**Government of the
District of Columbia**
Office of Tax
and Revenue
Recorder of Deeds
515 D Street, NW
Washington, DC 20001
Phone (202)727-5374

## Real Property Recordation and Transfer Tax Form FP 7/C

**PART A - Type of Instrument**

☐ Deed  ☐ Tax Deed  ☒ Deed of Trust  ☐ Trustee Deed
☐ Easement  ☐ Modification  ☐ Lease  ☐ Other _____

**PART B - Property Description/Data/Property Being Conveyed**

| 3565 | C000 | 0097 | | | |
|------|------|------|--|--|--|
| Square | Suffix | Lot | Square | Suffix | Lot |

If more than one lot, list Square/Suffix/Lots below or attach addendum:

**Square and/or Parcel** _____  **Lot(s)** _____

**Property Address** | 1905 | 2nd St. | NE | **Unit No.** ____
| Street Number | Street Name | Quadrant |

**Property Use** ☐ Residential  ☐ Commercial  ☐ Condominum  ☐ Apartment
In addition to the use above, is this property being rented? ☐ Yes  ☐ No

**Interest Transferred** ☐ Fee  ☐ Leasehold  ☐ Leasehold Improvement
☐ Easement  ☐ Other

**Interest Conveyed** ____% Does this transfer include Condo Parking? ☐ Yes  ☐ No

If YES, what is the parking account? | | |
| Square | Suffix | Lot |

**Sale Type** ☐ Single/Parcel Improved - Arms Length
☐ Single/Parcel Vacant - Arms Length
☐ Multiple Parcels  ☒ Arms Length,  ☐ Not Arms Length

**Date of Deed** _____  **Consideration $** _____ (Part J, Line #1)

Was personal property included in this transfer? ☐ Yes  ☐ No
If YES, what type? _____  Estimated Value $ _____

**PART C - Instrument Submitted by or Contact Person**

**Name** Richard Stern  **Firm** Democracy Title Corporation
**Address** 15400 Calhoun DR
**City** Rockville  **State** MD  **Zip** 20855

**PART D - Return Instrument To**

**Name** Barrett Ware  **Firm** 1905 2nd St. NE, LLC
**Address** 1717 K St. NW #600  **Phone** _____
**City** WASHINGTON  **State** DC  **Zip** 20036

**PART E - Exemption Application**

**Recordation Tax** ☐ Yes  ☐ No          **Transfer Tax** ☐ Yes  ☐ No
Reason for Recordation                    Reason for Transfer
Tax Exemption # _____               Tax Exemption # _____



| | | |
|---|---|---|
| 3565 | 0850 | CC97 |
| Square | Suffix | Lot |

**★★★**

**Government of the
District of Columbia**
Office of Tax
and Revenue
Recorder of Deeds
515 D Street, NW
Washington, DC 20001
Phone (202)727-5374

**PART F - Grantee Notification**

1. **Homestead/Senior Deduction:** Is the property being transferred
described in Part B, going to be used as an owner occupied
residential property by the new owner?  ☐ Yes  ☐ No

   If this is a refinance is the owner presently enrolled in the Homestead exemption Program?  ☐ Yes  ☐ No

2. **Mixed Use Tax Class:** Will this property be mixed use property?  ☐ Yes  ☐ No

3. **Low Income Tax Abatement:** Low income home owners may qualify for a 5-year tax abatement.
If you are a low income homeowner you must complete and attach a Low Income Tax Abatement
Application. If qualified, the tax abatement will begin for the first tax year following the transfer.

**PART G - Grantor(s) Information**

Grantor: Calvert M. Wilson   Grantor: _____

Grantor: _____   Grantor: _____

Address: _____   Phone: _____

City: Washington D   State: DC   Zip: 20019

**Grantor Tenancy**  ☐ Tenants in Common  ☐ Joint Tenants  ☐ Trustee
☐ Tenants by Entireties  ☒ Sole

Grantor Social Security # or Fed. ID #: 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

**PART H - Grantee(s) Information**

Grantee: 1905 2nd St NE LLC   Grantee: _____

Grantee: _____   Grantee: _____

Address: 1717 K St NW #610   Phone: 202-543-3716

City: Washington   State: DC   Zip: 2006

**Grantee Tenancy**  ☐ Tenants in Common  ☐ Joint Tenants  ☐ Trustee
☐ Tenants by Entireties  ☒ Sole

Interest Acquired: _____ %   Grantee Social Security # or Fed. ID #: _____

**PART I - Mailing Address for Grantee** (If different from Part H)

| Last Name | First Name | Middle Name |
|---|---|---|
| | | |

Unit #: _____   Address: _____

City: _____   State: _____   Zip: _____

Phone: _____

**PART J - Consideration and Financing** (complete all items; insert zero if no amount)

Cash  $ 0   Other $ _____
First Mortgage  $ 30,535.14
Second  $ 0
Assumed  $ 0   1. Construction Loan $ _____

2. Total Consideration  $ 30,535.14
3. If no consideration, use Assessed Value (see Assessment Roll)  $ _____

  

| 3565 | 0000 | 0047 |
|------|------|------|
| Square | Suffix | Lot |



**Government of the District of Columbia**
Office of Tax
and Revenue
Recorder of Deeds
515 D Street, NW
Washington, DC 20001
Phone (202)727-5374

## PART K - Computation of Tax



1. Recordation of Tax    1.1% of Line 2 or Line 3. Part J    $
1. Transfer Tax    1.1% of Line 2 or Line 3. Part J    $
1. Recordation Tax    1.1% of Line 1 (Construction Loan)    $
2. Recordation of Tax    1.5% of Line 2 or Line 3. Part J    $
2. Transfer Tax    1.5% of Line 2 or Line 3. Part J.    $
2. Recordation Tax    1.5% of Line 1 (Commercial Construction Loan)    $
3. Total of Lines 1 or 2 ...............................................

## PART L - Affidavit (Part A to L)

I/We hereby swear or affirm under penalty of perjury that this return, including any accompanying schedules/documents/and statements, has been examined by me/us and to the best of my/our knowledge and belief, the statements and representations are correct and true. I/We hereby acknowledge that any false statement or misrepresentations I/We made on this return is punishable by criminal penalties under the laws of the District of Columbia.

| Grantor(s) | Grantee(s) |
|---|---|
| Calvert M. Wilson | 1905 2nd St. NE, LLC |
| Typed Name | Typed Name |
| *Signature* | *Signature* |
| Signature | Signature |
| Date  11/17/04 | Date  11/17/2004 |

Subscribed to and sworn to before me by Grantor(s) this  17th  day of  November  , 2004 .

Subscribed to and sworn to before me by Grantee(s) this _____ day of _____ , 200__ .

Notary Public

Notary Public

My Commission Expires: 05/31/06
mm/dd/yyyy

My Commission Expires: _____
mm/dd/yyyy

**This information is subject to audit within three years of filing.
Please keep all supporting documentation.**

EQUITY-SHARE TM
EQUITY CALCULATION WORKSHEET

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | 107000 | | | | |
| 2 | | 27000 | | | | |
| 3 | | 0 | | | | |
| 4 | | 220 | | | | |
| 5 | | 3000 | | | | |
| 6 | | | | | | |
| 7 | | 137220 | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | $ 330,000.00 | | | | |
| 12 | | | | | | |
| 13 | | | | | | |
| 14 | | | | | | |
| 15 | | | | | | |
| 16 | | | | | | |
| 17 | | $ 192,780.00 | | | | |
| 18 | | | | | | |
| 19 | | | | | | |
| 20 | | | | | | |
| 21 | | | | | | |
| 22 | | $ 96,390.00 | | AMOUNT TO HOME SAVERS PLUS | | |
| 23 | | | | | | |
| 24 | | | | | | |
| 25 | | | | | | |
| 26 | | | | | | |
| 27 | | | | | | |
| 28 | | | | | | |
| 29 | | $ 233,610.00 | | AMOUNT YOU HAVE TO REFINANCE | | |
| 30 | | | | | | |
| 31 | | | | | | |

# Prospect Summary

File No. WILSONCAL

## I. Prospect Information

**Borrower**

| | | | | | |
|---|---|---|---|---|---|
| Name | Calvert M Wilson | SSN | 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 | H Phone # | 202-393-0797 |
| E-Mail | | Cell / Alt # | 202-480-8725 | B Phone # | 202-264-3842 |
| Birthday | 33/28/1971 | | | Fax# | |

**Co-Borrower**

| | | | | | |
|---|---|---|---|---|---|
| Name | zaratta Irva Wilson | SSN | 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 | H Phone # | 202-393-0797 |
| E-Mail | | Cell / Alt # | | B Phone # | 202-576 |
| Birthday | 10/28/1971 | | | Fax # | |
| Present Address | 110 47th place NE | Personal Interests | | | |
| | Washington, DC 20017 | Children's Info. | | | |

## II. Property Information

Property Address  1905 2nd st NE
Washington, DC 20017

| Occupancy Status | | | Sales Price | |
|---|---|---|---|---|
| | ☐ | Primary Residence | Down Payment/Equity | |
| | ☐ | Second Home | Appraised Value | 360,000 |
| | ☑ | Investment Property | | |

## III. Mortgage Information

**Note Information**

| | | **Lien Position** | |
|---|---|---|---|
| Loan Amount | 207,000 | ☑ First | |
| Note Rate | 20.000 % | ☐ Second | |
| Term (in months) | 360 | | |
| Due (in months) | 360 | Loan Program | |
| Monthly Payment | 3,459.61 | Loan Rep: | Jeff powell |

## IV. Underwriting Information

| Qualifying Ratios | | Loan-to-Value Ratios | | Total Income | 5,882.00 |
|---|---|---|---|---|---|
| Primary Housing Expense/Income | 12.870 % | LTV | 57.600 % | Total House Exp | 3,849.61 |
| Total Obligations/Income | 80.137 % | Total LTV | 57.500 % | Other Payments | 4,534.01 |

## V. Contact Information

| Contact Date | Time | Memo |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

Source:

Comments:

# GOOD FAITH ESTIMATE

| Applicants | Calvert M Wilson / Xeretta Iyve Wilson | Application No | WILSONCAL |
|---|---|---|---|
| Property Addr: | 1608 2nd st NE, Washington, DC 20017 | Date Prepared: | 10/22/2004 |
| Prepared By: | | Loan Program: | |

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates - actual charges may be more or less. Your transaction may not involve a fee for every item listed. The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 settlement statement which you will be receiving at settlement. The HUD-1 settlement statement will show you the actual cost for items paid at settlement.

Total Loan Amount $    207,000    Interest Rate:    10.000 %    Term:    360 / 360 mths

| | ITEMS PAYABLE IN CONNECTION WITH LOAN: | | | $ | 2,073.00 |
|---|---|---|---|---|---|
| 800 | | | | | |
| 801 | Loan Origination Fee | 1.000% | | | 2,073.00 |
| 803 | Loan Discount | 5.000% | | | 10,360.00 |
| 803 | Appraisal Fee | | | | 400.00 |
| 804 | Credit Report | | | | |
| 805 | Lender's Inspection Fee | | | | |
| 808 | Mortgage Broker Fee | | | | |
| 809 | Tax Related Service Fee | | | | |
| 810 | Processing Fee | | | | |
| 811 | Underwriting Fee | | | | |
| 812 | Wire Transfer Fee | | | | 100.00 |
| | Broker fee of | | | | 4,000.00 |

| 1100 | TITLE CHARGES: | | $ | 1,900.00 |
|---|---|---|---|---|
| 1101 | Closing or Escrow Fee | | | 1,900.00 |
| 1105 | Document Preparation Fee | | | |
| 1106 | Notary Fees | | | |
| 1107 | Attorney Fees | | | |
| 1108 | Title Insurance | | | |

| 1200 | GOVERNMENT RECORDING & TRANSFER CHARGES: | | $ | 2,080.00 |
|---|---|---|---|---|
| 1201 | Recording Fees | | | 2,080.00 |
| 1202 | City/County Tax/Stamps | | | |
| 1203 | State Tax/Stamps | | | |

| 1300 | ADDITIONAL SETTLEMENT CHARGES: | | $ | |
|---|---|---|---|---|
| 1303 | Pest Inspection | | | |

| | Estimated Closing Costs | 21,038.00 |
|---|---|---|

| 900 | ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE: | | | $ | 1,701.27 |
|---|---|---|---|---|---|
| 901 | Interest for | 15 days @ $ | 113.4247 | per day | 1,701.27 |
| 902 | Mortgage Insurance Premium | | | | |
| 903 | Hazard Insurance Premium | | | | |
| 904 | | | | | |
| 905 | VA Funding Fee | | | | |

| 1000 | RESERVES DEPOSITED WITH LENDER: | | | | $ | 1,440.00 |
|---|---|---|---|---|---|---|
| 1001 | Hazard Insurance Premium | | months @ $ | 70.00 | per month | |
| 1002 | Mortgage Ins. Premium Reserves | | months @ $ | | per month | |
| 1003 | School Tax | | months @ $ | | per month | |
| 1004 | Taxes and Assessment Reserves | 12 | months @ $ | 120.00 | per month | 1,440.00 |
| 1005 | Flood Insurance Reserves | | months @ $ | | per month | |
| | | | months @ $ | | per month | |
| | | | months @ $ | | per month | |

| | Estimated Prepaid Items/Reserves | 3,141.27 |
|---|---|---|

| | TOTAL ESTIMATED SETTLEMENT CHARGES | | 24,181.27 |
|---|---|---|---|

| | COMPENSATION TO BROKER    (Not Paid Out of Loan Proceeds) : | | $ | 4,000.00 |
|---|---|---|---|---|
| | from 0% to 4% | | | |

| TOTAL ESTIMATED FUNDS NEEDED TO CLOSE: | | | TOTAL ESTIMATED MONTHLY PAYMENT: | |
|---|---|---|---|---|
| Purchase Price/Payoff (+) | 213,885.00 | New First Mortgage(-) | Principal & Interest | 3,469.84 |
| Loan Amount (-) | 207,000.00 | & (Subordinate)(-) | Other Financing (P & I) | |
| Est Closing Costs (+) | | New 2nd Mtg Closing $ (+/-) | Hazard Insurance | 70.00 |
| Est. Prepaid Items/Escrow (+) | 3,141.27 | | Real Estate Taxes | 120.00 |
| Amount Paid (+) | | | Mortgage Insurance | |
| PMI, MIP, VA Funding Fee | | | Homeowner Assn. Dues | |
| Reqd. for origination fees | | | Other | |

| Total Est. Funds to Close | 315.86 | Total Monthly Payment | 3,659.84 |
|---|---|---|---|

This Good Faith Estimate is being provided by _____, a mortgage broker, and no lender has yet been obtained. These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender. If your application is to purchase residential real property and the lender will take a first lien on the property. The undersigned acknowledge receipt of the booklet "Settlement Costs", and if applicable the Consumer Handbook on ARM mortgages.

| Applicant    Calvert M Wilson | Date | Applicant    Xeretta Iyve Wilson | Date |
|---|---|---|---|

Calyx Form gfe.frm 11/01

SunTrust

NOVEMBER 18, 2004

$27,535.14

TWENTY SEVEN THOUSAND FIVE HUNDRED THIRTY FIVE DOLLARS AND 14 CENTS

Pay To The
Order Of     FRIEDMAN & MACFADYEN, P.A.

SunTrust Banks Inc. by its Authorized Agent SunTrust Bank

Purchaser  1905 2nd ST NE, LLC

Memo  File no. 51903 / Quray M. Kim

Payable At SunTrust Bank

# EXHIBIT "6"

# ANDREWS & BOWE, PLLP

*ATTORNEYS AND COUNSELORS AT LAW*

CHATTANOOGA, TN            WASHINGTON DC

August 5, 2005

**VIA FACSIMILE ONLY (202-726-8870)**

Mr. Luther Hector                    **CEASE & DESIST LETTER**
Home Savers, LLC
1717 K Street, NW, Suite 600
Washington, DC 20001

RE:    **Calvert M. Wilson/1905 2nd Street, NE, Washington, DC 20002**
       **Wilson v. ABN AMRO Mortgage Group, Inc., No. 05-CV-0108 (D.D.C.)**

Dear Mr. Hector:

As you know, this law firm represents the rights and interest of Mr. Calvert M. Wilson in connection with the above-referenced matters. As you also may recall, a key allegation in the referenced federal litigation is that one of Mr. Wilson's lenders has acted inappropriately in connection with the loan administration and debt collection practices.

It is for this, among other reasons, that we were surprised to learn that you or someone else affiliated with your organization apparently has been harassing or interfering with Mr. Wilson's attempts to refinance his debt obligations on the 1905 2nd Street, NE property (the "2nd Street Property") with an entity known as Allstate Lending. Specifically, we are advised that you or your affiliates have made several intrusive telephone calls to Allstate Lending during July and August 2005 seeking to obtain private or confidential information concerning Mr. Wilson or Allstate Lending's underwriting processes in connection with the planned refinancing of the 2nd Street Property. Allstate Lending's representatives have expressly advised Mr. Wilson that there are concerned about your contacts with its organization.

Notwithstanding the alleged rationale for your actions, please be advised that your continued, albeit unnecessary, interference with the known business relationship between Mr. Wilson and Allstate Lending is highly inappropriate and unprofessional. Accordingly, we hereby demand that you and your affiliates immediately cease and desist from taking any further action to harass Mr. Wilson, Allstate Lending or to otherwise interfere with the business relationship between Mr. Wilson and Allstate Lending in connection with the 2nd Street Property.

Mr. Luther Hector
August 5, 2005
Page 2 of 2

To the extent you and your affiliates do not cease and desist from such improper activities, we have been authorized by Mr. Wilson to notify the U.S. District Court in Case No. 05-CV-0108 of the situation and to pursue, simultaneously or consecutively, some or all of the remedies available to Mr. Wilson to remedy this situation.

Your prompt attention to this matter is appreciated.

Very truly yours,

Rawle Andrews Jr.

cc: Mr. Calvert. M. Wilson

1717 K STREET, NW #600• WASHINGTON, DC• 20036
PHONE: 202-349-3975 • FAX: 410-510-1034
RANDREWS@ANDREWSGROUP.ORG
WWW.LOBBYLAWFIRM.COM

# EXHIBIT "7"

# A N D R E W S  &  B O W E , P L L P

*A T T O R N E Y S  A N D  C O U N S E L O R S  A T  L A W*

C H A T T A N O O G A , T N                    W A S H I N G T O N  D C

November 8, 2005

<u>**VIA FACSIMILE ONLY (202-726-8870)**</u>
Mr. Barrett Ware
Mr. Luther Hector                                **2d CEASE & DESIST LETTER**
Home Savers, LLC
1717 K Street, NW, Suite 600
Washington, DC 20001

**RE:        Calvert M. Wilson/1905 2nd Street, NE, Washington, DC 20002**
**            Wilson v. ABN AMRO Mortgage Group, Inc., No. 05-CV-0108 (D.D.C.)**

Gentlemen:

This will respond to your recent telephone calls to our client, Calvert M. Wilson, his prospective financier and our firm concerning the 1905 2nd Street, NE property. (the, "2nd Street Property"). Unfortunately, I am away from the office and unable to discuss this matter with you, in detail, until I return. In the meantime, however, I do want to express my discomfort in learning that while I have been away, either or both of you have been telephoning Mr. Wilson and/or representatives of his prospective mortgage company repeatedly inquiring about Mr. Wilson's personal information that is you know is covered by, among other things, the federal Privacy Act.

As you are no doubt aware, demands, threats and harassment by a third party directed toward a covered individual and/or a business organization, in lawful possession of the covered individual's personal or confidential information, including demands that waive or withdraw the protections of the Privacy Act is prohibited by law. This is particularly disconcerting since this is not the first time we have had to communicate with Home Savers Plus, LLC about this type of misconduct, or for that matter, the first time that this type of misbehavior has caused Mr. Wilson to lose out on an opportunity to refinance the 2nd Street Property. *See* 08/05/05 Cease Desist Letter addressed to Mr. Luther Hector, enclosed herewith for your convenience.

Accordingly, we hereby demand that you and your affiliates immediately cease and desist from taking any further action to harass Mr. Wilson (particularly when he is at work), and/or the personnel with the prospective mortgage company. To the extent you do not cease and desist from such improper activities, we have been authorized by Mr. Wilson to notify the U.S. District Court in Case No. 05-CV-0108 of the situation so corrective action can be taken immediately. Given that Home Savers Plus, LLC already is in violation of a Federal Subpoena in this matter, so it is not likely that these repeat transgressions will be viewed favorably by the Court. *See* 09/29/05 Letter from William Mitchell, Esq. to Messrs. Ware & Hector, which also is enclosed herewith for your convenience. Thank you for your prompt attention to this matter.

Very truly yours,

Rawle Andrews Jr.
Dictated but not read

EXHIBIT "8"

## Allstate Lending Services

September 12, 2005

Dear Calvert Wilson,

This letter is in reference to the status of the refinance loan for your property located at "1905 2nd Street, NE, Washington, DC 20002.

1. I've made several attempts on your behalf to secure a mortgage loan for you since 2005.
2. In this process I secured two commitments for your loan.
3. Apparently when the final commitment was in underwriting the underwriter called to verify the status of the Homesavers mortgage and was apparently told the loan was in default by a representative of Homesavers.
4. After the conversation between the lender and Homesavers the loan was declined for the reason of default with Homesavers.

I will continue to search for a loan for your property however under the circumstances it has proven a difficult task.

Please feel free to call me with any questions that you might have.

Warm Regards,

Billie Haston
bhaston@allstatelending.us
Mortgage Broker
202-248-3807 (direct)
202-636-7528 (fax)

EXHIBIT "9"

# 1905 2ND SREET NE, LLC
## 1717 K ST NW, SUITE # 600
## WASHINGTON, DC 20036
### (202) 726-7283(o); (202) 726-8870(fax)

January 7, 2006

Dear Tenant,

As you may be aware, Mr. Calvert Wilson, the previous owner recently sold the building at 1905 2nd St NE, Washington, DC 20002 to 1905 2nd St NE, LLC. We would like to take this opportunity to introduce ourselves to you and to arrange for your new leases. We would also like you to report any repairs that need to be made, or any issues that need to be handled. All repair request can be directed to: (202) 726-7283, attention: Luther Hector.

We look forward to working with you and will provide the highest level of service for your rental needs.

As of 1/1/2006 all rental payments should be made via money order or cashiers checks. No cash or personal checks will be accepted. Rent is due on the 1st of each month with a grace period until the 10th of each month.

All payments should be mailed to:

1905 2ND ST NE, LLC
C/O LUTHER HECTOR
1717 K ST NW, SUITE 600
WASHINGTON, DC 20036

Your payments should be made out to "**1905 2ND ST NE, LLC**". If you have any questions regarding these matters, please do not hesitate to contact me. I may be reached M – S  9 am – 6pm at (202) 489-6810 (cell).

Sincerely,

Luther Hector
Portfolio Manger



strict of Columbia: Property Detail

**District of Columbia**

Prev

CFO HOME

TAXPAYER SERVICE CENTER

REAL PROPERTY SERVICES
Property Tax Bills
Property Tax Rates
Tax Rate Calculation
Property Assessment Process
Property Assessment Appeals
Tax Relief Credits
Search Real Property Sales Database
Search Real Property Assessment Database

SEARCH BY TOPIC



QUESTIONS?
Ask Our Online Service Rep

# Property Detail

**Address:** 1905 2ND ST NE
**SSL:**     3565 0047

### Record Details

| | | | |
|---|---|---|---|
| **Neighborhood:** | ECKINGTON | **Sub-Neighborhood:** | B |
| **Use Code:** | 23 - | **Class 3 Exception:** | No |
| **Tax Type:** | TX - | **Tax Class:** | 001 - |
| **Homestead Status:** | ** Not receiving the Homestead Deduction | | |
| **Assessor:** | ROBERT GONZALES | | |
| **Gross Building Area:** | | **Ward:** | 5 |
| **Land Area:** | 2,571 | **Triennial Group:** | 1 |

### Owner and Sales Information

| | |
|---|---|
| **Owner Name:** | 1905 2ND ST NE LLC C/O STE 600 |
| **Mailing Address:** | 1717 K ST NW; WASHINGTON DC20036-5346 |
| **Sale Price:** | $160,000 |
| **Sale Date:** | 11/09/2005 |
| **Instrument No.:** | 162022 |

### Tax Year 2006 Preliminary Assessment Roll

| | Current Value | Proposed New Value (2006) |
|---|---|---|
| **Land:** | $77,440 | $101,090 |
| **Improvements:** | $146,920 | $224,230 |
| **Total Value:** | $224,360 | $325,320 |
| **Taxable Assessment:** * | $143,573 | $325,320 |

\* Taxable Assessment after Tax Assessment Credit and after $38,000 Homestead Credit, if applicable. (Click here for more information).

\*\* If you believe you should be receiving tax relief through the Homestead deduction program and if you are domiciled in the District and this property is your principal place of residence, you can access the link below, complete the form, and return it per the instructions. For additional information regarding the Homestead program, call (202)727-4TAX. Click here to download the Homestead Deduction and Senior Citizen Tax Relief application \*

---

**View Tax Information | View Property Features | View Payments**

Government of the District of Columbia
Citywide Call Center : (202) 727-1000
TTY/TDD Directory

Telephone Directory by Topic | Agencies | DC Council | Search | Elected Officials
Feedback | Translation | Accessibility | Privacy & Security | Terms & Conditions

John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004

https://www.taxpayerservicecenter.com/RP_Detail.jsp?ssl=3565%20%20%20200047

1/9/2006

EXHIBIT "10"

**FILED**

JAN 1 2 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CALVERT M. WILSON,

    Plaintiff,

        v.                                Civil Action No.  05-0108 (JDB)

ABN AMRO MORTGAGE GROUP, et al.,

    Defendants.

---

### ORDER TO SHOW CAUSE

In light of the evident failure of Home Savers Plus, LLC, and 1905 2nd Street, N.E., LLC,

to comply with this Court's Order of December 21, 2005 -- directing them to show cause (in the

form of a written statement filed with the Court under this Civil Action Number by not later than

January 6, 2006) why they should not be held in contempt for failing to obey subpoenas issued by

and through this Court -- it is this 12th day of January, 2006, hereby

**ORDERED** that a representative or representatives of Home Savers Plus, LLC, and 1905

2nd Street, N.E., LLC, shall appear before this Court at 9:00 a.m. on January 27, 2006, to show

cause why they should not be held in civil contempt for failing to obey the subpoenas and for

failing to obey this Court's Order to Show Cause of December 21, 2005; and it is further

**ORDERED** that the Clerk of the Court shall cause a copy of this Order -- along with a

copy of the December 21, 2005, Order to Show Cause [Docket No. 37] -- to be served on Home

Savers Plus, LLC, and 1905 2nd Street, N.E., LLC, at the addresses listed below.


JOHN D. BATES
United States District Judge


Copies to:

Home Savers Plus, LLC
1717 K Street, NW, Suite 600
Washington, DC  20036

1905 2nd Street, N.E., LLC
c/o Home Savers Plus, LLC
1717 K Street, NW, Suite 600
Washington, DC  20036


Rawle Andrews, Jr.
ANDREWS & BOWE, PLLP
1717 K Street, NW, Suite 600
Washington, DC  20036
Email: randrews@andrewsgroup.org

   *Counsel for plaintiff*


David L. Permut
Sallie Fairlight Pullman
GOODWIN PROCTER LLP
901 New York Avenue
Washington, DC  20001
Email: dpermut@goodwinprocter.com
Email: spullman@goodwinprocter.com

   *Counsel for defendant ABN AMRO Mortgage Group, Inc.*

-2-

William Leonard Mitchell, III
Matthew A. Ranck
ECCLESTON & WOLF, P.C.
2001 S Street, NW, Suite 310
Washington, DC  20009-1125
Email: wmitchell@ewdc.com
Email: ranck@ewmd.com

*Counsel for defendants Friedman & MacFayden, PA; Alvin E. Friedman; Kenneth MacFayden; and Michael Cantrell*