**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

CALVERT M. WILSON, an individual,

Plaintiff,

v.

HOME SAVERS, LLC, a foreign limited liability company; 1905 2nd STREET, NE, LLC, a foreign limited liability company; LUTHER HECTOR, an individual; and BARRETT WARE, an individual,

Defendants

Case No.: 1:06CV00069 (JDB)

**PLAINTIFF'S AMENDED MOTION FOR TEMPORARY RESTRAINING ORDER; AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

ORAL ARGUMENT REQUESTED

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and LCvR 7 and 65.1, plaintiff Calvert M. Wilson ("Wilson" or "Plaintiff"), by undersigned counsel, respectfully submits this Amended Motion for Temporary Restraining Order; and Order to Show Cause Re: Preliminary Injunction against Defendants Home-Savers, LLC; 1905 2nd St., LLC; Luther Hector; and Barrett Ware (collectively, the "Defendants").[1]

As set forth more fully in the accompanying Amended Memorandum in Support and accompanying materials, Wilson seeks injunctive relief to enjoin Defendants, and all persons or entities acting in concert with them, from:

*1.* Destroying, discarding, mutilating, altering, concealing, transferring or disposing of any evidence that relates to the claims asserted in this litigation, including possession, custody or

control of the loan documents, security instruments, and other written communications concerning any residential loan related to Plaintiff's real property at 1905 2nd Street, NE, Washington, DC 20002 (the "2nd Street Property");

*2.* Selling, encumbering, destroying, transferring, assigning or otherwise disposing of the 2nd Street Property or any improvements thereon; or,

*3.* Harassing, intimidating, threatening or contacting any other residents of the 2nd Street Property.

WHEREFORE, plaintiff Calvert M. Wilson respectfully prays for injunctive relief against Defendants and all those acting in concert with them who receive an actual copy of an order enjoining Defendants and their agents from selling, destroying or further encumbering the 2nd Street Property; compelling Defendants to safeguard all the relevant evidence pending the resolution of this case on the merits, and preventing any further interference or harassment of other residents of the 2nd Street Property pending a resolution of this case on the merits, together with such further relief favoring Plaintiff as this Court deems proper under the circumstances.

Respectfully submitted,

By: /s/Rawle Andrews Jr.
Rawle Andrews Jr. (DC 436283)
ANDREWS & BOWE, PLLP
1717 K Street N.W., Suite 600
Washington, DC 20036
Office: (202) 349-3975
Fax: (410) 510-1034
Attorney for Plaintiff

Dated: January 18, 2006

[1] This Amended Motion, Supporting Memorandum and Proposed Order supersede and replace the original moving papers filed on January 13, 2006, all of which were inadvertently submitted to the Court with the Verified Complaint.

**CERTIFICATE OF SERVICE & CERTIFICATION UNDER LCvR 65.1**[2]

I hereby certify on this the 18th day of January, 2006, I caused a copy of the foregoing **"PLAINTIFF'S AMENDED MOTION FOR TEMPORARY RESTRAINING ORDER, AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION"** and **PROPOSED ORDER** that were filed electronically under the ECF Guidelines with the Court on this date in the above captioned matter to be sent via certified mail, return receipt requested Defendants identified below:

Home-Savers, LLC
Suite #600
1717 K St., N.W.
Washington, DC 20036

1905 2nd St., LLC
Suite #600
1717 K St., N.W.
Washington, DC 20036

Luther Hector
Suite #600
1717 K St., N.W.
Washington, DC 20036

Barrett Ware
Suite #600
1717 K St., N.W.
Washington, DC 20036

/s/Rawle Andrews Jr.
Rawle Andrews Jr., Esq.
Counsel for Plaintiff

---

2 For planning purposes, Plaintiff notes that Defendants have already been ordered to appear before this Court on January 27, 2006 at 9 a.m. (ET) to respond to an Order to Show Cause in Related Case No. 05-CV-0108.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CALVERT M. WILSON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>HOME SAVERS, LLC, a foreign limited liability company; 1905 2nd STREET, NE, LLC, a foreign limited liability company; LUTHER HECTOR, an individual; and BARRETT WARE, an individual,<br><br>Defendants.<br><br>********************************* | * * * * * * * * * * * * * * * * * * | Case No.: 1:06CV00069 (JDB)<br><br>**[PROPOSED] TEMPORARY RESTRAINING ORDER; AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** |

This matter came before the Court on __________________, 2006 on Plaintiff's Motion for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction against Defendants Home-Savers, LLC; 1905 2nd St., N.E., LLC; Luther Hector; and Barrett Ware (collectively, "Defendants") to enjoining any actual or threatened attempts to sell, encumber, transfer, assign or dispose of the 2nd Street Property or any improvements thereon.

The Court, having considered the Verified Complaint, the TRO Motion and Memorandum in Support, as well as the Declaration of Calvert M. Wilson, and other supporting materials submitted in connection therewith, finds sufficient grounds for concluding that irreparable harm will be sustained by Plaintiff while this action is

pending absent entry of a Temporary Restraining Order pending a hearing on the Order to Show Cause.

Therefore, it is this ___ day of _______________ hereby ordered, adjudged and decreed as follows:

1. Plaintiff's Motion for Temporary Restraining Order shall be, and hereby is, GRANTED.

2. A representative or representatives of Defendants shall appear before this Court at __________ a.m./p.m. on _____________, 2006, to show cause why a preliminary injunction should not issue in this action enjoining them from asserting or exercising in any alleged rights or interests in connection with the 2nd Street Property.

**3.** Pending the hearing on the Order to Show Cause, Defendants, and all persons or entities acting in concert with them shall be enjoined from destroying, discarding, mutilating, altering, concealing, transferring or disposing of any evidence that relates to the claims asserted in this litigation, including possession, custody or control of the loan documents, security instruments, and other written communications concerning any residential loan related to Plaintiff's real property at 1905 2nd Street, NE, Washington, DC 20002 (the "2nd Street Property"), pending further order of this Court;

4. Pending the hearing on the Order to Show Cause, no actual or threatened attempts shall be made by Defendants or their agents to sell, encumber, transfer, assign or dispose of the 2nd Street Property or any improvements thereon;

5. Given the apparent appraised value of the 2nd Street Property and the circumstances that give rise to this dispute, no bond shall be required for the entry of this

Temporary Restraining Order, which shall become effective immediately upon entry by the Court; and

6. Plaintiff shall cause a copy of the Verified Complaint, the TRO Motion and Memorandum in Support, the Wilson Declaration, and a copy of this Order to be served on Defendants forthwith, and file Proof of Service with the Court no later than one (1) day before the hearing on the Order to Show Cause.

______________________________
Honorable John D. Bates
United States District Judge

Copies to:

Rawle Andrews Jr.
Andrews & Bowe, PLLP
1717 K St., N.W., Suite 600
Washington, D.C. 20036
Email: randrews@andrewsgroup.org

*Counsel for plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CALVERT M. WILSON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>HOME-SAVERS, LLC, a foreign limited liability company; 1905 2nd STREET, NE, LLC, a limited liability company; LUTHER HECTOR, an individual; and BARRETT WARE, an individual,<br><br>Defendants.<br><br>********************************* | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Case No.: 1:06CV00069 (JDB)<br><br>PLAINTIFF'S AMENDED MEMORANDUM IN SUPPORT OF AMENDED MOTION FOR TEMPORARY RESTRAINING ORDER, AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION<br><br>ORAL ARGUMENT REQUESTED |

Plaintiff Calvert M. Wilson, by undersigned counsel, respectfully submits this Amended Memorandum in Support of Amended Motion for Temporary Restraining Order; and Order to Show Cause Re: Preliminary Injunction to enjoin Defendants (collectively, the "Home Savers Group") from attempting to enforce a sham land sale, as well as the terms and conditions of an unlawful HOEPA loan including the unauthorized exercise or attempt to exercise unlawful dominion and control over that certain improved real property known as 1905 2nd Street, NE, Washington, DC 20002 (the "2nd Street Property"). Plaintiff hereby incorporates the Verified Complaint, the Exhibits thereto and his Declaration (the "Wilson Declaration") as if fully set forth herein.

## I. BACKGROUND

This Amended Motion seeks injunctive relief to remedy an unconscionable predatory lending and equity stripping scheme by the Home Savers Group under which Defendants advanced $30,525.14 on Wilson's behalf during November 2004, without first seeking Bankruptcy Court approval, to stop what Plaintiff believes was a wrongfully noticed foreclosure sale of the 2nd Street Property by ABN AMRO Mortgage Group, Inc. ("ABN AMRO" or the "Mortgage Company"), the law firm of Friedman & MacFayden, PA and certain of its attorney (collectively, the "Friedman Law Firm").[1]

After making the HOEPA loan, Defendants began engaging in patently offensive and abusive collection activities, including harassing telephone calls, interfering with Plaintiff's efforts to refinance the debt, improper contacts with persons or individuals that were known to be doing business with Plaintiff, and fraudulently recording various land records with the D.C. Recorder of Deeds purporting to show that Plaintiff sold the 2nd Street Property to Defendants. *See generally* Wilson Declaration, ¶¶14-16, 24-27, and 43-55; Exhibits "8" and "9" to the Verified Complaint.

On January 12, 2006, it came to Plaintiff's attention that Home Savers Group has now recorded or otherwise filed certain documents, without prior notice to Plaintiff and against Plaintiff's will, with the D.C. Recorder of Deeds indicating that Wilson allegedly sold the 2nd Street Property to Defendants on November 9, 2005 for $166,000. *See generally* Declaration of Calvert M. Wilson, a true and correct copy of which is attached hereto as Exhibit "1".

There was no real estate sale by and between Wilson and Defendants involving the 2nd Street on November 9, 2005 or any other date. Rather, the Home Savers Group recorded alleged

---

[1] Plaintiff presently is prosecuting claims against ABN AMRO and the Friedman Law Firm in a related action before this Court under Civil Action No. 05-CV-0108 JDB (D.D.C.). Among others claims, Plaintiff contends that he was forced to accept HOEPA loan to stop the improperly noticed foreclosure sale of the 2nd Street Property by ABN AMRO and the Friedman Law Firm.

sale and related documents with the D.C. Recorder of Deeds because Wilson has resisted demands that he repay the high costs associated with the unlawful HOEPA loan including $30,525.14 in principal, 20% interest and 50% of the equity in Plaintiff's house, i.e., an amount equal to or exceeding $125,000.

The loan terms and conditions extended by Home Savers to Wilson for the express purpose of averting foreclosure by ABN AMRO and the Friedman Law Firm are harsh, oppressive, predatory, inequitable unfair and unconscionable. Moreover, Defendants preyed on Wilson to accept the loan and then engaged in abusive collection practices that were so outrageous that it rises to the level of fraud, ill will, recklessness or willful disregard of Plaintiff's rights. See e.g. 15 U.S.C. §§1601 *et seq.;* D.C. Code Ann. §§ 3904 et seq.

In sum, defendant Home Savers (via its 1905 2nd Street, NE, LLC affiliate) apparently can acquire fee simple ownership and title to the 2nd Street Property (a property then worth $379,000 circa November 2004, and now worth over $425,000) for a mere $30,525.14 absent rescission of the transaction or other appropriate relief by this Court.

Absent immediate judicial intervention, Wilson will lose ownership, possession and control of the 2nd Street Property.

## II. LEGAL ANALYSIS

A preliminary injunction is the appropriate remedy to halt Defendants' abusive and unlawful loan administration and debt collection practices that continually deny Plaintiff's rights to the quiet ownership, use and enjoyment of the 2nd Street Property, and improperly bash his credit history. *See Perpetual Bldg. v. District of Columbia*, 618 F. Supp. 603, 618 (D.D.C. 1985) (concluding that the prospect of owner's loss of real property constitutes irreparable harm; injunction granted); 1010 Potomac Associates v. Grocery Manufacturer's of America, Inc., 485

A.2d 199, 212 (D.C. 1985) (when real property is the subject matter of the dispute, money damages are inadequate as a remedy because each parcel of real property is deemed unique in nature).

When considering the propriety of injunctive relief, the courts in this Circuit evaluate four factors: (1) likelihood of success on the merits; (2) irreparable harm; (3) whether injunctive relief will substantially harm the defendant; and (4) whether injunctive relief is in the public interest. *See McVeigh v. Cohen*, 983 F. Supp. 215, 218 (D.D.C. 1998) (citing *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)). No one factor is dispositive, rather "[t]hese factors interrelate on a sliding scale and must be balanced against each other." *Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998). For instance, a particularly strong argument for one factor can overcome a weaker argument for another. *See CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

Plaintiff's prayer for equitable relief satisfies all four factors and a preliminary injunction is the necessary and appropriate remedy for the irreparable harm Plaintiffs has and continues to suffer because of Defendants unlawful and inequitable conduct.

**A. Defendants' misconduct violates Plaintiff's Rights**

**1. Plaintiff's claims are meritorious**

Although it is well settled that a movant seeking provisional injunctive relief must show a likelihood of success on the merits, this element need not be demonstrated with absolute certainty. In *Holiday Tours*, the D.C. Circuit recognized nearly 30 years ago:

> Generally, such relief is preventative, or protective; it seeks to maintain the status quo pending a final determination of the merits of the suit. **An order maintaining the status quo is appropriate when a serious legal question is present, when little if any harm will befall other interested persons or the public and when denial of the order**

> **would inflict irreparable injury on the movant**. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success.

*Holiday Tours*, 559 F.2d 844 (emphasis added); *see also In re Antioch University*, 418 A.2d 105, 110 (D.C. 1980). The claims set forth in the Verified First Amended Complaint are serious and substantial in nature, and are amply supported by the accompanying documentation. As such, this Memorandum highlights those consumer protection violations that are most salient to provisional relief. Wilson respectfully seeks injunctive relief under Counts I, II, IV, and VI. *Accord Cooper v. First Gov't Mortgage and Investors Corp.*, 238 F.Supp.2d 50, 55 (D.D.C. 2002); 15 U.S.C. §1639; D.C. Code Ann. §§ 28-3905(k)(1)(D) (injunctive relief available to enjoin unlawful trade practices in violation of D.C. law).

**Defendants' numerous statutory violations warrant an injunction**

Under the Home Ownership Equity Protection Act Amendments to the federal Truth in Lending Act, it is unlawful for a lender to make a high cost, sub-prime loan to a borrower when the basis for the loan is value of the victim's equity in the property. *See Cooper,* 238 F.Supp.2d at 55; 15 U.S.C. §§ 1601, 1602(aa) *et seq*. It is axiomatic that a violation of the federal Truth in Lending Act (and its HOEPA Amendments) also constitutes violations of the D.C. consumer protection laws and regulations. *See DeBerry vs. First Gov't Mortgage and Investors Corp.*, 743 A. 2nd 699, 703 (D.C. 1999), *reh'g en banc denied*, (May 16, 2000); D.C. Code Ann. §§ 28-3904(r), 28-3905(k)(1).

As set forth more fully in the Verified Complaint and the attached Wilson Declaration, there never was a sale of the 2nd Street Property between Plaintiffs and Defendants. *See* Verified Complaint, ¶¶37-45, 57-78. Furthermore, the actual loan documents (attached as Exhibit "5" to the Verified Complaint) and other record evidence (e.g., Wilson Declaration) demonstrate that

Defendants failed to abide by or otherwise follow federal and local consumer protection laws in the administration or collection of payments allegedly due by Plaintiff under a residential mortgage. *See* Wilson Declaration, ¶¶ 38-58. Moreover, as set forth more fully in the Wilson Declaration, Defendants engaged in fraudulent acts to induce Plaintiff to enter into the transaction, all the while knowing that the terms either were too onerous to be satisfied or that they would achieve a substantial windfall on default, i.e., ownership of the 2nd Street Property. *See Cooper,* 238 F.Supp.2d at 55. When viewed as a whole, however, the appropriateness of injunctive relief overwhelmingly tips in favor of granting an injunction pending a resolution of the merits.

**2. Plaintiff has and will continue to suffer irreparable harm**

The primary purpose of a preliminary injunction is to prevent irreparable injury and to preserve the Court's ability to render a meaningful decision on the merits. Thus, irreparable injury generally is regarded as one of the most important factors involved in the Court's determination of whether to grant injunctive relief. *See, e.g.*, *Wieck v. Sterenbuch*, 350 A.2d 384, 387-88 (D.C. 1976). When real property interests are at stake, the legal remedy of damages is inadequate, and injunctive relief is a common remedy to preserve such interests. *See, e.g.*, *1010 Potomac Associates v. Grocery Manufacturers of America, Inc.*, 485 A.2d 199, 212 (D.C. 1985); Flack v. Laster, 417 A.2d 393, 400 (D.C. 1980). Moreover, the loss or involuntary forfeiture of real property via foreclosure constitutes irreparable harm, particularly when, as here, the real property is the claimant's only substantial asset. A*ccord Perpetual Building v. District of Columbia*, 618 F. Supp. 603, 616 (D.D.C. 1985) (concluding that loss of owner's real property, which is its primary tangible asset, constitutes irreparable harm).

Defendants base their claim to ownership to the property on an alleged real estate sale between the parties, which in fact never took place. Rather than attempt to mitigate the harm Wilson sustained when he was duped into accepting the Home Savers loan, Defendants made matters worse by, among other things, recording sham land sale documents with the D.C. Recorder of Deeds, and contacting the other residents at the 2nd Street Property to inform them that Defendants owned the property.

Additionally, the loss of the 2nd Street Property would be devastating to Plaintiff and his family, and cause him to lose all his equity in the home he has owned since 1996, and impair Plaintiff's ability to care for his family and make timely child support payments. Given the on-going difficulties Plaintiff has experienced with Home Savers and its agents, including improper contacts or interference with persons or entities doing business with Wilson, there is no amount of money that could adequately compensate Wilson if he were to lose the 2nd Street Property based on Defendants' misconduct.

**3. The Balance of the Equities favors injunctive relief**

It is a time-honored legal maxim that equity abhors a forfeiture. Consequently, in evaluate the propriety of injunctive relief here, this Court, can and should view the relative positions of the parties with a view towards the circumstances under which ownership rights are asserted, as well as the downside effects of what would happen to the parties if a injunction does not issue in this case. Plaintiff acquired the 2nd Street Property during December 1996 and has been the continuous owner since that time. As stated above, Plaintiff maintains a unit in the house, and rents out the other three units to Section 8 Residents so we can meet his child support obligations and support his family.

On the other hand, Defendants are *unlicensed* lenders that made a modest $30,000 advance on Wilson's behalf to cure the first mortgage on a $450,000 house, and now claim to have "purchased" the 2nd Street Property for the made up sum of $160,000. There was no land sale. The loan is itself predatory and in violation of Federal and D.C. laws. Nonetheless, assuming Defendants assertions of ownership had any merit, which they do not, there is no legal justification for an alleged sale of the property at less than 40% of its fair market value. *See* Exhibit "4" to the Verified Complaint.[2] The balance of the harm Wilson and his children will suffer if the 2nd Street Property is lost pending the outcome of this litigation far outweighs any harm to Defendants. On the other hand, Defendants will not be stripped of any alleged rights in the house if an injunction issues because substantially all the relief requested by Plaintiff is provided for by statute, i.e., Defendants are obligated to obey the law and/or modify their behavior if it is determined they are, individually or collectively, violating the law.

Moreover, as evidenced by this Court's January 12, 2006 Order in Civil Action No. 05-CV-0108, Defendants have engaged in lawless behavior under which they apparently believe they can do whatever they want; whenever they want with impunity. Absent a Court order, it is a virtually lock that Defendants will not cause further harm to Plaintiff's rights and interests, as well as those of the other tenants at the 2nd Street Property.

Finally, the value of the 2nd Street Property is almost four times the alleged balance of the Note, i.e., $379,000 (*see* Property Appraisal at Exhibit "4" to the Verified Complaint), thus leaving Defendants with more than adequate security to protect their interests after a resolution on the merits.

**4. Granting an injunction is in the public interest**

---

[2] This Court can take judicial notice of the lengths to which Plaintiff has gone to maintain ownership over the 2nd Street Property, e.g., Civil Action 05-CV-0108. In short, no fire sale occurred or was ever intended.

Finally, the public interest weighs in favor of granting injunctive relief. As described above, when a statute expressly prohibits the actions that the plaintiff seeks to enjoin (i.e., deceptive trade practices against consumers), the public interest weighs heavily in favor of compelling defendants to comply with the law. *See* D.C. Code Ann. § 28-3905(k)(1)(D), (E), and (F); Wright, Miller & Kane, *Federal Practice and Procedure* § 2948.4, at 209 (1995). Granting an injunction also will serve the public interest because it will permit sufficient time for this Court to untangle any defects in the security instruments or title without the addition of other non-parties who presently have no stake in the outcome of this litigation. On the other hand, there is a significant likelihood that Defendants (having already disregarded a prior Order of this Court in a Related Case – *see* Exhibit "10" to the Verified Complaint) cannot be trusted to hold on to or safeguard the property from sale, destruction or further encumbrance until this dispute is resolved.

Furthermore, the public has a standing interest in orderly administration of justice and curbing predatory lending. In fact, since the commencement of this action, efforts to eliminate predatory lending have been initiated by, among others, the U.S. Congress, the Office of the Comptroller of the Currency, the U.S. Justice Department, the Federal Trade Commission, the Department of Housing and Urban Development, the D.C. Office of Insurance and Banking, and numerous consumer rights organizations.

Finally, the amount of security is a matter entrusted to the sound discretion of the trial court. *Friends for All Children v. Lockheed*, 746 F.2d 816 (D.C. Cir. 1984). Because Plaintiff is an hourly employee at the Washington Water and Sewer Authority with six children, and the value of the 2nd Street Property is nearly $500,000, no bond should be required. Even if this Court somehow were to determine that a bond is required, despite the high market value of the

2nd Street Property and Plaintiff's limited, financial resources, the strong public interest in this case would favor only a nominal bond under Rule 65(c).

Indeed, this Court and other courts have recognized that in actions such as this one, when the plaintiff is seeking to benefit the general public by enforcing a federal statute, a nominal bond is appropriate. *Natural Resources Defense Council v. Morton*, 337 F. Supp. 167 (D.D.C. 1971), *aff'd on other grounds*, 458 F.2d 827 (D.C. Cir. 1972) (requiring a substantial bond would effectively preclude judicial review; bond of only $100 required in the face of estimate of millions of dollars in damages from injunction against leasing operations on continental shelf); *see also Baxley v. Corps. of Engineers*, 411 F. Supp. 1261, 1275 (N.D. Ala. 1976) (one dollar bond required for injunction to enforce federal statute).

## IV. CONCLUSION

For the foregoing reason, plaintiff Calvert M. Wilson respectfully prays for an injunction against Defendants and all those acting in concert with them who receive an actual copy of an order enjoining any actual or attempted efforts to sell, assign, destroy, transfer or further encumber the 2nd Street Property; safeguard all the relevant evidence pending the resolution of this case on the merits, and prohibit further contacts with tenants at the 2nd Street Property, together with such further relief favoring Plaintiff as this Court deems proper under the circumstances.

Respectfully submitted,

By: /s/Rawle Andrews Jr.

Rawle Andrews Jr. (DC 436283)
ANDREWS & BOWE, PLLP
1717 K Street N.W., Suite 600
Washington, DC 20036
Office: (202) 349-3975
Fax: (410) 510-1034
Attorney for Plaintiff

Dated: January 18, 2006

**CERTIFICATE OF SERVICE & CERTIFICATION UNDER LCvR 65.1**

I hereby certify on this the 18th day of January, 2006, I caused a copy of the foregoing **"PLAINTIFF'S AMENDED MEMORANDUM IN SUPPORT OF AMENDED MOTION FOR TEMPORARY RESTRAINING ORDER, AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION"** that was filed electronically under the ECF Guidelines with the Court on this date in the above captioned matter to be sent via certified mail, return receipt requested Defendants identified below:

Home Savers, LLC
Suite 600
1717 K Street, NW
Washington, DC 20036

1905 2nd Street, NE
Suite 600
1717 K Street, NW
Washington, DC 20036

Luther Hector
Suite 600
1717 K Street, NW
Washington, DC 20036

Barrett Ware
Suite 600
1717 K Street, NW
Washington, DC 20036

/s/Rawle Andrews Jr.
Rawle Andrews Jr., Esq.
Counsel for Plaintiff

# EXHIBIT "1"

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CALVERT M. WILSON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>HOME-SAVERS, LLC, a foreign limited liability company; 1905 2nd STREET, NE, LLC, a limited liability company; LUTHER HECTOR, an individual; and BARRETT WARE, an individual,<br><br>Defendants. | * | Case No.: 1:06-CV-00069 (JDB)<br><br>**DECLARATION OF CALVERT M. WILSON** |

*********************************

I, Calvert M. Wilson, hereby declare and state under penalty of perjury as follows:

1. I am over the age of 18 years, have personal knowledge of the facts and circumstances set forth in this Declaration, and I am competent to testify on these facts and circumstances if called upon to do so.

2. I am the Plaintiff in the above captioned case, and the owner of residential real property at 1905 2nd Street, NE, Washington, DC (the "2nd Street Property").

3. The circumstances involved in this lawsuit originally arose out of difficulties my family and I have experienced in dealing with ABN AMRO Mortgage Group, Inc. ("ABN AMRO") and its outside attorneys at Friedman MacFayden, PA (the "Friedman Law Firm"), including a scheme to wrongfully foreclose on the "2nd Street Property" beginning in mid-September 2004.

4. After receiving notice of the wrongful foreclosure sale, I was approached by Luther Hector ("Hector") and Barrett Ware (Ware) of a company called Home Savers Plus, LLC (collectively, the "Home Savers") during late September 2004.

5. Among other things, Hector and Ware informed me that they were foreclosure specialists who could stop the foreclosure of the 2nd Street Property based on the equity in my house.

6. I was also informed by Hector and Ware that under the Home Savers emergency loan program I had nothing to worry about if I had substantial equity in my house because the Home Savers Group had a policy of not making loans to home owners unless it was clear from their network of lenders that the borrower could refinance the mortgage obligations on the house.

7. During the pendency of the Chapter 13 Proceeding, I made payments directly to the ABN AMRO or its predecessor in interest, at first by check, and then later via Western Union wire transfer until March 2004. For some unknown reason, ABN AMRO stopped accepting payments from Wilson during April 2004.

8. Thereafter, I made a series of attempts to work with the ABN AMRO to reconcile his account, including his compilation and delivery of cancelled checks and Western Union receipts to ABN AMRO and the Friedman Law Firm to no avail.

9. After returning from a trip to Florida during the summer 2004, I received correspondence from the Friedman Law Firm indicating that Wilson was in default, and a foreclosure notice on the 2nd Street Property.

10. Among other things, ABN AMRO also claimed in the Bankruptcy Court that it has not received any payments from me since March 12, 2002. I know this is untrue not

only because I made the payments, but also because I know a mortgage company would not have waited 18 months to give me notice of default if I had not been making monthly mortgage payments.

11. As such, I immediately contacted representatives of the Friedman Law Firm in an attempt to resolve the situation.

12. Neither ABN AMRO nor the Friedman Law Firm ever provided the required debt validation information to me before I sought emergency injunctive relief from the Bankruptcy Court.

13. As such, I hired an attorney and on September 17, 2004, I filed an emergency motion for a Section 105 injunction to prevent ABN AMRO from attempting to improperly foreclose against the 2nd Street Property. On October 7, 2004, the U.S. Bankruptcy Court for the District of Columbia held a hearing on my emergency motion. At the conclusion of the stay hearing, the Bankruptcy Court denied the motion to stay the foreclosure sale.

14. On October 8, 2004, one day after learning that the Bankruptcy Court denied Wilson's emergency motion, Defendants persuaded me to give them permission to make inquiries about his mortgage with ABN AMRO and the Friedman Law Firm. A true and correct copy of the Authorization Form is attached as Exhibit "2" to the Verified Complaint.

15. When I inquired whether my Bankruptcy status would affect my ability to obtain the emergency loan, Hector and Ware said no because Home Savers make loans based on the home owners' equity in the house.

16. On October 18, 2004, ABN AMRO (via the Friedman Law Firm) improperly and

inexplicably issued two (2) different cure amounts for the same foreclosure notice. This issue has never been corrected or explained, which left me in an almost impossible situation while I was trying to save my house from foreclosure.

17. Between November 5th and November 17, 2004, I worked diligently to obtain accurate account balance and cure amount information from ABN AMRO and the Friedman Law Firm to no avail.

18. During this critical time frame, ABN AMRO and the Friedman Law Firm either refused or were unable to provide me with an actual cure amount for the 2nd Street Property.

19. During or about the same time, the Home Savers Group was lying in wait for me and making contemporaneous inquiries with ABN AMRO and/or the Friedman Law Firm presumably in an attempt to obtain reinstatement figures for the Wilson's mortgage on the 2nd Street Property.

20. Although I believed that Home Savers was working with me to reinstate his mortgage account with ABN AMRO, I now understand that Defendants actually were seeking the information with the hidden motive of finding out precisely how little money Defendants would have to pay to acquire ownership of the 2nd Street Property.

21. When ABN AMRO and the Friedman Law Firm did finally provided cure information, the reinstatement amount(s) were estimates for periods that may or may not have included the day of the scheduled foreclosure sale. For example, as of November 5, 2004, the cure amount allegedly was $26,262.88.

22. By mid-November 2004 inquiry, however, the cure amount was $27,535.14. The foregoing amount was supposed to be accurate until the date of the scheduled foreclosure

on the 2nd Street Property, i.e., November 17, 2004.

23. Nonetheless, Defendants once again refused to be bound the account information in its own foreclosure notice and raised the number by an extra $3,000 the day before the scheduled foreclosure sale, or $30,525.14.

24. As such, in a final attempt to avert foreclosure, I was forced to obtain a HOEPA loan from Home Savers.

25. Defendants also knew when they approached Wilson concerning an emergency loan that Wilson was desperate to save his house from involuntary loss.

26. Finally, and perhaps most significantly, Defendants knew when they pursued Wilson concerning the "special loan program" that the value of 2nd Street Property vastly exceeded the outstanding balance of ABN AMRO's Note, i.e., there was substantial equity in Wilson's property at the time of the HOEPA loan transaction. A true and correct copy of the most recent Appraisal of the 2nd Street Property is attached as Exhibit "4" to the Verified Complaint.

27. The emergency loan I was forced to obtain to save my 2nd Street Property would have been totally unnecessary but for the unlawful acts and omissions of ABN AMRO and the Friedman Law Firm Defendants. The loan documents utilized by Home Savers in connection with the emergency loan are attached as Exhibit "5" to the Verified Complaint.

28. On November 16, 2004, the day before the scheduled Foreclosure of the 2nd Street Property, defendant Barrett Ware attempted to deliver a $27,535.14 Cashier's Check to ABN AMRO and the Friedman Law Firm to satisfy the alleged cure amount.

29. Much to my dismay, however, ABN AMRO and the Friedman Law Firm refused

to accept the Cashier's Check allegedly on the grounds that the cure amount some how had increased "at the eleventh hour" by another $3,000.

30. Defendants' artificially increased the cure amount by $3,000 under false pretenses or with a reckless indifference for whether the inflated cure amount was true or false, with the intent that I would rely to my detriment on that misinformation.

31. To date, I have never received any written verification from ABN AMRO or the Friedman Law Firm of a new cure amount, or for that matter, how the new $3,000 figure was calculated.

32. I believe that ABN AMRO increased the cure amount in retaliation for appealing the Bankruptcy Court's Order and otherwise preventing ABN AMRO from obtaining the 2nd Street Property.

33. I relied to my detriment on ABN AMRO's and the Friedman Law Firm's false and materially misleading statements regarding his mortgage account by, among other things, taking out the emergency loan from Home Savers and further encumbering my 2nd Street Property.

34. As part of the "special loan program", I was required to execute numerous Home Savers required Wilson execute numerous "loan documents", one of which happens to be an actual deed to the house.

35. Under the emergency loan repayment terms, I am apparently required to pay $30,525.14 principal, 20% interest and 50% of the equity in my house.

36. At the same time I was executing these loan documents, I was given assurance by Hector that the documents were a formality because the loan was based on the equity in my house, and there was more than enough value in the property to satisfy the repayment

obligations.

37. Hector and Ware also reminded me that Home Saver existing network of lenders was at the ready to help me refinance the debt, so I had nothing to worry about in accepting this loan.

38. Although I did not know it at the time, I have come to understand from recent articles in the newspaper about foreclosure scams that I was required to sign this combination of land records and loan documents was orchestrated by Home Savers so they would be in total control over either the high repayment terms of the emergency loan, or in a strong position of advantage over me in terms of taking over the 2nd Street Property if I did not cooperate with all their demands. Copies of these newspaper articles are attached to this Declaration as Exhibit "A".

39. During July and August 2005, Home Savers and its affiliates began to exercise some of its leverage against me by improperly interfering with Wilson's attempt to refinance the entire debt on the 2nd Street Property.

40. Specifically, I advised Hector and Ware that I would be attempting to refinance the mortgage on the 2nd Street Property as soon as I received a Discharge in his Chapter 13 Bankruptcy Case. The D.C. Bankruptcy Court entered an Order of Discharge in my Chapter 13 case on July 1, 2005.

41. Shortly thereafter, I began working with Allstate Lending to make arrangements to refinance the 2nd Street Property. Wilson gave notice of these good faith efforts to refinance the mortgage debt to Home Savers.

42. As a lender, Home Savers only obligation was to provide a good pay-off figure to Allstate Lending or its representatives so that the underwriting and documenting

functions of the refinancing could be completed by the end of August 2005.

43. Home Savers was on notice that a prompt summer 2005 refinancing was critical because ABN AMRO had mysteriously continued to withhold excess sums in Wilson's escrow account and given notice that it intended to increase his monthly mortgage payment beginning in September 2005.

44. Although Home Savers knew that I was working with Allstate Lending on a refinancing package, Home Savers, led by co-defendant Luther Hector, made numerous, albeit unauthorized, contacts with Allstate Lending or its affiliates and proceeded to provide false or materially misleading information to Allstate Lending or its affiliate Finance America concerning my relationship with ABN AMRO, as well as to demand that Allstate Lending cease certain parts of its work on my refinancing package so that Home Savers could further increase their take on the deal by assuming control of the title work and settlement of the refinancing for Wilson's house.

45. On August 5, 2005, my attorney sent a cease & desist letter to Home Savers requesting that the company stop interfering with the known business relationship between Wilson and Allstate Lending. A true and correct copy of the first C&D Letter is attached as Exhibit "6" to the Verified Complaint.

46. All these unauthorized contacts interrupted the normal business relationship between Wilson and Allstate Lending and ultimately led to a decision that Finance America would terminate or suspend further dealings with Wilson, i.e., Home Savers destroyed a planned refinancing that was well on its way toward consummation by the end of August 2005, thus further jeopardizing Wilson's fee ownership in the 2nd Street Property. A copy of Allstate Lending's letter to me is attached hereto as Exhibit "7" to

the Verified Complaint.

47. Thereafter, I pursued other refinancing alternatives. Once again, my good faith efforts to refinance my mortgage obligations on the 2nd Street Property were unlawfully disturbed by Defendants, including the repeated demands that my prospective lenders at New Century Mortgage violate my rights under the Privacy Act under the threat that Defendants would seize the 2nd Street Property if these demands were not honored.

48. As a result, on November 8, 2005, my attorney issued a second C&D Letter to Defendants. A copy of the second C&D Letter is attached as Exhibit "8" to the Verified Complaint. I did not hear much of anything from Home Savers for the remainder of the year, so I believed at that point that Defendants understood their obligations.

49. Unfortunately, on or after November 9, 2005, Home Savers apparently recorded certain land sale documents with the D.C. Recorder of Deeds supposedly showing that I had sold all his right, title and interest in the 2nd Street Property to the Home Savers Group.

50. I did not receive any notice from Home Savers that they intended to file any documents with the D.C. government concerning the 2nd Street Property, or any notices of default.

51. I never sold my house to Defendants on November 9, 2005 or any other time, and have no intention of doing so.

52. Additionally, in a letter dated January 7, 2006, Home Savers gave written notice to the other residents of the 2nd Street Property to the other residents of the 2nd Street Property that they bought the 2nd Street Property from Wilson, and would be attempting to make future arrangements to re-work existing landlord-tenant relationships. A true

and correct copy of Defendants' January 7, 2006 letter is attached as Exhibit "9" to the Verified Complaint.

53. I was made aware of this disturbing development by the tenants at the 2nd Street Property, all of whom expressed concern and confusion as to this alleged development.

54. Although I attempted to allay the residents' concerns about the situation, there are no guarantees that further disruptions will not occur with my ownership rights or to my tenants absent immediate Court action, particularly since Home Savers and its agents have shown in their past dealings with me and other interested parties that they will do whatever they want; whenever they want, regardless of who might be harmed by their misconduct as evidenced by this Court's January 12, 2006 Order, a true and correct copy of which is attached as Exhibit "10" to the Verified Complaint.

55. Unless the Court enters an order immediately stopping and preventing ABN AMRO and their attorneys from abusive and deceptive loan administration and related debt collection practices, I will continue to be subjected to undue stress and anguish arising out of the Defendants efforts to take my home, mishandle my escrow account or unfairly harm my credit history, even though I have been making my monthly mortgage payments on time.

56. I did not sell the 2nd Street Property to Defendants on November 9, 2005 or any other date. Rather, the Home Savers Group recorded alleged sale and related documents with the D.C. Recorder of Deeds because Wilson has resisted demands that he repay the high costs associated with this highly irregular loan.

57. The loan terms and conditions extended by Home Savers to Wilson for the express purpose of averting foreclosure by ABN AMRO and the Friedman Law Firm are

harsh, unfair and unreasonable because they would permit Defendants to take title to the 2nd Street Property (a property then worth $379,000 circa November 2004, and now worth over $425,000) for a mere $30,525.14 absent rescission of the transaction or other appropriate relief by this Court.

58. Notwithstanding Defendants' misconduct (including the improper recordation of sham land sale documents) Plaintiff remains in exclusive possession of the 2nd Street Property as of this date.

FURTHER DECLARANT SAYETH NOT.

Calvert M. Wilson, an Individual
Plaintiff

# EXHIBIT "A"

washingtonpost.com

# Ehrlich Signs Bill Targeting Foreclosure Scams

By Sandra Fleishman
Washington Post Staff Writer
Friday, May 27, 2005; E02

Maryland Gov. Robert L. Ehrlich Jr. (R) yesterday signed legislation to protect struggling homeowners from so-called foreclosure rescue consultants who promise to help them avoid foreclosure but end up taking title to their house or stealing the built-up equity.

Consumer groups have hailed the Maryland effort as one of the toughest measures in the country against what they believe is an escalating nationwide problem, but some say still more needs to be done.

"We're very pleased that the legislature passed this bill because it's very comprehensive and it will benefit a lot of people," said Cheryl Hystad, executive director of the Maryland Consumer Rights Coalition.

Although there are no reliable statistics, Hystad said, Washington -- along with other areas where house prices are exploding -- "seems to be a hotbed" for the self-styled consultants who scan the foreclosure documents on file in local courts and then target the homeowners involved.

In a typical arrangement, the consultant promises to make the overdue mortgage payments to the lender, and in return, the homeowner transfers the deed to the property. The owner is given a year to buy the deed back, but the more common result is that the consultant ends up in possession of the home after paying thousands of dollars less than it is worth.

The new law, which takes effect immediately, makes such transactions a misdemeanor, punishable with prison terms of up to three years.

It also gives homeowners more time to lay plans to avoid a foreclosure. Maryland's 80-year-old foreclosure law let lenders notify homeowners as little as 10 days before a foreclosure sale. The new law, by requiring lenders to notify homeowners two days after they file foreclosure documents with the local court, will give homeowners as much as a month or two to raise the cash needed to bring their mortgage payments up to date or consider options such as selling the house on the open market.

The legislation was offered by Del. Doyle L. Niemann (D-Prince George's) and Sen. Brian E. Frosh (D-Montgomery) in response to a barrage of complaints from financially distressed homeowners -- particularly in Prince George's and Montgomery counties, Baltimore and the Eastern Shore -- who say they have lost their homes to people claiming to offer help.

"It's been happening more and more frequently because there is the potential for significant gains in this housing market," Niemann said.

© 2005 The Washington Post Company

washingtonpost.com

# Foreclosure Scams on the Rise

Real Estate Boom Engenders Bogus 'Rescues,' Study Says

By Sandra Fleishman
Washington Post Staff Writer
Friday, June 3, 2005; D02

The real estate boom has contributed to a rise in foreclosure rescue scams, a national consumer advocacy group said yesterday.

Although there are no nationwide statistics on such scams, a survey of consumer groups and lawyers indicates that "many, many thousands" of people have been victimized, according to the authors of a report released by the National Consumer Law Center.

The run-up in housing prices has created a group of cash-strapped but house-rich owners who are particularly vulnerable when hit by emergencies, such as the loss of a job or medical problems, according to the authors. Some of those struggling with housing payments, especially minorities and the elderly, have sub-prime, high-cost mortgage loans, which compounds the problem, they said.

"Put those all together, and you've got a ripe opening for this type of scam," said Steve Tripoli, who wrote the report with the organization's attorney, Elizabeth Renuart.

The schemes can take several forms. Rescue consultants sometimes might promise help for a big fee and not deliver. Others persuade homeowners that they can sign over the title, become renters and buy the house back later. Instead, homeowners can never afford to repurchase.

There has also been an increase in scamming because "get-rich-quick" seminars teach people how to find desperate homeowners facing foreclosures and persuade them to turn over their property, according to the authors. "This kind of scam is being taught around the country," Tripoli said.

In California alone, one firm had 1,800 clients who paid basic fees of $750 to $1,250 for advice and never got help or refunds, according to the report. The firm on May 18 settled with California prosecutors for $500,000 and agreed to a permanent injunction.

"There have been major outbursts of these scams in the D.C./Maryland/Virginia region, Florida, New York, Ohio and many other states," the report said. "It's important to note that most . . . go either completely unexposed or unpunished" because homeowners don't even realize what happened or can't afford to hire attorneys or because state regulators lack investigative staff or the authority to act.

It warned that problems could worsen significantly if mortgage interest rates soon jump and foreclosures follow. The authors urged states to ban or restrict such activities.

Federal banking regulators have issued a warning that directs lenders to be more selective about who can get home equity loans and lines of credit because of concerns about the growth of risky interest-only loans and adjustable-rate mortgages. The fear is that rising interest rates could make it harder for people to repay their

loans, raising the possibility of increased foreclosures.

Julie L. Williams, acting U.S. comptroller of the currency, whose agency regulates the nation's banks, recently said there has been a clear spike in foreclosures in a number of major urban areas.

The report said many homeowners don't realize that the rising value of their homes means they might be able to work out a new payment plan or refinancing schedule based on the appreciated value of the house. They also don't realize that they can often sell before the foreclosure and make a profit.

Families are often evicted while they are trying to argue that they still own the home. Landlord-tenant courts generally don't hear these kinds of cases. To delay an eviction hearing so a case alleging fraud or deception can be heard in another court can require the posting of an expensive bond, according to the authors.

Wanda Walker, a Fort Washington homeowner who spoke at the news conference, said she had to give up on fighting in landlord-tenant court to get back her house because she couldn't afford to post a "$250,000 bond on a house that I paid $168,000 for" in 2001. She is still pursuing a civil suit.

"I'm angry and very disgusted" about losing the home, Walker said. Instead of getting help from consultant Robert C. Brown of RCB Group LLC, Walker alleged that the consultant copied her signature onto a deed transferring ownership of the five-bedroom duplex in return for the $10,900 owed on the mortgage. She says she never got the $157,290 listed as paid on the deed and that her mortgage has never been paid off.

Ronald M. Miller, Brown's lawyer, said this week that he was "hesitant to answer questions because the matter is still in litigation." But he said Walker signed an agreement and that she "is the wrong alleged victim to be arguing this after having a jury trial and losing, and filing an appeal and having dropped her appeal."

© 2005 The Washington Post Company